1               UNITED STATES DISTRICT COURT
                 EASTERN DISTRICT OF KENTUCKY
2                 CENTRAL DIVISION AT LEXINGTON

3
                          - - -
4   UNITED STATES OF AMERICA,      .   Case No. 5:21-CR-00101-1
                                   .
5          Plaintiff,              .
                                   .   Lexington, Kentucky
6          - v -                   .
                                   .   Thursday, January 12, 2023
7   MAURICE A. TAYLOR,             .   1:00 p.m.
                                   .
8          Defendant.              .
                          - - -
9
             TRANSCRIPT OF SENTENCING PROCEEDINGS
10          BEFORE THE HONORABLE DANNY C. REEVES
              UNITED STATES DISTRICT COURT JUDGE
11
                          - - -
12

13  For the United States:     ROGER WEST, ESQ.
                                Assistant U.S. Attorney
14                              United States Attorney's Office
                                260 West Vine Street, Suite 300
15                              Lexington, Kentucky  40507

16  For the Defendant:         MATTHEW WAYNE BOYD, ESQ.
                                Boyd Law Office, PSC
17                              155 East Main Street, Suite 220
                                Lexington, Kentucky  40507
18                                    and
                                GAYLE E. SLAUGHTER, ESQ.
19                              453 Ohio Street
                                Lexington, Kentucky  40508
20
    Court Reporter:            LINDA S. MULLEN, RDR, CRR
21                              Official Court Reporter
                                101 Barr Street
22                              Lexington, Kentucky  40507

23

24  Proceedings recorded by mechanical stenography, transcript
    produced by computer.
25

1    (Proceedings in open court, January 12, 2023, 1:00 p.m.)

2         THE COURT:  Thank you.

3         Madam Clerk, would you call the matter scheduled for 1:00,

4    please.

5         THE CLERK:  Yes, Your Honor.  Lexington Criminal Action

6    Number 21-101, United States of America versus Maurice Taylor,

7    called for sentencing.

8         THE COURT:  Thank you.

9         Would counsel state their appearances, please.

10        Mr. West.

11        MR. WEST:  Yes, Your Honor, good afternoon.  Roger West on

12    behalf of the United States.

13        THE COURT:  Thank you.

14        Mr. Boyd.

15        MR. BOYD:  Matthew Boyd on behalf of Maurice Taylor.

16        MS. SLAUGHTER:  Gayle Slaughter on behalf of Mr. Taylor.

17        THE COURT:  This is Mr. Taylor that's at counsel table.

18        This matter is scheduled for a sentencing hearing this

19    afternoon.  Before we proceed with the hearing, let me first

20    confirm that Mr. Taylor has had the opportunity to review his

21    presentence report and also to discuss the report with counsel

22    to his satisfaction; is that correct, Mr. Taylor?

23        THE DEFENDANT:  Yes.

24        THE COURT:  Mr. Taylor, your presentence report will be

25    filed in the record under seal pursuant to Rule 32 of the

1    Federal Rules of Criminal Procedure.  It's available for the

2    parties' use, but it is not available for the general public to

3    review.

4         THE DEFENDANT:  Yes, sir.

5         THE COURT:  There are a number of objections to the

6    presence report, both to the factual summary contained in

7    the report as well as the guideline calculations, and a number

8    of enhancements that are included in the report.  We will

9    address those in just a moment.

10        I'll summarize the nature of the objections before we

11   proceed.  I understand that the parties may be presenting some

12   testimony on some of these issues.

13        But before we get to the objections, I'll note for the

14   record, I have received the memorandum that has been filed by

15   the defendant regarding the objections.  Now, that's also

16   attached to the presence report and addressed by the

17   probation officer in the addendum to the report.

18        I also received the sentencing memorandum, the United

19   States' response to the objections to the presence report,

20   and there's one motion that's been filed under seal that I'll

21   take up separately.

22        Turning to the objections.  The defendant has objected to

23   a number of paragraphs in the factual summary section, which

24   would include most of paragraph 7, parts of paragraphs 8 and

25   11, all of paragraphs 12 and 13 and 14, 19 and 20, 23, 24 and

1    25.  And then there are objections raised to some of the

2    guideline enhancements in paragraphs 32, 33 and 35.

3        There's also an objection to a point being assessed for

4    the conviction reflected in paragraph 55.  Then I believe

5    there's also an objection to paragraph 64, which would not

6    affect the guideline calculation, but the parties may certainly

7    address that as well.

8        Mr. West, inasmuch as most of the objections do relate to

9    enhancements to the guideline range or would affect

10    enhancements to the guideline range, it would be the United

11    States' burden of going forward with proof on some of these

12    objections.

13        I certainly understand that some of the information you're

14    relying upon is contained in the plea agreement itself,

15    admissions in the plea agreement.  Again, I reviewed the plea

16    agreement, but at this time if you would like to present

17    testimony or evidence on support of these issues, you may

18    certainly do so.

19        MR. WEST:  Yes, sir.  We would have approximately four,

20    perhaps five witnesses at the most, but the first witness is

21    Mr. Shad Wilson, please.

22        THE COURT:  Yes, sir.

23        MR. WEST:  He has counsel.  Ms. Ledgewood is in the

24    courtroom also.  If needed, I would ask she be given the

25    opportunity to be placed close to Mr. Wilson.

SHAD WILSON - DIRECT

1        THE COURT:  Ms. Ledgewood, if you would like to come

2   up, in the event you need to confer with Mr. Wilson during

3   his testimony.  We'll give you the catbird seat up in the jury

4   box.

5        **SHAD WILSON, GOVERNMENT WITNESS, SWORN**

6        THE COURT:  All right.  Thank you.

7        Mr. West, you may proceed.

8        MR. WEST:  Yes, sir.  Thank you.

9                              SHAD WILSON

10                        DIRECT EXAMINATION

11   BY MR. WEST:

12   Q.   Would you state your name, please.

13   A.   Shad Aaron Wilson.

14   Q.   Spell your first name.

15   A.   S-h-a-d.

16   Q.   Middle name, please.

17   A.   Spell it?

18   Q.   Yes, sir.

19   A.   A-a-r-o-n.

20   Q.   Okay.  Mr. Wilson, you are a charged defendant under this

21   indictment, correct?

22   A.   Yes, sir.

23   Q.   All right.  Have you subsequently entered a guilty plea to

24   charges within that indictment?

25   A.   Yes, sir.

SHAD WILSON - DIRECT

1    Q.    Before we begin today, prior to these events or prior to

2    this indictment, were you convicted of a felony, sir?

3    A.    Yes.

4    Q.    What felony was that?

5    A.    Trafficking.

6    Q.    Trafficking?

7    A.    Trafficking in cocaine.

8    Q.    State case?

9    A.    Yes, sir.

10   Q.    Was that in Fayette County or somewhere else?

11   A.    Fayette County.

12   Q.    When was that?

13   A.    2008.

14   Q.    Are you under parole or probation or anything regards to

15   that sentence now?

16   A.    No, sir.

17   Q.    Did you serve any time off that sentence?

18   A.    No, sir.  Got probation.

19   Q.    I'd ask you to take a look at the defendant in the red

20   shirt over there.

21         Do you see him?

22   A.    Yes, sir.

23   Q.    How do you know him?

24   A.    I've known him a long time, kind of grew up together.

25   Q.    Did you grow up here in Lexington?

SHAD WILSON - DIRECT

1   A.   Yes.

2   Q.   And what do you know him by?

3   A.   Maurice.

4   Q.   Maurice.  Is there a street name or nickname that he's

5   also known?

6   A.   Wee Wee.

7   Q.   Wee Wee.  What is Maurice's last time?

8   A.   Taylor.

9   Q.   Sir, in this case you entered a guilty plea, you said,

10  correct?

11  A.   Yes.

12  Q.   Do you recall what you entered a guilty plea to?

13  A.   Conspiracy -- it was four counts, I can't remember every

14  one of them.

15  Q.   Understood.  In regards to the conduct in the indictment

16  for which you entered a guilty plea, do you know when about

17  that began, sir?

18  A.   I think it was 2016, maybe.

19  Q.   Okay.  There are other people listed in that indictment

20  including Mr. Taylor, correct?

21  A.   Correct.

22  Q.   When you say this began about, I think, 2016, who did you

23  become involved with first in 2016?

24       Did you understand my question, sir?

25  A.   You said who was involved?

SHAD WILSON - DIRECT

1    Q.    Who was involved besides you?

2    A.    Just Eric.

3    Q.    Eric Trigg?

4    A.    Eric Trigg.

5    Q.    At some point did Mr. Taylor become involved in that?

6    A.    He was always involved.

7    Q.    Always involved?  Always since 2016?

8    A.    Yeah.

9    Q.    When you began with Mr. Trigg and Mr. Taylor in 2016, what

10   was your role?  What were you supposed to do and what did you

11   do?

12        Mr. Wilson, please tell the Court, keep your voice up.

13   A.    It started kind of just getting around to survive at the

14   time, getting -- obtaining drugs and sell them.

15   Q.    Do you know an individual known as Ansar McIver?

16   A.    Yes.

17   Q.    And did you know him by a nickname also?

18   A.    Sorrow.

19   Q.    Sorrow?  During the time that you became involved with

20   Mr. Taylor, did you have occasion to be in the company of

21   Sorrow and Mr. Taylor?

22   A.    Previous.  I think it was before that time frame, but it

23   was before then, yes.

24   Q.    You know Mr. McIver was arrested at some point, right?

25   A.    Yes.

9

SHAD WILSON - DIRECT

1    Q.    Did you see Mr. McIver and Mr. Taylor together before

2    McIver got arrested?

3    A.    Yes.

4    Q.    At that time that you saw them together, were you involved

5    with Mr. Taylor?

6    A.    Yes.

7    Q.    When you -- I'll ask you this.  Did you sell drugs during

8    that time period, initially in 2016?

9    A.    Yeah.

10   Q.    Where did the drugs come from?

11   A.    Where did I get them from or where did they come from?

12   Q.    No.  Where did the drugs come from?

13   A.    I'm not understanding your question right there.

14   Q.    Okay.  You're involved with Mr. Taylor in 2016, correct?

15   A.    Correct.

16   Q.    Did you get the drugs from somebody else and sell them?

17   Or tell us how that happened, please.

18   A.    No, I get them from him, Maurice.

19   Q.    I'm going to ask, when you use pronouns, give us the name

20   of that person rather than just saying "him."

21   A.    Maurice.

22   Q.    The defendant?

23   A.    Yes.

24   Q.    Have you seen the defendant with amounts of drugs

25   before?

SHAD WILSON - DIRECT

1   A.    Yes.

2   Q.    What kind?

3   A.    Cocaine and fentanyl.

4   Q.    Fentanyl?  How much cocaine have you seen Mr. Taylor with,

5   please?

6   A.    I mean, all different kinds of amounts.

7   Q.    Okay.  Did you see kilos?

8   A.    Yes.

9   Q.    Did you deliver drugs to sell to people?

10  A.    Yes.

11  Q.    Who did the drugs come from that you sold to other

12  people?

13  A.    Maurice.

14  Q.    The defendant?

15  A.    Yes.

16  Q.    Did you pick up money from other people?

17  A.    Yes.

18  Q.    What did you do with the money when you picked it up?

19  A.    Hold it, hold it for him until he came and got it.

20  Q.    Who is "he," sir?

21  A.    Maurice.

22  Q.    Do you know the largest amount of money you kept or got

23  from other people?

24  A.    Not necessarily a direct amount, no.

25  Q.    Were there other things you did with the money, other than

SHAD WILSON - DIRECT

1  give it to Mr. Taylor?

2  A.   Yes, I passed it along to somebody else before.

3  Q.   And did you do that at your own accord or somebody else's

4  direction?

5  A.   At Maurice's direction.

6  Q.   And do you recall the name of the person you passed it on

7  to?

8  A.   No.

9  Q.   Do you know Warren Miller?

10 A.   Yes.

11 Q.   All right.  Did you ever pass any money to Warren Miller?

12 A.   Yes.

13 Q.   On how many occasions did you do that?

14 A.   Several.  I don't know an exact amount, but several

15 times.

16 Q.   Sir, there was a search warrant executed at your residence

17 in about 2019.

18      Do you recall that?

19 A.   Yes.

20 Q.   That was a state search warrant, correct?

21 A.   Correct.

22 Q.   Do you recall what kind of drugs were found inside your

23 residence?

24 A.   Fentanyl.

25 Q.   Fentanyl?  How much?

SHAD WILSON - DIRECT

1    A.    I think it was 80 grams, maybe.

2    Q.    Maybe 83 grams?

3    A.    80-something, yes, sir.

4    Q.    Where did you get the 83 grams of fentanyl from?

5    A.    Maurice.

6    Q.    The defendant?

7    A.    Yes.

8    Q.    Were there any other amounts found in there, in your

9    house?

10    A.    I don't think so.

11    Q.    Okay.  Are you a user of controlled substances or were you

12    a user?

13    A.    Yes.

14    Q.    What drugs did you use, sir?

15    A.    Cocaine, heroin, fentanyl.

16    Q.    How would you use them?

17    A.    Snort, snorting and IV use.

18    Q.    Snort the cocaine?

19    A.    Yes.

20    Q.    And IV use what?

21    A.    Both.

22    Q.    Now, following your arrest on that day, I think it's

23    October 2019, I'm not sure of the exact date, did you stop your

24    relationship with Mr. Taylor at that time?

25    A.    Several occasions we fall out or whatever and stopped

SHAD WILSON - DIRECT

1    talking, communicating.

2    Q.    Do you know Eric Trigg?

3    A.    Yes.

4    Q.    Do you know Rae'Shawna Campbell?

5    A.    Yes.

6    Q.    How do you know Rae'Shawna Campbell?

7    A.    Maurice and her were involved in a relationship.

8    Q.    I'm sorry, say again, please.

9    A.    Maurice and her was involved in a relationship.

10   Q.    Okay.  Did you know where Ms. Campbell lived during the

11   time of these events?

12   A.    Yes.  I can't remember the name of the street.

13   Q.    How about Lucille Drive?

14   A.    Yes.

15   Q.    Have you ever been to Ms. Campbell's residence with

16   Mr. Taylor?

17   A.    Yes.

18   Q.    How many occasions, sir?

19   A.    Not very many, but several times.

20   Q.    I think you said a moment ago that Ms. Campbell and

21   Mr. Taylor had a relationship?

22   A.    Yes.

23   Q.    Like a boyfriend-girlfriend relationship?

24   A.    Yes.

25   Q.    You've been inside Ms. Campbell's residence?

SHAD WILSON - DIRECT

1    A.    Yes.

2    Q.    Did you ever see controlled substances or something

3    packaged like controlled substances in there?

4    A.    Yes.

5    Q.    How did you come to be there at that time?

6    A.    One time with Maurice.  And then one time he sent me over

7    there to pick up something for him.

8    Q.    "He" being who sent you over there?

9    A.    Maurice.

10   Q.    Maurice.  What did you pick up over there?

11   A.    It was a bag, I believed it to be fentanyl.

12   Q.    Describe this bag to the Court, please.

13   A.    A white bag with several little cylinder-looking things

14   inside of it.

15   Q.    Did you say "cylinder looking"?

16   A.    Cylinder looking.

17   Q.    What did you do with this bag?

18   A.    Dropped it off to different people.

19   Q.    To different people.  Did you know who these people

20   were?

21   A.    Not necessarily, but ...

22   Q.    Okay.  Who directed you to these people?

23   A.    Maurice.

24   Q.    Did you pick up money from these people at a later time

25   period?

SHAD WILSON - DIRECT

1  A.   Several different occasions.

2  Q.   Who would direct you to pick up the money?

3  A.   Maurice.

4  Q.   Same questions.  After you picked up the money, where did

5  the money go?

6  A.   Maurice would tell me what to do with it.

7  Q.   Sir, in this group of people -- I'm going to use the words

8  "group of people" involved with the defendant, Mr. Taylor --

9  can you name for the Court, please, how many other people were

10  involved in this group or this organization?

11  A.   You say how many people?

12  Q.   Yes.  State their names for the Court, please.

13  A.   State their names?

14  Q.   Yes, sir.

15  A.   Eric, Eric Trigg; Rae'Shawna Campbell.

16  Q.   Okay.

17  A.   Warren Miller.

18  Q.   Okay.

19  A.   And myself.

20  Q.   All right.  So that's four, correct?

21  A.   Sorry?

22  Q.   That's four, correct?

23  A.   Yes.

24  Q.   Did you ever meet the supplier of the controlled

25  substances?

SHAD WILSON - DIRECT

1   A.    No.

2   Q.    Did you ever have any conversations with this person about

3   how much was going to be delivered or the price or anything of

4   that nature?

5   A.    No.

6   Q.    Out of this group of people you named including the

7   supplier, can you identify the role of Mr. Taylor, please?

8   A.    He had -- he was the one distributing to all of us.

9   Q.    Okay.  When you took direction, who did you take direction

10  from?

11  A.    Maurice.

12  Q.    Did you take direction from Ms. Campbell?

13  A.    No.

14  Q.    Eric Taylor -- I mean Eric Trigg?

15  A.    No.

16  Q.    Do you know Ouisha Talbert?

17  A.    I do know her.

18  Q.    Do you know if she was involved with this group?

19  A.    Not to my knowledge.

20  Q.    One second, please, sir.

21       Mr. Wilson, you are going to be sentenced shortly in front

22  of this Court, correct?

23  A.    Correct.

24  Q.    Have you been made any promises as to what your ultimate

25  sentence would be?

SHAD WILSON - CROSS

1    A.    No.

2    Q.    Have you been told that permission will be sought to

3    file a motion for you but there is no specific sentence

4    recommended?

5    A.    Could you repeat that one more time?

6    Q.    I'll ask it more simply.  Have you been promised any

7    specific sentence, sir?

8    A.    No.

9    Q.    At all times throughout the course of this action, were

10   you represented by Ms. Pam Ledgewood?

11   A.    You say --

12   Q.    All the times in this indictment, were you represented by

13   Ms. Ledgewood?

14   A.    At this indictment, yes.

15   Q.    Okay.  That's all at this time, sir.

16        THE COURT:  All right.  Thank you.

17        MR. BOYD:  Judge, can we have just a minute?

18        THE COURT:  Yes, sir.

19                      CROSS-EXAMINATION

20   BY MR. BOYD:

21   Q.    Mr. Wilson, my name is Matthew Boyd.  I represent Maurice

22   Taylor.  I've got a few questions for you, okay?

23   A.    Yes, sir.

24   Q.    In review of your criminal history, it looks as though you

25   were charged in 2004 in Fayette County with a conspiracy

SHAD WILSON - CROSS

```
1   charge.
2        Do you recall that?
3   A.   '04?  2004, yeah, I think so, maybe.
4   Q.   Gregg Clendenin was your attorney?
5   A.   Yes.
6   Q.   Do you know -- do you recall what the results of that
7   indictment were?
8   A.   2004, I believe it was dismissed.
9   Q.   Okay.  Do you recall why that was dismissed?
10  A.   It was set to go -- to go to trial and they didn't
11  proceed.
12  Q.   Okay.  And was Mr. Taylor the source of your drugs in
13  that?  Was he charged in that conspiracy?
14  A.   No.
15  Q.   Okay.  And who was the source that you got those drugs
16  from?
17  A.   I wasn't -- it wasn't -- it wasn't included in a -- it
18  was -- they said that I was involved in it, but it was
19  subsequently -- it wasn't -- I wasn't involved in it.  That's
20  why it was dismissed.
21  Q.   Okay.  In 2004 -- did you work as an informant in that
22  case?
23  A.   No.
24  Q.   You didn't provide any information to the government?
25  A.   No.
```

19

SHAD WILSON - CROSS

1    Q.    Okay.  In '04, it looks like there was another Fayette

2    County charge, superceding indictment for criminal syndicate

3    and facilitation.

4        Do you recall that?  I think you received a 12-month

5    sentence.

6    A.    Yes, yeah.

7    Q.    I think it was a sealed indictment?

8    A.    Yeah, yeah.  Yes, yes.

9    Q.    And in that indictment, you did end up pleading guilty to

10    a misdemeanor; is that correct?

11    A.    Correct.

12    Q.    Who was the source of the drugs in that trafficking

13    case -- in that syndicate case?

14        MR. WEST:  Your Honor, I'll object.  That's not

15    particularly relevant.

16        THE COURT:  I'll sustain the objection.

17    BY MR. BOYD:

18    Q.    You were then again charged in '07 in a trafficking case

19    that was subsequently dismissed; is that correct?

20    A.    No.

21    Q.    No?  You weren't charged in 07-1154, trafficking in

22    controlled substance?

23    A.    Yeah.  You said it was dismissed.  It wasn't dismissed.

24    Q.    What happened in that case?

25    A.    I received, I think, six years.

SHAD WILSON - CROSS

1    Q.    Are you sure that wasn't the '08 case, 08-CR-287,

2    where you received six years on a trafficking, maybe got drug

3    court?

4    A.    I don't recall them being two different ones, you was my

5    attorney.

6    Q.    That's correct.  So you got six years, that you mentioned

7    being a convicted felon in 2008, correct?

8    A.    I think it ended in 2008, yes.

9    Q.    And you did do drug court?

10   A.    No.

11   Q.    Okay.  What did -- did you end up serving the time?

12   A.    No.

13   Q.    What happened?

14   A.    Probation.

15   Q.    Okay.  You were charged again in 2014; is that correct?

16   A.    '14?

17   Q.    Yes, sir.

18   A.    You say ended in '14?

19   Q.    You were charged in, I believe, January 9th, 2014,

20   14-CR-129, it looks like trailer two, so there was another

21   co-defendant in the case.

22   A.    A trailer?

23   Q.    "Trailer" meaning that there's two defendants.

24   A.    What was it?  I don't --

25   Q.    You had a public defender, the -- I believe at the end of

21

SHAD WILSON - CROSS

1    the day, the charge was dismissed without prejudice.

2    A.    What was the charge?

3    Q.    Burglary charge.

4    A.    Oh, yeah.  It was dismissed.

5    Q.    Jessamine County?

6    A.    Oh, okay.  Yeah, yeah.

7    Q.    Did you work as an informant in that case?

8    A.    No.

9    Q.    And it was dismissed without prejudice; is that correct?

10   A.    Correct.

11   Q.    Okay.  And then you related you were charged in 2019, is

12   that the incident that you were discussing with Mr. West

13   earlier where you say that you had fentanyl?

14   A.    Correct.

15   Q.    And what happened with those charges?

16   A.    It's on this case here.  It's on this case here.

17   Q.    You were charged in Fayette Circuit Court, 19-CR-726,

18   represented by Russell Baldani.

19   A.    Uh-huh.

20   Q.    I'm asking you what happened to that case?

21   A.    It's on -- I pleaded guilty to it, this case.

22   Q.    So it was merged into this case in 2021?

23   A.    Yes.

24   Q.    It was pending through 2021 and it was dismissed for the

25   federal indictment here?

SHAD WILSON - CROSS

1  A.   I guess that's correct.

2  Q.   Okay.

3       MR. BOYD:  Give me just one second.

4       THE COURT:  Anything else?

5  BY MR. BOYD:

6  Q.   Sir, can you tell me when you first met Ansar McIver?

7  A.   About '97 -- 1997.

8  Q.   1997.  Was he ever involved in any of the drugs that you

9  were charged with in any of cases that I just related to you?

10 A.   No.

11 Q.   So you met Mr. McIver in 1997.  How long had you known

12 Mr. Taylor, you said?

13 A.   I would say probably about since '84, 'about '84.

14 Q.   Isn't it true that you introduced Mr. Taylor to Ansar

15 McIver?

16 A.   I'm not sure how they met.

17 Q.   So it's your testimony under oath that you didn't

18 introduce Mr. Taylor to Mr. McIver?

19 A.   I don't recall introducing him to him, no.

20 Q.   Is it also not true that -- is it true that you received a

21 phone number from Mr. McIver with regard to the Sinaloa

22 cartel?

23 A.   No.

24 Q.   You didn't receive a phone number from him?

25 A.   No.

23

SHAD WILSON - CROSS

1  Q.    Did a female associated with Mr. McIver provide you with a

2  phone number to the Sinaloa cartel?

3  A.    No.

4  Q.    Have you at any point contacted anyone with that cartel

5  and ordered drugs to be delivered to Lexington?

6  A.    No.

7  Q.    Sir, when did you begin to work as an informant?

8  A.    Say one more time.

9  Q.    When did you begin to work as an informant?

10 A.    I'm not sure about a date.

11 Q.    What about a year?

12 A.    Two thousand -- no.  2020.

13 Q.    Okay.  And when you stated that you had received orders

14 from Mr. Taylor, have you provided any type of telephonic, text

15 or otherwise electronic or documented evidence of those orders,

16 calls, electronic messages, anything to the government?

17 A.    No.

18 Q.    And why is that?

19 A.    Why didn't I?

20 Q.    Yeah.

21 A.    It wasn't relevant.

22 Q.    Do you have those?

23 A.    Do I have what?

24 Q.    Do you have any type of documentary evidence to back up

25 what you're testifying to today that you received orders from

SHAD WILSON - CROSS

1   Mr. Taylor?

2   A.   No.  I mean ...

3   Q.   So beginning in 2020, you were an informant.  Did you ever

4   wear a wire for the government and obtain conversations from

5   Mr. Taylor to you ordering you to do the things that you

6   testified today he ordered you to do?

7   A.   No.

8   Q.   Do you know why?

9   A.   Never -- I never wore a wire on him.

10  Q.   Were you asked to?

11  A.   No.

12  Q.   Is it your testimony that if you had wore a wire, the

13  judge wouldn't be just hearing your word that you received

14  these orders, there would be proof of that through the

15  conversations that you had if they were recorded?

16       MR. WEST:  Objection.

17       THE COURT:  Sustained.  It's argumentative.

18  BY MR. BOYD:

19  Q.   So there is no testimony other than your own today that

20  documents in any way the supposed orders from Mr. Taylor?

21  A.   No.

22  Q.   Mr. Wilson, Mr. Miller's not indicted in this indictment

23  along with Mr. Taylor and the other defendants that we've

24  spoken of, correct?

25  A.   Correct.

SHAD WILSON - CROSS

1   Q.   You're not charged with any gun charges in this

2   indictment, when you say that the 2019 case is rolled into this

3   indictment, correct?

4   A.   Correct.

5   Q.   And those guns were taken by another person, right, that

6   claimed those?

7   A.   Correct.

8   Q.   And who was that?

9   A.   Warren Miller.

10  Q.   Mr. Wilson, so it's your indication that basically

11  your entire involvement in the activity that's alleged in this

12  indictment came at the orders of Mr. Taylor, correct?

13  A.   Correct.

14  Q.   And you have seen in this indictment that they have

15  alleged that there were drugs stored and drugs found in

16  Ms. Campbell's home; is that correct?

17  A.   Correct.

18  Q.   You also stored drugs at your mother's house and at your

19  house, correct?

20  A.   No.

21  Q.   Was there a home on Parallel Drive?

22  A.   My mother used to live on Parallel Drive.

23  Q.   I'm sorry?

24  A.   My mother used to live on Parallel Drive.

25  Q.   At no point -- are you telling the Court under oath

SHAD WILSON - CROSS

1  that you at no point stored drugs at the Parallel Drive

2  address?

3  A.   If I was using drugs, I had drugs on me, yeah.

4  Q.   But not the drugs that were part of the allegations in

5  this case?

6  A.   No.

7  Q.   And did you not also package drugs and basically stretch

8  cocaine and fentanyl at your own home and at your mother's home

9  during that period of time?

10  A.   Not my mother's home.  I had at my house before, yes.

11  Q.   You did at your house?  So the allegation, at least part

12  of what we're talking about today is -- are the drugs that were

13  stored at Ms. Campbell's house, correct?

14  A.   Yes.

15  Q.   And you indicated that you knew Ms. Campbell, correct?

16  A.   Yes.

17  Q.   When did you first meet her?

18  A.   Particular year, I would say around two thousand -- let's

19  say about 2019, maybe.

20       THE COURT:  I'm sorry, '18 or '19?

21  A.   2019.

22  Q.   '19?

23  A.   Yes.  Possibly 2019, yes.

24  Q.   How many times had you gone to Ms. Campbell's home?

25  A.   In -- in '19?

SHAD WILSON - CROSS

1   Q.   Just since you've known her, since 2019.

2   A.   Just a handful.  Four or five times maybe, total, since

3   the whole time I've known her.

4   Q.   Okay.  When you went there, was Mr. Taylor present any of

5   those times?

6   A.   Yes.

7   Q.   When was the last time that you went there?

8   A.   I would say 2020.

9   Q.   So the handful of times was within 2019, 2020?

10  A.   Yes.

11  Q.   And with regard to Ms. Campbell, did you have access to

12  her home?

13  A.   No -- well, yes and no.

14  Q.   What do you mean?

15  A.   I, personally, no, until I would -- Maurice would call her

16  to let me in or to leave a door open or something.

17  Q.   You didn't have a key or access other than Ms. Campbell

18  allowing you in the home?

19  A.   Correct.

20  Q.   Do you know Tannare Brown?

21  A.   I do.

22  Q.   And how many times -- when did you first meet Tannare

23  Brown?

24  A.   I know him from high school, played football against each

25  other.

SHAD WILSON - CROSS

1  Q.    And so when was that?

2  A.    '94, to May -- up to '94.  So 1990 -- in the 1990s to '94.

3  Q.    What involvement -- I guess, did you and Mr. Brown begin

4  any type of relationship that resulted in illegal trafficking

5  of drugs?

6  A.    No, not at all.

7  Q.    Did you ever see Tannare Brown involved in illegal

8  trafficking of drugs?

9  A.    No.

10 Q.    Did you ever witness any type of illegal activity at

11 Wheatcroft?

12 A.    No.

13 Q.    Sir, have you gotten your PSR done in this case?

14 A.    Have I gotten it done?

15 Q.    Yes.  Has it been done?  Do you know what your criminal

16 history -- what your category is?

17 A.    No, I don't.

18     MR. BOYD:  That's all the questions I've got.  Thank you,

19 sir.

20     THE COURT:  Before any redirect, I have just a couple of

21 questions as clarification --

22     MR. WEST:  Certainly, sir.

23     THE COURT:  -- Mr. West.

24     Mr. Wilson, in response to Mr. West's questions on direct,

25 you were asked about activities in which you were directed by

SHAD WILSON - CROSS

1   Mr. Taylor to either pick up or deliver --

2          THE WITNESS:  Yes, sir.

3          THE COURT:  -- controlled substances.  And you talked

4   about controlled substances that were found at your house or

5   your residence in March of 2019.

6          THE WITNESS:  Yes, sir.

7          THE COURT:  Were you paid or did you receive something in

8   exchange for following those instructions from Mr. Taylor with

9   regard to drug trafficking?

10          THE WITNESS:  Was I paid?

11          THE COURT:  Were you paid money or were you given drugs

12   or what did you receive in exchange for your work?

13          THE WITNESS:  Access.  Access to get pretty much what I

14   wanted from him.

15          THE COURT:  There wasn't a set amount that you were paid

16   or anything of that nature?

17          THE WITNESS:  No.

18          THE COURT:  When you went to Ms. Campbell's home, you said

19   you were there a handful of times, four or five times, 2019,

20   2020.  Were there always drugs at that residence when you were

21   there?

22          THE WITNESS:  It wasn't always about drugs, not every time

23   we went there.

24          THE COURT:  So you weren't going there always to pick up

25   drugs?

30

SHAD WILSON - REDIRECT

1        THE WITNESS:  No, sir.

2        THE COURT:  All right.  Thank you, sir.

3        Mr. West.

4        MR. WEST:  Yes, sir.

5                      REDIRECT EXAMINATION

6   BY MR. WEST:

7   Q.   Mr. Wilson, just a few questions for you, sir.

8        Following the arrest of Maurice Taylor, are you aware of

9   that time?

10  A.   No.

11  Q.   Let me ask you this.  At some time did you become aware

12  that Mr. Taylor had been arrested on charges based on this

13  indictment?

14  A.   Yes, sir.

15  Q.   All right.  Now, after that, did you receive any phone

16  calls?  Defense counsel referred to it as a member of the

17  Sinaloa cartel.

18       Did you ever receive a phone call from someone who was

19  representing themselves as a supplier for Mr. Taylor?

20  A.   Yes.

21  Q.   About when was that after Mr. Taylor got arrested?

22  A.   It wasn't very, very long, because Maurice had called me

23  and he asked me to -- he had asked me to tell them -- I told

24  him that they had called looking for him.

25  Q.   Okay.  "Him" called?

SHAD WILSON - REDIRECT

1    A.    Maurice had called me.

2    Q.    Okay.

3    A.    And I told him that -- I don't even remember the guy's

4    name, called looking for him.

5    Q.    You actually spoke with this person that called looking

6    for Mr. Taylor?

7    A.    Yes.

8    Q.    What was the nature of that conversation, sir?

9    A.    He asked me had my brother got jammed up.

10   Q.    Was that in English?

11   A.    Yes, he was speaking English.

12   Q.    Did he ask you anything else?

13   A.    He asked me did I know who owed him, who owed

14   Maurice.  Did I know, have any knowledge of anybody that

15   owed Maurice.

16   Q.    Owed money?

17   A.    Owed money to him.

18   Q.    Okay.  What else in that discussion?

19   A.    I told him that I would try to find out and let him know.

20   Q.    A moment ago you said you talked to Maurice after you had

21   a conversation with this other person.

22   A.    Yes.

23   Q.    And this was while Mr. Taylor is in custody?

24   A.    Yes, sir.

25   Q.    Would you know if it was coming from a holding facility or

SHAD WILSON - REDIRECT

1  a jail?  Like did they say a call from so-and-so?

2  A.    It was like a three-way call.

3  Q.    Three-way call?

4  A.    Uh-huh.

5  Q.    Meaning an outside person, and then they join you in the

6  conversation?

7  A.    Correct.

8  Q.    What did Mr. Taylor ask you or discuss with you at that

9  time?

10 A.    Just he needed -- he needed a way out of the situation

11 that he got himself into, and to make sure the lines of

12 communication were still open with them so he could get himself

13 out of trouble.

14 Q.    Okay.  Defense counsel also asked you questions about when

15 you become a cooperating witness.

16     At some point after you began being a cooperating witness,

17 were you terminated, sir?

18 A.    Yes.

19 Q.    Do you recall what that was for?

20 A.    Because of my involvement with Maurice Taylor.

21 Q.    Let me ask you a few more questions about that.

22     So you signed up as a cooperating witness.  At the

23 time that you signed up, were you still involved with

24 Mr. Taylor?

25 A.    No.

SHAD WILSON - RECROSS

1   Q.   After that event, at what point did you become involved

2   with Mr. Taylor again?

3   A.   It was a couple of months later, maybe.  Couple months.

4   Q.   Now, how did you become involved with Mr. Taylor

5   again?

6   A.   Well, I mean, I never really stopped talking to him at

7   all.

8   Q.   Okay.

9   A.   But so happened -- I happened to relapse so I needed to be

10  around the drugs so I have access to it, so ...

11  Q.   All right.  Did you relapse and begin using drugs again?

12  A.   Yes.

13  Q.   After you were terminated by the agency for which you had

14  signed up with, did you make deliveries of drugs on behalf of

15  Mr. Taylor?

16  A.   I can't remember if it was before or after.

17  Q.   Okay.  Mr. Wilson, have you ever sought treatment for your

18  drug use?

19  A.   Yes.

20       MR. WEST:  That's all, Your Honor.  Thank you.

21       THE COURT:  All right.  Thank you.

22       Mr. Boyd.

23                      RECROSS-EXAMINATION

24  BY MR. BOYD:

25  Q.   Mr. Wilson, you had stated, I believe, that -- when you

SHAD WILSON - RECROSS

1   related the conversation that you had with, I guess, the

2   members of the supplier after Mr. Taylor was taken into

3   custody -- do you recall that testimony?

4   A.   Yes.

5   Q.   You stated that they had called looking for him.  When you

6   say that, the suppliers were calling looking for Mr. Taylor,

7   correct?

8   A.   Correct.

9   Q.   Which means they had your phone number, right?

10  A.   Correct.

11  Q.   And they -- but you said you didn't have any dealings with

12  them directly, right?

13  A.   I didn't.  This, though, was the brother -- the brother of

14  the major supplier, I guess.  I had to pick him up for Maurice

15  once before.

16  Q.   You picked him up from where?

17  A.   The airport.

18  Q.   Lexington's airport?

19  A.   Yes.

20  Q.   And you gave him your phone number at that time to

21  coordinate?

22  A.   I believe Maurice had given that to him.

23  Q.   When did that phone call take place?

24  A.   This was --

25  Q.   Not to pick up at the airport, but the phone call after

SHAD WILSON - RECROSS

1   Mr. Taylor was taken into custody.

2   A.   So I believe he was -- this happened in August, I believe.

3   So it was sometime, a couple of -- maybe a couple of days after

4   it happened.

5   Q.   Okay.  Mr. Wilson, your testimony here seems to imply or

6   state directly that the only time you were involved in the

7   illegal sale or transport of drugs was at the direction of

8   Mr. Taylor.  And your testimony is you at no point

9   independently sold any type of illegal drugs during any of the

10  period of time of this indictment.

11  A.   You say the whole period of the indictment?

12  Q.   Right.

13  A.   The indictment is --

14  Q.   I believe --

15  A.   -- from --

16  Q.   -- you said 2016.

17  A.   I think I have them dates correct.  I'm not -- wait a

18  minute.  So you're saying that I never sold drugs before that

19  time?

20  Q.   Right.  It seems to be your testimony that the only time

21  you were involved in the illegal sale or transport of drugs was

22  at the direction of Mr. Taylor.

23       So my question is, does that mean that you at no point did

24  any independent sale of drugs, any type of transaction that

25  wasn't directly ordered by Mr. Taylor?  You didn't do anything

SHAD WILSON - RECROSS

1   on your own?

2   A.   Oh, no, that's not correct.

3   Q.   Okay.  Then what's correct?

4   A.   I -- I actually sold -- I actually sold some.

5   Q.   Where did you get those drugs?

6   A.   From Maurice.

7   Q.   So you did your own operation with the drugs that Maurice

8   had stored in Lexington?

9   A.   I don't -- I'm not understanding what you're asking right

10  there on that one.

11  Q.   Well, I'm asking you, I thought your testimony was that

12  when you sold drugs or transported drugs, it's because Maurice

13  told you to.

14      And I think your testimony now is that you actually sold

15  and transported drugs on your own from the drugs that were in

16  Lexington that you say came from Maurice; is that correct?

17  A.   No.  So when I had -- like the ones I had in my house, I

18  would tend to sell -- I would tend to sell a couple grams of

19  it, of what I had.

20  Q.   So when you said you had access, it wasn't just access to

21  drugs to use, it was access to the drugs that you could sell on

22  your own?

23  A.   That's correct.

24  Q.   So at no point -- and it's your testimony here today that

25  at no point ever did you receive drugs from Ansar McIver?

SHAD WILSON - RECROSS

1   A.   I don't understand what Ansar has to do with this, during
2   this time period.
3   Q.   Did you at any point sell drugs that you got from Ansar
4   McIver?
5   A.   Are you talking about in --
6   Q.   At all.  Ever.
7   A.   Yeah.
8   Q.   So you just stopped doing that and let Maurice get them
9   from Ansar, is your testimony?  And you just gave up that
10  source?
11  A.   Ansar was in prison.
12  Q.   So before Ansar went to prison, you would use -- you got
13  drugs from Ansar, correct?
14  A.   No, not right when he got -- he had got arrested, it was
15  one of those cases you were talking about.
16  Q.   I'm maybe not clear, I apologize.
17       Prior to Ansar McIver going to prison, prior to that, you
18  requested, received and sold drugs on your own, independent of
19  Maurice Taylor, that you received from Ansar McIver?
20  A.   Yeah.
21  Q.   So you knew Ansar before Maurice did?
22  A.   I don't know if I knew him before.
23  Q.   Okay.  You sold drugs that you got from Ansar up until the
24  point that he went to prison, correct?
25  A.   No.  We -- it was in 2000 -- we relinquished our

SHAD WILSON - RECROSS

1   relationship in 2000 and -- you said on one of them cases, I

2   think 2004, maybe.

3   Q.    Okay.

4   A.    So 2004, we had never done any business after that.

5   Q.    Was Ansar involved in that case in '04?

6   A.    Yes.

7   Q.    Was he charged in that case?

8   A.    Yes.

9   Q.    So you've been a co-defendant with Ansar McIver?

10  A.    Yes.

11  Q.    At any point did you purchase drugs from Ansar McIver and

12  sell them to Maurice?

13  A.    No.

14        MR. BOYD:  No further questions.

15        THE COURT:  All right.

16        Anything else?

17        MR. WEST:  Nothing further, sir.  He may be finally

18  excused as far as the United States is concerned.

19        THE COURT:  Thank you, Mr. Wilson.

20        THE WITNESS:  Yes, sir.

21        THE COURT:  Thank you.

22        Mr. West, you may call -- I'm sorry, Mr. Boyd.

23        MR. BOYD:  If we could just reserve the right to recall

24  Mr. Wilson.

25        THE COURT:  Is he under subpoena?  Do you have him under

TANNARE BROWN - DIRECT

1    subpoena?

2         MR. BOYD:  I'm sorry, Your Honor?

3         THE COURT:  Do you have him under subpoena?

4         MR. BOYD:  No, Your Honor.

5         THE COURT:  He will be in a holding cell.  We will take

6    that up if necessary.

7         MR. WEST:  Yes, sir.  Call Mr. Tannare Brown, please.

8         Likewise, Your Honor, Mr. Brown is represented by counsel,

9    Mr. Jarrod Beck.  Same procedure as before, please, he'll be

10   close to Mr. Brown.

11        THE COURT:  Mr. Brown, if you could come up to the clerk's

12   desk and be sworn, please.

13        Mr. Beck, would you come up to the jury box?

14        **TANNARE BROWN, GOVERNMENT WITNESS, SWORN**

15        THE COURT:  Thank you.

16        Mr. West, you may proceed.

17        MR. WEST:  Thank you, sir.

18                          TANNARE BROWN

19                      DIRECT EXAMINATION

20   BY MR. WEST:

21   Q.   Would you state your full name, please.

22   A.   Tannare Brown.

23   Q.   Mr. Brown, are you a resident of Fayette County,

24   Kentucky?

25   A.   Correct.

TANNARE BROWN - DIRECT

1    Q.    Are you currently employed?

2    A.    Correct.

3    Q.    Do you know the defendant in the red shirt over there?

4    A.    Correct.

5    Q.    All right.  How do you know him, sir?

6    A.    His name or --

7    Q.    His name, please.

8    A.    Maurice.

9    Q.    Does he have a nickname or street name?

10   A.    I believe Wee Wee.

11   Q.    How long have you known Mr. Taylor, the defendant?

12   A.    A few years.

13   Q.    Does that mean less than five, more than five?

14   A.    Around five.

15   Q.    How did you become acquainted with Mr. Taylor?

16   A.    Through football up at the park, guys come up and hang

17   out.

18   Q.    You mean like youth football?

19   A.    Correct.

20   Q.    Were you a coach or assistant coach?

21   A.    No.

22   Q.    Was Mr. Taylor, to your knowledge, a coach or assistant

23   coach?

24   A.    I'm sorry, could you repeat the last question?

25   Q.    Sure.  Were you an assistant coach?

TANNARE BROWN - DIRECT

1    A.    I was a coach, correct.

2    Q.    Do you know if Mr. Taylor was an assistant coach?

3    A.    No.

4    Q.    Sir, you entered a guilty plea to maintaining a drug

5    involved premises, correct?

6    A.    Correct.

7    Q.    Are you pending sentencing at this time?

8    A.    Correct.

9    Q.    Have there been any promises made to you about whether or

10   not a cooperation motion will be filed or recommendation on a

11   specific sentence?

12   A.    No.

13   Q.    Prior to this event, these indictments, what is your

14   criminal record, sir?

15   A.    None.

16   Q.    None?

17   A.    Speeding ticket, I believe.

18   Q.    You weren't under probation, parole or anything like

19   that?

20   A.    No.

21   Q.    Sir, in this case, I've got your plea agreement here and

22   there is a set of facts involved.  It says on or about

23   October 19th, 2020.  Did you live on Wheatcroft Drive at that

24   time, sir?

25   A.    Correct.

TANNARE BROWN - DIRECT

1    Q.    Prior to that date, were you acquainted with Mr. Taylor?

2    A.    Yes.

3    Q.    Prior to that date, had you had a discussion with

4    Mr. Taylor about allowing your property or your garage to be

5    used for a purpose?

6    A.    Yes.

7    Q.    Can you relate to the Court, please, the nature of that

8    first conversation with Mr. Taylor about using your garage?

9    A.    Yeah.  Mr. Taylor implied that he was in the -- getting

10   into landscape and wanted to see if I could use -- he could use

11   my garage to maybe have one of his guys work on a lawn

12   mower.

13   Q.    Do you recall about when that was, Mr. Brown?

14   A.    I don't know.

15   Q.    Let me ask the question a different way.  Prior to the

16   events of October 19th, how many weeks, days, maybe

17   months before that did you have this conversation with

18   Mr. Taylor?

19   A.    Maybe six months prior.

20   Q.    Did you ask for or were you promised any compensation for

21   allowing someone to use your garage to repair lawn mowers?

22   A.    Yes.

23   Q.    What was that?

24   A.    $300.

25   Q.    $300.  Who did that come from?

TANNARE BROWN - DIRECT

1   A.    Mr. Taylor.

2   Q.    Do you recall about the first time that happened,

3   Mr. Brown?

4   A.    Yes.

5   Q.    And when was that, sir?

6   A.    I believe around August.

7   Q.    August of 2020?

8   A.    Correct.

9   Q.    All right.  I want you to scoot that microphone close to

10  you, please, if you don't mind.

11      Tell the Court what happened in August on this first

12  contact with your garage, sir.

13  A.    Yeah.  Hispanic pulled up with the trailer with a lawn

14  mower attached to it.

15  Q.    Okay.

16  A.    I let the garage door open.  He backed the trailer in and

17  the Hispanic got out, undid the tire, I noticed.  And then from

18  the tire, then from the axle, proceeded to pull out cylinder

19  tubes.

20  Q.    What did you think when you saw those cylinder tubes?

21  A.    My first reaction, I didn't quite know what it was.

22  Q.    Uh-huh.

23  A.    But then it kind of dawned on me pretty quickly that --

24  well, not pretty quickly, but soon that it was illegal.

25  Q.    What did you think it might be, sir?

TANNARE BROWN - DIRECT

1    A.    Drugs.

2    Q.    Drugs?   Was Mr. Taylor present on this first occasion in

3    August when the Hispanic male removed those items from the

4    axles?

5    A.    Came a little later, about maybe 30 minutes after.

6    Q.    Prior to this event where the individual drove up, had

7    Mr. Taylor contacted you about "I've got a guy coming" or

8    something of that nature?

9    A.    Texted and said his guy was on his way.

10   Q.    How soon was that before the guy showed up?

11   A.    Probably 15 minutes.

12   Q.    What happened to the items that were removed from the

13   axle, sir?

14   A.    They were placed in -- I believe in a bag, and then taken

15   with Mr. Taylor.

16   Q.    Taken with Mr. Taylor?

17   A.    Correct.

18   Q.    Do you know if anybody was with Mr. Taylor when he showed

19   up?

20   A.    No.

21   Q.    Tell us about the second event, please.

22   A.    Second event happened later in the evening, same text,

23   basically saying this guy was on his way.   I was a little

24   hesitant in responding, but he came.   It was dark.   Hispanic

25   male backed the trailer into the garage.

45

TANNARE BROWN - DIRECT

1       Again, same instance.  I noticed the -- he took off the

2   tire, then proceeded to take out, again, drugs.  It appeared

3   that one of those were damaged in this instance and spilled

4   out.  And so the Hispanic motioned for me to provide a

5   broom.  So I provided a broom and it was subsequently

6   swept up.

7       He did motion for something to, you know, put it in, maybe

8   dispose of, so I grabbed the first thing I saw, was a plastic

9   bag and they were placed in there.

10  Q.   Was the bag with the items that spilled out, do you know

11  what happened to it, sir?

12  A.   Yes.  They was wrapped up and placed in a cooler that I

13  had.

14  Q.   In the garage?

15  A.   Correct.

16  Q.   A moment ago you mentioned that you were somewhat

17  hesitant in responding to Mr. Taylor's text about my guy's on

18  the way.

19      Is that accurate, sir?

20  A.   Correct.

21  Q.   Explain to the Court, please, your hesitancy or your

22  delay.

23  A.   Just I kind of knew what appeared to be the situation.

24  And so, yeah, I just didn't -- I was contemplating whether or

25  not to continue with this.

TANNARE BROWN - DIRECT

1    Q.    Now, after the -- what happens to the items that were

2    removed from the axle?  Not asking about the stuff that

3    spilled out, but the other stuff that was there.  What happened

4    to it?

5    A.    It was placed in what appeared to be a department store

6    bag, and then walked out by Mr. Taylor.

7    Q.    Do you know who he met outside?

8    A.    No, I do not.

9    Q.    Were you paid $300 off the first time that took place?

10   A.    Correct.

11   Q.    And were you paid on the second occasion, the $300?

12   A.    Correct.

13   Q.    On October 19th?

14   A.    Correct.

15   Q.    And who paid those to you?

16   A.    Mr. Taylor.

17   Q.    Do you know if anybody else was with Mr. Taylor that

18   night?

19   A.    No.

20   Q.    Do you know if anybody picked up the bag outside that he

21   walked out?

22   A.    I do not know.  I didn't see anybody.

23   Q.    On the first occasion and on the second occasion, how did

24   they compare as far as amounts are concerned or volume, size?

25   Use it that way.

TANNARE BROWN - CROSS

1   A.   If I had to guess, maybe about the same.  I'm not sure

2   amounts or how it's determined.

3   Q.   Understood.  Mr. Brown, let me ask you a couple of

4   questions, please.  You know I'm going to ask these

5   questions.

6        Did you ever sell drugs for Mr. Maurice Taylor, the

7   defendant?

8   A.   No.

9   Q.   Did you ever store drugs at your location for the

10  defendant?

11  A.   No.

12  Q.   Within the time period from you first heard, my guy's on

13  the way, up until the time they vacated your garage, can you

14  estimate for the Court, please, about how long that was?

15  A.   About 15 to 20 minutes.

16       MR. WEST:  That's all at this time, sir.

17       THE COURT:  Mr. Boyd.

18       MR. BOYD:  Thank you, Your Honor.

19                      CROSS-EXAMINATION

20  BY MR. BOYD:

21  Q.   Mr. Brown, my name is Matthew Boyd.  I represent

22  Mr. Taylor.

23       Do you know Shad Wilson?

24  A.   Only by name.

25  Q.   Just by name?

TANNARE BROWN - CROSS

1   A.    Yeah.

2   Q.    So you don't have any -- there was no -- you didn't know

3   him growing up or anything like that?

4   A.    I knew him through -- we are about the same age, so we

5   played football at a rival high school.

6   Q.    So you knew him just by reputation?

7   A.    Correct.

8   Q.    Did you at any point -- have you ever been around Shad

9   Wilson, since, I don't know, the last five years?

10  A.    No.

11  Q.    So let's go to that first testimony you said about you

12  being requested or talking to Mr. Taylor about what

13  subsequently you related two incidents about.

14      What was going on when you were approached by Mr. Taylor

15  about allowing some things to be unloaded?

16  A.    It was basically a general conversation that was at the

17  park.  We kind of -- kind of stepped to the side and he

18  mentioned that he, again, was interested in landscaping and had

19  a guy that wanted to -- or a place to work on lawn mowers, I

20  guess, fix up a lawn mower.

21  Q.    Had you ever allowed anyone to use your garage for illegal

22  unloading of drugs or any other criminal activity prior to the

23  two instances you related at any point?

24  A.    No.

25  Q.    So it would surprise you then to hear that Mr. Taylor was

49

TANNARE BROWN - CROSS

1  told you would do that sort of thing?

2  A.    Correct.

3  Q.    You testified that you at no point sold drugs for

4  Mr. Taylor, correct?

5  A.    Correct.

6  Q.    Were there drugs found in your bedroom on that October

7  date that you related?

8  A.    No.

9  Q.    Let me ask you this.  When he -- you mentioned that you

10  were at the park, that was how long in advance of that first

11  date you related, which I believe was August of 2020?

12  A.    Probably around six months prior, guessing.

13  Q.    Okay.  And that was a conversation in person?

14  A.    Correct.

15  Q.    Between that six months -- that conversation six months

16  earlier and the date you related in August, what type of

17  contact did you have with Mr. Taylor, if any?

18  A.    Prior to?  Can you repeat the question?

19  Q.    So you said you had the conversation maybe six months

20  before August, approximately February, March.  How many times

21  did you interact with Mr. Taylor prior to that August date that

22  you related?

23  A.    Sparingly.  When he would -- you know, again, I would see

24  him at the park or not.

25  Q.    Do you recall the last time you saw him prior to that

TANNARE BROWN - CROSS

1   first August date that you related where someone came there?

2   A.    I do not.

3   Q.    You don't?   Would it have been months?

4   A.    Could have been, possibly.

5   Q.    So --

6   A.    Several.

7   Q.    So your testimony is that out of the blue, you receive a

8   text that someone needs to do what?   What's the nature of what

9   you received from Mr. Taylor that precipitated that August

10  drop-off that you talked about?

11  A.    It was a text just saying "my guy's coming."

12  Q.    Okay.   That what's it said, "my guy's coming?"

13  A.    Basically more or less.

14  Q.    You knew what that meant?

15  A.    Correct.

16  Q.    What did it mean to you?

17  A.    That he had his individual that was -- what we had prior

18  talked about, about working on a lawn mower, was going to come

19  through.

20  Q.    So is it your testimony that you thought he was talking to

21  you about having somebody work on lawn mowers?

22  A.    Correct.

23  Q.    You said you were shocked when you saw them unload illegal

24  drugs from the axles.

25  A.    Yes.

TANNARE BROWN - CROSS

1  Q.   Yet you did it again in October?

2  A.   Correct.

3  Q.   And your testimony is you received $300 for both of those

4  occasions?

5  A.   Correct.

6  Q.   And you remained in the garage while this was taking

7  place, both times?

8  A.   I was back and forth.  So I didn't remain in there the

9  whole time, no.

10  Q.   Back and forth to what?

11  A.   Between inside my dwelling and in the garage.

12  Q.   And so your testimony is that when he -- they came the

13  second time, that you received a text that said what?

14  A.   "My guy's on the way."

15  Q.   Based on the discovery I've seen in this case, they came

16  back that same night and executed a search warrant on your

17  house, right?

18  A.   Correct.

19  Q.   Did you show them the text from Maurice Taylor?

20  A.   No.

21  Q.   Did they ask for the text from Maurice Taylor?

22  A.   No.

23  Q.   Was the text still on your phone from Maurice Taylor?

24  A.   No.

25  Q.   I may be incorrect, so your testimony is that at no point

TANNARE BROWN - CROSS

1    did they find any drugs inside your residence when they came

2    back and did that search warrant?

3    A.    Inside my residence?  No.

4    Q.    They found what you related came out was in a broken bag

5    and was put into, I think, the grocery bag?

6    A.    Cooler.

7    Q.    And then you put it in the cooler?

8    A.    In the garage, yes.

9    Q.    So is it your testimony you never sold drugs?

10   A.    Correct.

11   Q.    And there's just these two incidents?

12   A.    Correct.

13   Q.    Have you ever allowed anyone else use your garage since,

14   before or after that?

15   A.    No.

16   Q.    Mr. Brown, what park were you at when you say this

17   conversation took place with Mr. Taylor?

18   A.    Martin Luther King Park.

19   Q.    Where is that located?

20   A.    It's in the Winburn.

21   Q.    Do you know what Mr. Taylor -- was he involved in

22   one of the teams?  Did he have a child there?  What was going

23   on?

24   A.    No, just plenty of times there's guys that congregate up

25   there, so they don't necessarily have a team.  They could have

TANNARE BROWN - CROSS

 1  played there in the past, or just showing interest in youth

 2  football.  So it's a common congregation point for a lot of

 3  people.

 4  Q.   And you're positive that's where this conversation took

 5  place?

 6  A.   Correct.

 7  Q.   And did you provide him with your phone number at that

 8  time?

 9  A.   I don't know if I did at that time.

10  Q.   How would he text you if you didn't --

11  A.   It may have been that time, I'm not for sure.  But at some

12  point I did provide him with a phone number, I can't say at

13  that specific time.

14  Q.   And how many times did you say you saw him between the

15  first time when you had the conversation and the August

16  incident?

17  A.   I can't recall an exact number.  A few times.

18  Q.   Was it at the same park?

19  A.   Correct.

20  Q.   And were you guys acquaintances before this?

21  A.   No.

22  Q.   Did you know who he was?

23  A.   Only by name.

24  Q.   Which, the street name or Maurice?

25  A.   Street name.

TANNARE BROWN - CROSS

1      MR. BOYD:  I don't have any more questions.  Thank you,

2  sir.

3      THE COURT:  Mr. West.

4      MR. WEST:  No other questions for the United States.  Your

5  Honor, he may be finally excused as far as the United States is

6  concerned.

7      THE COURT:  Mr. Brown, I just wanted to clarify one point.

8  I understand that this first delivery was in August of 2020 and

9  then the later one was in October of 2020.  I believe you said

10  you would have had the first conversation with Mr. Taylor six

11  months before that August delivery?

12      THE WITNESS:  About, yes.

13      THE COURT:  That puts us in February of that same year.

14  Is youth football played in the spring or in the fall?

15      THE WITNESS:  We would hold like workouts during the

16  wintertime as well, so I try to get as much work in with the

17  kids as possible.

18      THE COURT:  So that would explain why that would have

19  been maybe in February or March as opposed to sometime in the

20  fall?

21      THE WITNESS:  Yes.

22      THE COURT:  All right.  Thank you, you can step down, sir.

23      THE WITNESS:  Thank you.

24      THE COURT:  Mr. West.

25      MR. WEST:  Yes, Your Honor.  Call Ms. Ouisha Simone

OUISHA TALBERT - DIRECT

1   Talbert.

2        Likewise, sir, she is represented by counsel, Mr. Rawl

3   Kazee.  Ask her counsel be placed somewhat closer.

4        **OUISHA TALBERT, GOVERNMENT WITNESS, SWORN**

5        THE COURT:  Thank you.

6        Mr. West.

7        MR. WEST:  Yes, sir.  Thank you.

8                           OUISHA TALBERT

9                         DIRECT EXAMINATION

10  BY MR. WEST:

11  Q.   State your name, please, ma'am.

12  A.   Ouisha Talbert.

13  Q.   How do you spell your first name?

14  A.   O-u-i-s-h-a.

15  Q.   And do you have a middle name also?

16  A.   Simone.

17  Q.   Spell that also, please.

18  A.   S-i-m-o-n-e.

19  Q.   Ms. Talbert, going to get right to the point.

20       Do you see the individual in the red shirt over here?

21  A.   Yes.

22  Q.   Do you know him?

23  A.   I do.

24  Q.   How do you know him?

25  A.   We were in a relationship.

OUISHA TALBERT - DIRECT

1  Q.    What is the name by which you know him, including a street

2  name?

3  A.    Wee Wee.  That's how I know him, Wee Wee.

4  Q.    Wee Wee?

5  A.    That's what I call him.

6  Q.    About when did this relationship begin that you just spoke

7  of?

8  A.    Around my birthday of 2019, in October.

9  Q.    In October, you said?

10  A.    Yes.

11  Q.    You would know your own birthday.  What day of the month,

12  please, was that?

13  A.    The 17th.

14  Q.    17th, October 17th then?

15  A.    Uh-huh.

16  Q.    How is it you know that's the date that your romantic

17  relationship took place?

18  A.    That's when we kind of exchanged numbers and started to

19  get to know each other.  The relationship elevated after that

20  on his birthday.

21  Q.    All right.  Do you know about when that date was, when you

22  say the relationship elevated?

23  A.    The beginning of February 2020.

24  Q.    Of 2020?  All right.  So around February 1st, 2020,

25  correct?

OUISHA TALBERT - DIRECT

1    A.   A little bit after February 1st.

2    Q.   Ms. Talbert, there is a microphone right in front of you,

3    all right?  Pull that to you or scoot closer or both.  There we

4    go.  Thank you.  Ask you to keep your voice up because we're

5    recording this also.

6    A.   Okay.

7    Q.   All right.  So around February 1st, 2020 is when you say

8    the relationship elevated?

9    A.   Yes.

10   Q.   Did you know where Mr. Taylor was living at the time, in

11   February of 2020?

12   A.   Yes.

13   Q.   Where is that?

14   A.   In North Carolina.

15   Q.   Charlotte area?

16   A.   I think so.

17   Q.   From that date forward, had you ever been to the Charlotte

18   area?

19   A.   No.

20   Q.   And did you live in Fayette County at that time?

21   A.   Yes.

22   Q.   How often would you see Mr. Taylor?

23   A.   Every time he came to Lexington, I think he came more

24   often because we were together.

25   Q.   Okay.  How often do you think that would be, once a month,

OUISHA TALBERT - DIRECT

1  twice a month?

2  A.   Maybe twice a month.

3  Q.   Okay.  And I assume that relationship lasted up until what

4  time, please?

5  A.   Oh, it lasted even kind of after he went to jail.

6  Q.   Now, do you recall the date that you were arrested,

7  please?

8  A.   Yes.

9  Q.   What date was that?

10  A.   It was October 19th, 2020.

11  Q.   And were you arrested here in Fayette County, ma'am?

12  A.   Yes.

13  Q.   From the initial parts of the relationship, February 1st,

14  2020, did you know what Mr. Taylor did for a living?

15  A.   I knew from word on the street what he did for a living,

16  yes.

17  Q.   Okay.  What did you understand that to be?

18  A.   Selling drugs.

19  Q.   I told you I was going to ask you these questions.  Have

20  you ever sold drugs on behalf of Mr. Taylor?

21  A.   No.

22  Q.   Do you know Shad Wilson?

23  A.   Yes.

24  Q.   During the time period in relationship -- or before

25  that, had you ever seen Mr. Taylor in the company of Shad

OUISHA TALBERT - DIRECT

1    Wilson?

2    A.    Yes.

3    Q.    On how many times, occasions, do you think?

4    A.    Twice, maybe.

5    Q.    Do you know Eric Lamont Trigg?

6    A.    Yes.

7    Q.    During that time period of the relationship and onward,

8    did you see Mr. Taylor in the company of Mr. Trigg?

9    A.    Yes.

10   Q.    About how many times, ma'am?

11   A.    Maybe like three or four.

12   Q.    I think you have a couple of children; is that right?

13   A.    Uh-huh.   I have one that I birthed and then one that I

14   take care of.

15   Q.    Are either of those children Mr. Taylor's children?

16   A.    No.

17   Q.    During your relationship, did you ever stay with

18   Mr. Taylor when he came to Lexington?

19   A.    Yes.

20   Q.    Where would that be?

21   A.    I stayed with him over his grandmother's house or he would

22   stay with me.

23   Q.    Okay.   And his grandmother's house on Ohio Street,

24   correct?

25   A.    Yes.

OUISHA TALBERT - DIRECT

1   Q.    How often do you think Mr. Taylor would stay with you?

2   A.    Once we got comfortable, it became every time he was here,

3   unless he came without me knowing.

4   Q.    Okay.  Did Mr. Taylor provide you with money or meals or

5   clothing or anything during the time period of your

6   relationship?

7   A.    Yes.

8   Q.    Tell us about that.

9   A.    If we would go out to eat or anything like that.  He gave

10  me birthday gifts.

11  Q.    What was the nature of the birthday gifts he gave you?

12  A.    He bought me an outfit for my birthday.

13  Q.    Okay.

14  A.    Shoes.  We would go out to eat all the time.

15  Q.    Places like where?

16  A.    J. Alexander's, Jeff Ruby, Tony's, Malone's.

17  Q.    Would he pick up the tab on those all the time?

18  A.    I picked up the tab as well.

19  Q.    Okay.  Did he ever give you money?

20  A.    He has, to get my hair done and stuff.

21  Q.    Do you recall how much he's given you at one time?

22  A.    I don't -- like five or six.  It just depends on -- five

23  or six to get my hair done.  It was pricy.

24  Q.    On or about October 19th of 2020, did you know whether or

25  not Mr. Taylor had come to Lexington from Charlotte?

OUISHA TALBERT - DIRECT

1    A.    He came for my birthday.

2    Q.    Came for your birthday?

3    A.    Uh-huh.

4    Q.    On that day, did you try to locate the actual physical

5    location of Mr. Taylor?

6    A.    Well, I had called him several times trying to figure out

7    where he was.  But he gave me his location.  He pinged me on my

8    phone the location.

9    Q.    So you used the ping feature that showed where he was at,

10   correct?

11   A.    Uh-huh.

12   Q.    Were you familiar with that address?

13   A.    No.

14   Q.    Had you ever been to that address before?

15   A.    No.

16   Q.    On that day prior to the ping, was there any verbal

17   communication between you and Mr. Taylor?

18   A.    We had talked on the phone --

19   Q.    Uh-huh.

20   A.    -- that day, yeah.  Because I was trying to figure out if

21   he was with a female, he said no.

22   Q.    What was the nature of your feelings at that time towards

23   Mr. Taylor?

24   A.    We were in a relationship, I loved him.

25   Q.    I assume you went to the address listed on the ping,

OUISHA TALBERT - DIRECT

1    correct?

2    A.    Uh-huh.

3    Q.    What happened then?

4    A.    We talked for a little bit, he was just telling me that

5    there was no females over there.

6          He asked me, was I going home?

7          I said "yes."

8          And then he told me to take a bag to the house, he will be

9    out there later.

10   Q.    Okay.  Did this conversation take place in the house or

11   outside?

12   A.    Outside.  I never went in the house.

13   Q.    Were you in your vehicle when this conversation took

14   place?

15   A.    Yes.

16   Q.    And then you said he asked you to take a bag?

17   A.    Well, he threw it in the car.

18   Q.    All right.

19   A.    In the back seat.

20   Q.    Let me go back for a minute then.  You're outside, you're

21   in your vehicle.  Is he standing outside the vehicle?

22   A.    Uh-huh.

23   Q.    And you said he asked you to take a bag.  Was it while you

24   were standing right there?

25   A.    I never got out of the car.

OUISHA TALBERT - DIRECT

1    Q.    Okay.

2    A.    I was in my car, his car was beside mine.

3    Q.    Okay.  Do you know, did he have the bag in his hand when

4    he was talking to you?

5    A.    Yeah, he had multiple bags.  Like he had like a box and

6    then like -- well, I think it was a Louis Vuitton bag, and then

7    the bag, that bag.

8    Q.    All right.  Tell us exactly what he did, please.

9    A.    My window was down, it was raining.  And then he just

10   asked me where I was going after that.

11         I said, "I'm going home.  When are you coming out

12   there?"

13         And he was like, I'll be out there in a minute.  And then

14   he was, "Take this out there with you, I'll be out there in a

15   minute."

16         And then I sat out there for a little longer talking to my

17   sister on the phone, because either I was writing down a

18   license plate or my sister was, because I was giving it to her,

19   because we were going to Google them to see if there was any

20   females' cars.

21   Q.    Okay.  Did you guys actually Google them?

22   A.    No.

23   Q.    Ms. Taylor [sic], this bag -- you were ultimately stopped

24   by a marked Lexington police officer cruiser, correct?

25   A.    Yes.  Uh-huh.

OUISHA TALBERT - DIRECT

1    Q.   Guy was in uniform, marked police unit.  What happened

2    then?

3    A.   He said he pulled me over and said that I was speeding.

4         I said I wasn't speeding.

5         He asked for my license.  By this time, there was a dog

6    walking on the passenger's side.  And then he got in front of

7    my car and it stopped.

8         And he asked me did I have any drugs or anything in the

9    car.

10        And I said no.  I told him that we had been -- people were

11   smoking in my car at the club that I was at, so it could have

12   been that.

13        So he asked me to get out of the car.  And he searched it.

14   Q.   Okay.  When they bring the drug dog around, you see all

15   this stuff, correct?

16   A.   Yes.

17   Q.   What are you thinking to yourself?

18   A.   I was like, oh, Lord.  That's the first thing that came to

19   my mind, oh Lord.  And then I was just like, what's going on?

20   What has he got me into?

21   Q.   You say "he," you mean who?

22   A.   Wheatie.

23   Q.   Bag in the front seat or back behind or what?

24   A.   It's in the back seat.

25   Q.   Did you reach and try to touch the bag?

OUISHA TALBERT - DIRECT

1   A.   No.

2   Q.   When the drug dog hit, did you have any concerns about the

3   bag?

4   A.   At first no.

5   Q.   What do you mean by that?

6   A.   Because it was happening so fast, it didn't cross my mind

7   at first until I was already out of the car.  And they were

8   searching it.  And the dog kind of got to the back of the --

9   the back door, and then it dawned on me, like something ain't

10  right with this, this is not going to end well.

11  Q.   Okay.  Ms. Talbert, you testified a few moments ago that

12  you were aware of the defendant's reputation as a drug dealer,

13  correct?

14  A.   Uh-huh.

15  Q.   So you get stopped by a marked police unit, you already

16  know that his reputation is that of a drug dealer.  There is a

17  bag in your car and the drug dog alerts, right?

18  A.   Yes.

19  Q.   What's going through your head at that moment?

20  A.   At that moment, I knew that there was probably drugs in

21  the bag.

22  Q.   Did the police officers talk to you about where you had

23  been prior to that?

24  A.   Yes.

25  Q.   Did you give them a truthful statement about your

OUISHA TALBERT - DIRECT

1  whereabouts?

2  A.   I didn't tell them that I had went to his location.  I

3  just told them that -- the two clubs that I had been to.  And

4  then I told them that I was on my way home, I never told them

5  that I stopped.

6  Q.   Why would you say that to them?

7  A.   I didn't want to give his name up.

8  Q.   Do you recall about how much cocaine was in that

9  vehicle?

10  A.   No.  I do remember when I got in the police car that

11  night, the officer told me, he asked me if I knew how much was

12  in there.  And I was like no.

13       And he just said it was a lot.

14  Q.   You signed a plea agreement, correct?

15  A.   Correct.

16  Q.   And in that plea agreement, specifically in paragraph

17  5(d), you admit that it was at least two kilograms but less

18  than 3.5 kilograms.

19       Is that accurate, please?

20  A.   Uh-huh.  I found that out afterwards.

21  Q.   Ms. Talbert, a big question for you is, why would you do

22  this for Mr. Taylor?  Why would you do that?  Why would you

23  transport a package across to your apartment, why?

24  A.   I did it because we were together.

25  Q.   Together as in how?

OUISHA TALBERT - CROSS

1   A.   As a couple.

2        MR. WEST:  That's all at this time, please, sir.

3        THE COURT:  Thank you.

4        Mr. Boyd.

5                        CROSS-EXAMINATION

6   BY MR. BOYD:

7   Q.   Ms. Talbert, my name is Matthew Boyd.  I represent

8   Mr. Taylor.

9        So you indicated that you had first met him in around your

10  birthday 2019?

11  A.   Yes.

12  Q.   Where was that at?

13  A.   I had a dinner at Mi Mexico.

14  Q.   And was he there, was he invited to the dinner?

15  A.   Uh-huh.

16  Q.   He was invited to the dinner?  How -- who knew him that

17  was related to you, how did that --

18  A.   One of my friends.

19  Q.   Okay.  Who is your friend that invited him?

20  A.   Well, he actually -- before that time, he had came to

21  Paris one time, over my friend's house.  And I think -- I can't

22  remember when that was.  But at that time he was trying to talk

23  to me, nothing really happened at that moment.  But then I had

24  the dinner and he came to that.

25  Q.   How much -- do you recall when the Paris, first time you

OUISHA TALBERT - CROSS

1    met him there?

2    A.   I think it was -- I know it was hot outside.  I can't

3    remember the month.

4    Q.   I'm sorry, I don't understand what you said.

5    A.   I know it was hot outside.  But I can't remember exactly

6    when that was.

7    Q.   You're going to have to say that for me one more time.  I

8    don't think I understand what that means.

9    A.   It was hot outside.

10   Q.   Hot outside.  So sometime during the summer you think?

11   A.   Yes.

12   Q.   That was in Paris, Kentucky?

13   A.   Yes.  And nothing really happened from that.  It didn't

14   really start until he came to my dinner.

15   Q.   So October 17th, you're having a dinner at Mi Mexico?

16   A.   Uh-huh.

17   Q.   Is that the location on New Circle Road by Eastland?

18   A.   Yes.

19   Q.   And he's in attendance with one of your friends?

20   A.   Yes.

21   Q.   And at that point you guys, you just exchanged numbers and

22   have a conversation?

23   A.   Uh-huh.

24   Q.   Exchanged numbers.  And then you related that things kind

25   of started in February of 2020?

OUISHA TALBERT - CROSS

1   A.   Well, we were talking on the phone, but it became more

2   intimate in February.

3   Q.   So did you see him between October 2019 and

4   February 2020?

5   A.   Yes.

6   Q.   You see him?

7   A.   Uh-huh.

8   Q.   How many times do you think you saw him during that period

9   of time?

10  A.   I would say about four maybe.

11  Q.   Where would those -- where would that be at?

12  A.   I would meet him like at Fitz, we'd go have a drink or

13  somewhere out.

14  Q.   So these were just casual meet-ups, I guess?

15  A.   Yeah, uh-huh.

16  Q.   And then February 1st of 2020 was when things became more

17  of what you would call a relationship and intimate?

18  A.   Uh-huh.

19  Q.   From February 1st up until the October date that you were

20  just talking to Mr. West about, how many times do you think

21  that you saw Mr. Taylor?

22  A.   I saw him at -- I would say twice a month, it could have

23  been three at times.

24  Q.   I was reading through your plea agreement.  I think your

25  testimony was that every time he came to Lexington, he would

OUISHA TALBERT - CROSS

1    come to see you?

2    A.    Once it got -- once we got real comfortable, I

3    introduced him to my kids and then he would come to my

4    house.

5    Q.    I was just reading the first paragraph of your plea

6    agreement.  It says, "Taylor would come to Lexington

7    frequently and on some of those visits would contact the

8    defendant."

9    A.    Well, when he was in Lexington, I would see Taylor --

10   well, I would see Wheatie.

11   Q.    Did you ever see Mr. Taylor with drugs?

12   A.    No.

13   Q.    At no point?

14   A.    No.

15   Q.    The only time I guess you would have known that there was

16   drugs involved in anything was the day that you didn't know --

17   I think your plea agreement says you should have known that

18   there were drugs in the bag -- but so there were drugs involved

19   that one time?

20   A.    Yes.

21   Q.    When you placed those in your vehicle, he didn't indicate

22   to you that you needed to take any special care, he just said

23   "see you at the house"?

24   A.    Yes.

25   Q.    He didn't tell you those were drugs in the bag, correct?

OUISHA TALBERT - CROSS

1   A.    No.

2        MR. BOYD:  I don't have any more questions.  Thank you.

3        THE COURT:  Thank you.

4        Mr. West.

5        MR. WEST:  No other questions.  She may be finally excused

6   for the United States.

7        THE COURT:  Yes, ma'am.  You may step down.  You are

8   finally excused.

9        Mr. West, I think at some point we're going to need to

10  take a short recess.  We can either do that now, or if you have

11  another additional witness, we could do that after.

12       MR. WEST:  I would appreciate doing that right now, sir.

13  The next witness may be longer than the last few.

14       THE COURT:  Take about a 15-minute recess at this

15  point.

16       (A recess was taken from 2:23 p.m. to 2:40 p.m.)

17       THE COURT:  We'll continue at this time with the

18  sentencing hearing in United States versus Maurice Taylor,

19  Lexington Criminal Action Number 21-101.

20       Mr. West, you may call your next witness.

21       MR. WEST:  Yes, sir.  Before I do that, I've been asked

22  through the U.S. Marshals if Mr. Wilson is still here or if

23  they can transport him back to the location?  There's a little

24  management issue today, so I would ask counsel if they are

25  still intending to recall Mr. Wilson, or what the Court's

1    position of Mr. Wilson being retained in the courthouse,

2    please.

3            MR. BOYD:  Judge, we don't intend to at this time.

4            THE COURT:  He can be returned.  Thank you.

5            MR. WEST:  Yes, sir.

6            Rae'Shawna Campbell, please.  She's likewise represented

7    by Mr. Oakley, sir.

8            **RAE'SHAWNA CAMPBELL, GOVERNMENT WITNESS, SWORN**

9            THE COURT:  Thank you.

10           Mr. West.

11           MR. WEST:  Yes, sir.  Thank you.

12                              RAE'SHAWNA CAMPBELL

13                              DIRECT EXAMINATION

14   BY MR. WEST:

15   Q.   Would you state your name, please.

16   A.   Rae'Shawna Michelle Campbell.

17   Q.   Will you spell your first name, please.

18   A.   R-a-e, apostrophe, capital S-h-a-w-n-a.

19   Q.   Ms. Campbell, do you live here in Fayette County?

20   A.   Yes, sir.

21   Q.   Ask you to take a look at the individual over here in the

22   red shirt.

23           Do you see him?

24   A.   Yes, sir.

25   Q.   Do you know him?

RAE'SHAWNA CAMPBELL - DIRECT

1    A.    Yes, sir.

2    Q.    By what name do you know him?

3    A.    I know him by Maurice and also by Wee Wee.

4    Q.    Wee Wee?  How long have you been acquainted with

5    Mr. Taylor?

6    A.    Several years, almost -- almost as long as my daughter's

7    been living.  She's 15.

8    Q.    Can you recall about when you became acquainted with

9    Mr. Taylor?  Then I've got some follow-up after that, please.

10   A.    I want to say I think my daughter was three, so about

11   12 years ago we became acquainted and, you know, kind of

12   had a casual relationship.  And in 2019, we were in a

13   relationship.

14   Q.    Okay.  Do you know about when that relationship started?

15   A.    Yes.

16   Q.    Tell the Court, please.

17   A.    We started dating in about April of 2019.

18   Q.    April of 2019?  In April of 2019, did you know Mr. Taylor,

19   if he had a job, had any occupation?

20   A.    I knew that he had -- he said he had like a couple of

21   businesses, like a hemp store in Charlotte.

22   Q.    In Charlotte?  Did you know whether or not Mr. Taylor was

23   actually from Lexington or whether he was from Charlotte?

24   A.    I knew he was from Lexington.

25   Q.    Did Mr. Taylor ever stay the night -- after that operative

RAE'SHAWNA CAMPBELL - DIRECT

1   date, did he ever stay the night at your residence?

2   A.    Yes, sir.  He had a key.

3   Q.    Did you provide him the key?

4   A.    Yes, sir.

5   Q.    At that time where did you work?

6   A.    I worked for Fayette County Public Schools.

7   Q.    When is the last time you worked for Fayette County Public

8   Schools?

9   A.    The day that I was arrested in February.  February 7th was

10  the last day that I reported to work.  And I was let go in

11  August.

12  Q.    Did you know, when you first began your relationship with

13  Mr. Taylor, how often he would actually be in Lexington from

14  Charlotte?

15  A.    No, sir.

16  Q.    How would you find out if he was there?

17  A.    He would let me know when he was coming or he would call

18  me.

19  Q.    What was your normal work hours in the early part when you

20  started seeing Mr. Taylor?

21  A.    I had to be at school before 7:15 a.m., and I got off work

22  at 2:35 p.m.

23  Q.    I hate to pry in your personal business, but I told you

24  I'd have to ask these questions.  What was the nature of the

25  girlfriend-boyfriend relationship with Mr. Taylor?

RAE'SHAWNA CAMPBELL - DIRECT

1    A.    We had a sexual relationship.

2    Q.    During the times that you were at school, would you

3    know whether or not Mr. Taylor used his key to get into your

4    house?

5    A.    No, sir, not all the times.  I mean, if he stayed the

6    night, he would be there when I left.  But no, sir, I did not

7    know.

8    Q.    During this time period, had Mr. Taylor ever provided you

9    money for the key or staying the night at your house or

10   anything like that?

11   A.    No, sir.

12   Q.    At some point did you find something in your house that

13   drew your suspicion as the homeowner or tenant?

14   A.    Yes, sir.

15   Q.    What was that?

16   A.    In a pink bin in October of 2019, I found a bin full of a

17   substance.

18   Q.    Ma'am, if you would, please, there's a microphone

19   there.  If you can either get close to that, pull that closer

20   to you.

21         Say again, please.  You found something, and what was

22   that?

23   A.    In a pink bin, I found a substance.  I did not know at the

24   time, but later found out it was heroin.

25   Q.    A pink bin?

RAE'SHAWNA CAMPBELL - DIRECT

1  A.    Yes.

2  Q.    Was it like a child's toy bin?

3  A.    Like a bin that you would like store clothes or shoes in.

4  Q.    How is it that you came to look in this pink bin?

5  A.    Because I was looking for boots to put on.

6  Q.    All right.  You found this item.  How big was it?

7  A.    The bin?  It was like just a big one you can buy at

8  Walmart, like a storage bin.

9  Q.    Inside was this other item.  Was it inside its own

10 container, bag?

11 A.    I mean, the substance was wrapped in a clear plastic.

12 Q.    So at that point, what did you do?

13 A.    I called him and --

14 Q.    "Him" being who?

15 A.    I called Maurice.

16 Q.    Okay.

17 A.    And I was not happy.  So I was pretty upset.  Whenever I

18 was upset, he would avoid me and he avoided me until he came

19 back.

20 Q.    On that first conversation, did you actually exchange

21 conversation, was it by text or --

22 A.    No, I called.  We FaceTimed.

23 Q.    Okay.  And you told him what you found?

24 A.    (Nodding head.)

25 Q.    What did you tell him to do?

RAE'SHAWNA CAMPBELL - DIRECT

1    A.    To get his shit out of my house.

2    Q.    Do you recall his response, ma'am?

3    A.    No, I don't.

4    Q.    And you said a moment ago whenever he knew that --

5    something like there was a delay in him contacting you.  How

6    long was it before you had a conversation with him again about

7    that item?

8    A.    Probably a few days, and he told me he was coming back in

9    town.  And I saw him again on November 1st.

10   Q.    Between the time you found the item in the pink bin and

11   November 1st, did he ever come get it?

12   A.    No.  No, sir.

13   Q.    Did anybody else come over and get it?

14   A.    No, sir.

15   Q.    Do you know Shad Wilson?

16   A.    Yes, sir.

17   Q.    At the time that you and Mr. Taylor were engaged in this

18   relationship, did you ever see Mr. Taylor with Shad Wilson?

19   A.    Yes, sir.

20   Q.    Do you know Eric Lamont Trigg?

21   A.    Yes, sir.

22   Q.    During the time of this initial relationship, did you ever

23   see Taylor with Trigg?

24   A.    Yes, sir.

25   Q.    How often was that, please?

RAE'SHAWNA CAMPBELL - DIRECT

1  A.   In the beginning of our relationship, I didn't see them

2  together.   We -- actually we were broke up, but when he would

3  come to the house in 2021 is when I saw him with Trigg the

4  most.

5  Q.   With Trigg the most?  All right.

6       So do you know about what date he actually got the item

7  out of your house?

8  A.   In 2019 or in 2021?

9  Q.   Let's go to 2019, when you first found the item in the

10  pink bin.

11  A.   It was in December, I was trying to get him to get his

12  stuff out of the house in December.   Late December, I took a

13  picture at the IGA on Citation of a dumpster and I texted it to

14  him and said, "If you don't come and get your shit, it's in the

15  dumpster."

16  Q.   Okay.  What happened after that?

17  A.   Shortly thereafter, he came and got his stuff.

18  Q.   Tell us how that took place, were you home when he came

19  and got it?

20  A.   I was home.

21  Q.   Do you know if he came with anybody?

22  A.   I think he had somebody with him.

23  Q.   Can't recall for sure?

24  A.   No, sir.

25  Q.   Did you ever find out or ask him what was in -- what were

RAE'SHAWNA CAMPBELL - DIRECT

1    in the packages in the pink bin?

2    A.    Yes, he told me later.

3    Q.    All right.  What did he tell you?

4    A.    He said it was $600,000 worth of heroin.

5    Q.    During the -- so I assume, based on what you said a moment

6    ago, that you were broke up at that time?

7    A.    We broke up on November 1st.

8    Q.    When you found the items, correct?

9    A.    After -- when he came back.

10   Q.    During that time period, after he came and picked up his

11   stuff, how much -- did you have communication with Mr. Taylor

12   either by phone or in person?

13   A.    I would call him, of course, and then he would avoid me.

14   After the time that he picked up his stuff in December, we

15   didn't really have contact for almost a year.

16   Q.    Almost a year.  Did you begin dating anybody else during

17   that year's time period?

18   A.    Yes, sir.

19   Q.    In between the time you started dating Mr. Taylor

20   November 1st, had you ever been to his residence in

21   Charlotte?

22   A.    Yes, sir.

23   Q.    Tell us about that, please.

24   A.    In April of 2019, he flew me out there because I told him

25   I would not date him until his divorce was final.  And he said

RAE'SHAWNA CAMPBELL - DIRECT

1   it was final and flew me there in April.

2   Q.   Did you go to a house, townhome, hotel room, something

3   like that?

4   A.   I went to his condo.

5   Q.   Okay.  And did you see anything in the condo that caused

6   you any concern?

7   A.   I didn't see any drugs.  I saw money.

8   Q.   You saw money.  How much?

9   A.   I don't know how much it was.  It was in like a black

10  backpack.

11  Q.   Did you have a conversation with Mr. Taylor about how much

12  was in the backpack?

13  A.   He probably told me, but I don't remember.

14  Q.   Okay.  How did you get to Charlotte?

15  A.   He flew me to Charlotte.

16  Q.   Mr. Taylor paid the fee?

17  A.   Yes, sir.

18  Q.   You said after you picked up the package almost -- he

19  picked up the item.  It's about a year before you talked to him

20  again?

21  A.   Yes, sir.

22  Q.   So that would be early 2021?

23  A.   Yes, sir, it was either towards the end of January or

24  beginning of February 2021.

25  Q.   Did you guys begin a conversation, a regular course of

RAE'SHAWNA CAMPBELL - DIRECT

1  conversation, more than the last year?

2  A.    I'm sorry?

3  Q.    Sure.  Last year you said you had hardly any contact.

4  From the time late January or early February 2021, how frequent

5  was your conversations after that?

6  A.    At that point I was pretty upset with him, so really the

7  conversation would be -- he would call me when he needed to

8  get in the house.  If I didn't answer, he would call several

9  times.

10 Q.    Let me back up for just a moment.  Was he keeping stuff at

11 your house after --  when he started conversations again?

12 A.    When he called in that time frame between January and

13 February.

14 Q.    Okay.

15 A.    He called one day and was like he needed me to hold

16 something there.  And of course I told him no and I was mad.

17 And that's when he said I didn't know what he had in the house.

18 He said he could have shit buried in the ground.

19 Q.    He says that to you, "you don't know what I have in the

20 house?"  All right.  I assume when this first relationship was

21 over with, you got your key back from him?

22 A.    Yes, sir.  I got my key back in December of 2019.

23 Q.    Did he acquire a new key to get into your house?

24 A.    Not that I know of.

25 Q.    Did he ask you to put stuff in your house again?

RAE'SHAWNA CAMPBELL - DIRECT

1   A.   Yes, he did.

2   Q.   Ms. Campbell, big question, you knew I was going to ask

3   this.  What was your answer to that question?

4   A.   I told him no.  And then when he said I didn't know what

5   he had there --

6   Q.   Okay.

7   A.   -- I didn't feel like I had a choice.

8   Q.   Did you agree to let him put stuff in your house at some

9   point?

10  A.   No.  I mean, I just was reluctant.  And because he said he

11  had stuff there, I just let him bring whatever he had.

12  Q.   All right.  You knew the stuff from beforehand was there,

13  correct?  The items that he claimed was heroin, or stated was

14  heroin.

15  A.   That was gone.  So when he asked in February, could he

16  bring stuff to the house and I said no, that's when he said,

17  you don't know what I have there.

18  Q.   After that event, did you give him access to your

19  house?

20  A.   He didn't have a key.  He would just call and ask me to

21  leave a door unlocked.

22  Q.   Leave the door unlocked.  Ms. Campbell, why did you do

23  that?

24  A.   Honestly, for two reasons.  Because I loved him and I

25  believed him when he said he loves me, and also because I was

RAE'SHAWNA CAMPBELL - DIRECT

1  scared.

2  Q.   What do you mean by "scared"?

3  A.   Because I knew that he had people that were watching and I

4  also knew that there were Hispanics that were watching as well.

5  Q.   Let me ask you a question.  Did you ever see an individual

6  come to your house that was Hispanic?

7  A.   Yes, sir.

8  Q.   Did you know he was coming before you actually put eyes on

9  the guy?

10 A.   Yes, sir.

11 Q.   How did you know that?

12 A.   Maurice called me that day and said that somebody was

13 coming and I needed to let them use the garage.  And I told him

14 I had to sing at a funeral, I didn't want anybody there when I

15 wasn't there.

16 Q.   Okay.

17 A.   And I didn't have a choice.  He told me they were coming

18 and they had to use the garage.

19 Q.   Okay.  Who had the key to the garage, Taylor or the

20 Hispanic gentleman?

21 A.   Nobody had a key.

22 Q.   So how did they get in the garage?

23 A.   I had to let them in before I went to the funeral.

24 Q.   Did you stay around to see what took place in the

25 garage?

RAE'SHAWNA CAMPBELL - DIRECT

1    A.    No, sir.  I was ready to leave and there was somebody in a

2    dark truck that was in front of my house.

3    Q.    Uh-huh.

4    A.    And when the Hispanic man pulled up, there was also

5    another car that I noticed that had other Hispanic men in the

6    car.

7    Q.    Yeah.

8    A.    He had a gold truck and he pulled up.  And he could not

9    get the trailer into the garage.  So he got out and said that I

10   had to back the trailer into the garage.

11   Q.    Okay.

12   A.    And I told him "no."  I was like, "I have to be

13   somewhere."

14         And he looked at me and said, "Do it."

15         And then I got in the truck and backed the trailer into my

16   garage.

17   Q.    Again, please, about what date was that?  I don't need an

18   exact date but just kind of about, if you can recall?

19   A.    I do not know the exact date.  I know it was during the

20   pandemic.

21   Q.    Is that early 2021, mid?

22   A.    Yes, sir, early 2021.

23   Q.    How long did the Hispanic person stay inside your garage?

24   A.    I do not know.  After I got the trailer in there, I got in

25   my car and I left.

RAE'SHAWNA CAMPBELL - DIRECT

1  Q.    Okay.

2  A.    And I locked the door from the garage to my house so that

3  nobody could get into my home.

4  Q.    Did you see anything in the garage or up against the wall

5  or on the floor that was present after you left the residence?

6  A.    Yes, sir.

7  Q.    What was it?

8  A.    When I returned home, I saw what looked like, like long

9  pipes, pieces of an axle that had been cut, and some were left

10  in the garage.

11  Q.    Okay.

12  A.    They were empty.

13  Q.    Did you speak with Mr. Taylor after that event about the

14  Hispanic person coming?

15  A.    I think I did speak to him later.

16  Q.    Do you recall what he said?

17  A.    I do not recall what he said.  I just told him I didn't

18  want people coming to my home.

19  Q.    And were there -- is this an isolated incident or was

20  there more than one incident that took place?

21  A.    I know that at least on two occasions.

22  Q.    Do you recall about when the second one was?

23  A.    I do not know when the second one was.  I know that it was

24  warm outside, so I know it was not the earlier part of the

25  year.

RAE'SHAWNA CAMPBELL - DIRECT

1  Q.   Do you recall about how long after the first event the

2  second event took place?

3  A.   It could have been a few months.

4  Q.   Few months.  So maybe April?

5  A.   Yes, sir.

6  Q.   Again, was this the same individual that came on the first

7  time that was there present on the second one?

8  A.   I believe so.

9  Q.   So again, what took place then?

10  A.   That I do not know.

11  Q.   Were there any extra pipes laying around or axles laying

12  around after you left?

13  A.   Yes, sir.

14  Q.   Tell us what you saw, please.

15  A.   I just saw, once again, pieces of an axle, some short

16  pieces, one very long piece that looked like it had been cut.

17  Q.   Do you know how that person got into your garage on that

18  second event?

19  A.   That time Maurice was there.

20  Q.   Maurice was there on the second time.

21       Was anyone else with Maurice besides the Hispanic person?

22  A.   Yes, sir, but I do not know their name.

23  Q.   Okay.  Was it Shad Wilson or Eric Trigg?

24  A.   The second time Shad Wilson and Trigg were not there.

25  Q.   Okay.  I want to take you up to the event of the search

RAE'SHAWNA CAMPBELL - DIRECT

1   warrant at your house.

2       Now, prior to that search warrant -- I assume you recall

3   that day?

4   A.   Yes, sir.

5   Q.   How often had Mr. Taylor been to your residence, say, in

6   the month or two months prior to that?

7   A.   He had been there -- in August he was -- he was there the

8   day before.  And then of course that day.

9   Q.   Do you recall from the paperwork that the date was about

10  August 19th, 2021?

11      Is that an accurate date, ma'am?

12  A.   Yes, sir.

13  Q.   Were you present when Mr. Taylor came to your residence

14  the day before?

15  A.   Yes, sir.

16  Q.   What was the nature of your discussions?

17  A.   He was already in town for a family member.  And he came,

18  my daughter was there, and my cousin who is special needs that

19  I keep sometimes.

20      And he gave my daughter like $20 for her grades and he

21  talked -- talked about us like basically getting back together.

22  And I told him he needed to get his stuff out of my home.

23      And he said, "Give me until September 1st."

24      And I said, "No."

25      And he said give him until tomorrow, which would have been

RAE'SHAWNA CAMPBELL - DIRECT

1    the -- which was August 19th.

2    Q.   Okay.  You said "get the stuff out of the home."  Did you

3    know if he had stuff in your house --

4    A.   Yes.

5    Q.   -- before August 18th?

6    A.   Yes, sir.

7    Q.   What did you know was there?

8    A.   I did not know what was there, I just knew he had

9    something there.

10   Q.   Do you know where it was kept at?

11   A.   At that time like I knew that he had something in the

12   closet in my living room.

13   Q.   Do you live in a single level or is it split level?

14   A.   Single level.

15   Q.   And he had something in the living room closet.  Where

16   would that living closet be in relation to the front door?

17   A.   If you walk in my front door, the living room closet is

18   just a few feet and to the right.

19   Q.   Did you ever look in there to see what was there?

20   A.   No, sir.

21   Q.   How did you know that stuff was kept in the bedroom

22   closet -- I mean, the living room closet?

23   A.   Because I didn't trust him.  And whenever he would come

24   over, I would lock all the other doors that I had that locked

25   so he didn't have anywhere else to put anything.

RAE'SHAWNA CAMPBELL - DIRECT

1  Q.   Now, during the time period that this stuff was kept in

2  the closet there, had you seen Eric Trigg come over?

3  A.   Yes, sir.

4  Q.   How did that take place?

5  A.   He would call and say that Trigg was coming over or was I

6  home, leave the door unlocked.

7  Q.   Did you do that, ma'am?

8  A.   Yes, sir.  I would leave the back door unlocked.

9  Q.   When the items were taken out of the closet, were there

10  any type of big box, plastic bag, package, backpack, something

11  like that?

12  A.   I did not see it until the day that my house was -- that

13  you all came to the house.  If Trigg came in there or if

14  Maurice came in there, I would go to my bedroom and I would

15  lock the door.

16  Q.   Ma'am, you recognize that there were approximately

17  7.9 kilograms of fentanyl in your closet, correct?

18  A.   I didn't -- I did not know until the detective told me,

19  after they had detained me in my home on August 19th.

20  Q.   Why would you do this, Ms. Campbell?  Why let the

21  defendant keep stuff in your house, even though you didn't know

22  what it was?

23  A.   I didn't feel like I had a choice.

24  Q.   What do you mean by that, ma'am?

25  A.   Because at that point I knew that he had people that were

RAE'SHAWNA CAMPBELL - DIRECT

1   watching my house and I knew that there were Hispanics that

2   were watching my house.

3   Q.   At that time that the search warrant was executed -- or at

4   the time Mr. Taylor came just before the execution of the

5   search warrant, what was the nature of the relationship with

6   Mr. Taylor at that time?

7   A.   What was the nature of my relationship with him?

8   Q.   Yes.  Were you guys dating each other?  Were you

9   boyfriend-girlfriend?  Were you friends?

10  A.   We did not have a sexual relationship, so I guess you

11  could say just casually dating.

12  Q.   Uh-huh.  Ma'am, do you have any prior criminal record at

13  all?

14  A.   No, sir.

15  Q.   Have you ever used drugs?

16  A.   No, sir.

17  Q.   Have you ever sold drugs?

18  A.   No, sir.

19  Q.   You are facing sentencing shortly with this Court,

20  correct?

21  A.   Yes, sir.

22  Q.   Have you been made any promises in regards to your

23  testimony as to what your final sentence will be?

24  A.   No, sir.

25  Q.   You were told something when you were getting ready to

RAE'SHAWNA CAMPBELL - CROSS

1  testify, correct?  In fact, you've given a couple of statements

2  to the United States, right?

3  A.   Yes, sir.

4  Q.   What were you told, ma'am?

5  A.   To tell the truth.

6       MR. WEST:  That's all of this witness, Your Honor.

7       THE COURT:  Thank you.

8       Mr. Boyd.

9       MR. BOYD:  I believe Ms. Slaughter is going to question

10  this witness.

11                        CROSS-EXAMINATION

12  BY MS. SLAUGHTER:

13  Q.   Ms. Campbell, I'm Gayle Slaughter.

14       THE COURT:  I'm sorry, Ms. Gunther [sic].  I can't hear

15  you while you're sitting down.

16       MS. SLAUGHTER:  I'm sorry.  I'm still recovering from some

17  health issues.

18       THE COURT:  Yes, ma'am.

19       MS. SLAUGHTER:  If the Court wouldn't mind, if I could sit

20  and ask the questions, that would be a little bit more -- I'm

21  still recovering from some health issues.  If the Court

22  wouldn't mind --

23       THE COURT:  That will be fine.  Keep your voice up,

24  please.

25       Ma'am, if you can't hear Ms. Gunther, just ask her to

RAE'SHAWNA CAMPBELL - CROSS

1    speak up, okay?

2        THE WITNESS:  Yes, sir.

3        MS. SLAUGHTER:  Thank you very much.

4    BY MS. SLAUGHTER:

5    Q.   Ms. Campbell, my name is Gayle Slaughter.

6        THE COURT:  Slaughter.  Excuse me, I'm sorry.

7        MS. SLAUGHTER:  I'm sorry?

8        THE COURT:  I'm sorry.  I mispronounced your name.  I'm

9    sorry, please go ahead.

10       MS. SLAUGHTER:  Okay.

11   BY MS. SLAUGHTER:

12   Q.   I'm going to ask some questions that you've answered, but

13   I couldn't really hear all of your answers until you started

14   speaking a little bit louder.

15       But it seems to me that you indicated that you and

16   Mr. Taylor began a relationship on or about April 2019?

17   A.   Yes.

18   Q.   Is that correct?

19   A.   Yes, ma'am.

20   Q.   And I think you also indicated that at some point you

21   provided him with a key.

22   A.   Yes, ma'am.

23   Q.   When would that have been, at that time in April?

24   A.   Possibly.  I can't recall exactly when I gave him the key.

25   Q.   Okay.  And that he was living in North Carolina, I think

RAE'SHAWNA CAMPBELL - CROSS

```
 1   you said.  Did you ever see him in possession of any illegal
 2   substances?  I mean, I know you said you suspected something in
 3   April or shortly thereafter.
 4        Did he ever display to you any contraband?
 5   A.   I did not see -- I didn't see contraband in April.  It
 6   wasn't until -- it was months later.
 7   Q.   Okay.
 8   A.   -- that --
 9   Q.   So do you know -- months later.  I think you said perhaps
10   October of 2019 or --
11   A.   Yes, ma'am.
12   Q.   Okay.  So when you discovered this bin, you don't know
13   exactly how long it had been there in your home?
14   A.   No, ma'am.
15   Q.   And you immediately confronted him and told him to get his
16   stuff out.
17   A.   Yes, ma'am.
18   Q.   And then in December, you said you threatened to trash it
19   all and he came and got it.
20   A.   Yes, ma'am.
21   Q.   And you all broke off, you said, for about a year.
22   A.   Yes, ma'am.
23   Q.   Do you know Ouisha Talbert?
24   A.   I know who she is.
25   Q.   You do?
```

RAE'SHAWNA CAMPBELL - CROSS

1  A.   Yes, ma'am.

2  Q.   Were you aware that she and Mr. Taylor had a relationship

3  in 2020?

4  A.   I had asked him and he said they were friends.

5  Q.   Okay.

6  A.   But I figured that they -- I had heard they were dating

7  and I figured they were dating.

8  Q.   Isn't it true that upon her arrest in 2020, you contacted

9  Mr. Taylor regarding Ms. Talbert's arrest?

10 A.   I don't know.  We may have talked about it on the phone.

11 Q.   Isn't it -- I'm sorry?

12 A.   I may have.  I don't really -- I can't recall.

13 Q.   You don't recall asking -- telling him he could begin to

14 store stuff at your place again, is that --

15 A.   No, ma'am, I never said that.

16 Q.   Now, you say you got your key back in December of 2019.

17 And as far as you knew, he did not have another key to your

18 residence?

19 A.   Yes, ma'am.

20 Q.   Now, I think you were asked about what you received for

21 storing -- for him storing substances on the premises; is that

22 correct?

23 A.   Yes, ma'am.

24 Q.   And I didn't really hear your answer.

25 A.   I never received anything for him storing things at my

RAE'SHAWNA CAMPBELL - CROSS

1    house.

2    Q.    This residence on Lucille, are you buying or renting or --

3    A.    I'm renting.

4    Q.    And you pay the mortgage yourself?

5    A.    I pay rent to the landlord.

6    Q.    That's what I meant.  You pay rent?

7    A.    Yes, ma'am.

8    Q.    You pay all the utilities?

9    A.    Yes, ma'am.

10   Q.    You provide for all the upkeep on the premises?

11   A.    The things that I'm responsible for.  The landlord, I

12   mean, you know, does repairs and things.

13   Q.    When exactly did you move to Lucille Drive?

14   A.    I moved on Lucille Drive, I want to say, in 2016.

15   Q.    This would have been before you met Mr. Taylor?

16   A.    Yes, ma'am.  Well, I mean, I knew him, but we were not in

17   a relationship at that time.

18   Q.    Okay.  Would you consider yourself an acquaintance of his

19   at that time or --

20   A.    Yes, ma'am.

21   Q.    -- you just knew him?

22   A.    No, we were friends.  We just were not -- we were not

23   dating.

24   Q.    So then you indicated that in January and/or February of

25   2021, something about you were upset with him.  I didn't hear

RAE'SHAWNA CAMPBELL - CROSS

1   why.   What were you upset about?

2   A.    Because he said he needed to hold some things at my house.

3   Q.    And you were upset because he asked if he could hold some

4   things at your house?

5   A.    Yes.

6   Q.    And your response to him was what?

7   A.    No.

8   Q.    So when did you change your mind, or did you change your

9   mind?

10  A.    I didn't.  We went back and forth, and it was after he

11  alluded to the fact that there were already things there that I

12  felt like I didn't have a choice.

13  Q.    So did he ask to come back to bring some stuff there or to

14  get some stuff?

15  A.    No, to bring stuff.  But then I asked -- he said he was

16  coming.

17  Q.    Did you ever locate any items, you know, supposedly that

18  he had left there?

19  A.    Aside from when I found the items in October?  No.

20  Q.    Of 2019?

21  A.    Yes, ma'am.

22  Q.    So you say you know Shad Wilson, correct?

23  A.    Yes, ma'am.

24  Q.    And you said that Shad and Trigg were not there in April

25  of '21.

RAE'SHAWNA CAMPBELL - CROSS

1    A.    No, ma'am.

2    Q.    Now, how many times had Shad Wilson been at your home?

3    A.    Shad had been to my home several times in the beginning of

4    my relationship with Maurice, not so much in those months prior

5    to -- to the feds coming and finding everything.

6    Q.    Was there a specific reason why he was no longer coming

7    around your house or your premises?

8    A.    They had fallen out.

9    Q.    Who had fallen out?

10   A.    Maurice and Shad had fallen out.

11   Q.    Do you know what that was about?  Did Maurice talk to you

12   about his falling out with Shad?

13   A.    Yes.

14   Q.    What were you told?  What do you recall?

15   A.    He said that he had to always dig him out of a hole and he

16   couldn't trust him.

17   Q.    Did he elaborate on what he meant by digging him out of a

18   hole?

19   A.    He always had to -- like when it came to money that was

20   owed, so I don't really know exactly.

21   Q.    And so did you all have a -- was he ever there at your

22   place just for social gatherings or social interaction, Shad?

23   A.    No.  I mean, he would come sometimes and trim my bushes in

24   my yard, but no.

25   Q.    He would do what?  I'm sorry.

RAE'SHAWNA CAMPBELL - CROSS

1    A.    He would come and like sometimes trim like my bushes, like

2    little yardwork.

3    Q.    Okay.

4    A.    But that was all.  He wasn't there for social gatherings.

5    Q.    So your testimony essentially is that sometime in October

6    or November of 2019, you observed some items in your home which

7    you believe Mr. Taylor had left there, and they were there

8    until December of 2019?

9    A.    Yes, ma'am.

10   Q.    And then again you indicated that there was a drop-off of

11   some sort in '21?

12   A.    Yes, ma'am.

13   Q.    So it would be true to say that Mr. Taylor did not have

14   anything in your home in 2020?

15   A.    I did not think he had anything in my home in 2020.

16   Q.    You never saw anything, he never came and got anything

17   from the premises?

18   A.    No, ma'am.  We did not talk in 2020.

19   Q.    Okay.  So from early '21, your testimony was that someone,

20   a Hispanic person, dropped off some items.  Did you see

21   specifically what was dropped off?

22   A.    No, ma'am, I did not.

23   Q.    And I think your testimony was that you saw some pieces of

24   an axle or something, but you didn't really see the evidence of

25   any illegal substances or -- stored in your home?

RAE'SHAWNA CAMPBELL - CROSS

1   A.   I did not see the illegal substance.  I was upset that

2   there were things in my garage.

3   Q.   Okay.

4   A.   That a mess was left in my garage basically.

5   Q.   But not any drugs?

6   A.   I did not see drugs in my garage.

7   Q.   When the police served a warrant on your premises in

8   August of '21, where were those items located that they

9   confiscated in August?

10  A.   I did not know where they were finding the items.  It

11  wasn't until I was -- I had to go with the female officer to

12  use the restroom.  And after I used the restroom, she cuffed me

13  and told me I was being detained.  And I stood behind her and I

14  heard a male voice on a radio saying where the items were

15  located.

16       And I saw a male officer -- I heard a male officer say

17  "got it," and then when he walked through the hallway, he had a

18  black duffle bag.

19  Q.   That was the first you had seen or were aware that

20  anything was being stored at your premises?

21  A.   That's the first time I had seen the bag.

22  Q.   Okay.  It was the first time you even had any knowledge

23  that something was being stored on your premises, correct?

24  A.   No, I knew he had stuff there.  I just didn't know what he

25  had there.

RAE'SHAWNA CAMPBELL - CROSS

1   Q.   So how did you know there was stuff there?

2   A.   Because he told me in February that he needed to bring

3   things there.

4   Q.   So you think that -- when exactly did you say this first

5   dropoff had happened?  In April, is that what you said, with

6   these Hispanics?

7   A.   I said I cannot recall the month.

8   Q.   You indicated at some point in your testimony that

9   Mr. Taylor had indicated that perhaps there was some things

10  there that you were unaware of, correct?

11  A.   Yes, ma'am.

12  Q.   Did you ever undertake any effort to locate those items?

13  A.   No, ma'am.

14  Q.   You didn't?

15  A.   No, ma'am.

16  Q.   And you never happened upon anything?

17  A.   Just what I found in October of 2019.

18  Q.   That's what I'm talking about.

19  A.   Yes, ma'am.

20  Q.   Okay.

21  A.   I didn't -- I didn't want to know.

22  Q.   You didn't want to know?

23  A.   No.  Because, I mean, if he's saying something is there, I

24  don't want to find out if something is there or not.

25  Q.   You said you had a child in your home?

RAE'SHAWNA CAMPBELL - CROSS

1    A.    I had a child -- I have a child.

2    Q.    And you didn't want to even ascertain whether there were

3    any things there that might pose a danger to her or yourself

4    even?

5    A.    At that point I already knew that we were in danger.

6    Q.    You already knew you were in danger.

7          MS. SLAUGHTER:  Your Honor, I believe that's all I have.

8          THE COURT:  I have just a couple of questions, Mr. West.

9          MR. WEST:  Yes, sir.

10         THE COURT:  Ms. Campbell, I want to ask you some questions

11   about the period starting in 2021, January, until the time your

12   home was searched in August.

13         You had indicated in your testimony that you had

14   received -- or you would receive a call from Mr. Taylor

15   indicating he wanted access to your home.  You didn't give him

16   a key at that point, but he was asking for access.

17         About how many times do you believe that he asked for

18   access during that period of time?

19         THE WITNESS:  From April -- I mean, from --

20         THE COURT:  From January 2021 --

21         THE WITNESS:  Until August?

22         THE COURT:  -- until August.

23         THE WITNESS:  Honestly, I don't know.  It wasn't very

24   often because I wasn't there a lot.  My daughter and I were not

25   there a lot.

RAE'SHAWNA CAMPBELL - RECROSS

1        THE COURT:  What's your best memory of the number of times

2   he asked you for access?

3        THE WITNESS:  Probably double digits, between ten and 15.

4        THE COURT:  Thank you, ma'am.

5        MS. SLAUGHTER:  Between what?  I'm sorry, I couldn't hear.

6        THE COURT:  Between ten and 15.

7        Mr. West.

8        MR. WEST:  No other questions on behalf of the United

9   States.

10        THE COURT:  All right.  Thank you.

11        Any follow-up on what I've asked?

12        MS. SLAUGHTER:  Yes, Your Honor.

13                        RECROSS-EXAMINATION

14   BY MS. SLAUGHTER:

15   Q.   Just I want to be clear.  You did not provide a key to

16   Mr. Taylor after he had returned a key, correct?

17   A.   No, ma'am, I did not provide a key after 2019.

18   Q.   So from -- anywhere from January 20th until August '21, he

19   did not have a key to your premises?

20   A.   That is correct.

21   Q.   But for you allowing him access to it, he had no way of

22   controlling the premises or accessing the premises?

23   A.   He would just say he needed to come over and I would leave

24   the back door unlocked.

25        MS. SLAUGHTER:  That's all I have.

1     THE COURT:  All right.  Thank you.

2     Anything else?

3     MR. WEST:  No, sir.  Thank you.

4     THE COURT:  Thank you, Ms. Campbell.  You may step down.

5  You are excused.

6     THE WITNESS:  Thank you, Your Honor.

7     THE COURT:  Mr. West, do you have additional witnesses?

8     MR. WEST:  No, sir.  The United States would not be

9  calling any additional witnesses, sir.

10     THE COURT:  Thank you.

11     Mr. Boyd or Ms. Slaughter, would you like to present any

12  testimony or evidence on any of these factual issues?

13     MR. BOYD:  No, Your Honor.  We don't have any witnesses.

14     MS. SLAUGHTER:  Just one moment, Your Honor, if we could.

15     THE COURT:  Yes, ma'am.

16     MR. BOYD:  Your Honor, after discussion with co-counsel,

17  we would request the Court to give us a brief recess to discuss

18  with Mr. Taylor the possibility that he may testify to the

19  Court.

20     THE COURT:  That's fine.  We'll take ten minutes.

21     I do want to advise counsel, of course, if the Court were

22  to determine that false or misleading testimony were presented,

23  under the sentencing guidelines it could result in either an

24  addition for obstruction of justice or loss of acceptance of

25  responsibility.  But, of course, that's only for purposes of

1    notice and entirely within the defendant's prerogative to

2    testify or not.  We will take a ten-minute recess.

3         (A recess was taken from 3:20 p.m. to 3:30 p.m.)

4         THE COURT:  Thank you.

5         We'll continue again in Lexington Criminal Action 21-101,

6    United States versus Maurice Taylor.

7         Before our last break, I was asking counsel to briefly

8    summarize their position with regard to the factual issues that

9    are disputed and contained in the presentence report.  This is

10   not the time we'll be arguing over the facts that apply to the

11   enhancements that are also the subject of objections.

12        Mr. West.

13        Before we do that, counsel had asked for a brief recess to

14   determine whether to present additional testimony.  So let's

15   see if there's additional testimony to be presented.

16        MR. BOYD:  Judge, at this time we will not call

17   Mr. Taylor.  We would like to proceed.

18        THE COURT:  All right.  Thank you.

19        Mr. West.

20        MR. WEST:  Yes, sir.  As I understand the Court's

21   inquiries, you would like me to address some of the factual

22   assertions but not necessarily address the enhancements,

23   correct?

24        THE COURT:  Yes, sir.

25        Specifically, the defendant has objected in the offense

1    conduct section to paragraph 7, beginning on the top of page 5.

2         MR. WEST:  Yes, sir.

3         THE COURT:  After that carryover sentence that begins,

4    "Law enforcement conducted an investigation into Salas'

5    trafficking organization."

6         And then in paragraph 8, beginning, "Taylor engaged in an

7    agreement with members of the aforementioned organization

8    outside the Eastern District of Kentucky to receive shipments

9    of cocaine and fentanyl at irregular intervals."

10        MR. WEST:  Yes, sir.

11        THE COURT:  "These locations included but are not limited

12   to the residences at Wheatcroft Drive and Lucille Drive."

13        And they have also objected to paragraph 11, about the

14   defendant's primary residence being in Charlotte, North

15   Carolina, for several months before October 2020.

16        Also that Talbert was a resident of Lexington.  And prior

17   to October 2020, knew that Taylor had moved his residence.

18        The defendants also objected to paragraph 12, 13 and 14 in

19   their entirety, and to the factual summary for Shad Wilson's

20   conduct at paragraphs 19 and 20, as well as the admissions that

21   are summarized for Campbell, Brown, and Trigg at paragraphs 23,

22   24 and 25.

23        MR. WEST:  Yes, sir.  Of course the standard in regards to

24   this hearing is preponderance of the evidence in this matter.

25        In evaluating the defendant's objections in regards to

1    objection number 1, again, very candidly, and based on the

2    proof that we have, the second sentence where it says "The

3    defendant asserts the outline that the investigation in

4    paragraph 7" --

5         THE COURT:  I'm sorry, I'm not -- where are you now?

6         MR. WEST:  I'm on page 24 of the addendum to the

7    presentence report, sir.

8         THE COURT:  I'm looking at the presentence report itself

9    in paragraph 7.

10        MR. WEST:  I'm sorry, sir.  I was -- I had gone to the

11   back end of listing the objections.

12        THE COURT:  All right.

13        MR. WEST:  I don't -- we did not introduce specific proof

14   in regards to paragraph 7 regarding the Salas matter.  And I

15   don't intend to offer any additional proof on that matter.

16        I have no issue with -- to their objections if the

17   information regarding Mendoza-Salas is removed from the PSR.  I

18   think there is sufficient evidence otherwise in this matter

19   that will obviate the need to include that.

20        THE COURT:  All right.

21        MR. WEST:  In regards to the next paragraph -- regarding

22   irregular intervals to the residence on Wheatcroft Drive, we

23   have the testimony of Mr. Brown, who testified that on two

24   occasions items were received at his residence.  I think it's

25   more of a semantics argument.  There is no set pattern with

1    two, but clearly Mr. Brown said two.

2        In regards to the objection, paragraph 11 regarding

3    Ms. Talbert, again, she testified in this matter and talked

4    about knowing of his residence in North Carolina and his

5    employment.

6        I think the statement, "The defendant maintains that he

7    was employed in trucking," if that were expanded to that he

8    owned a trucking business, that would be accurate.

9        But as far as employed in trucking, I don't think that

10   applies, sir.

11       THE COURT:  Does it affect the guideline calculations, the

12   objection?

13       MR. WEST:  It does not, sir.

14       THE COURT:  All right.

15       MR. WEST:  In regards to paragraphs 12, 19 and 29, that

16   the offense conduct regarding Brown's residence and search of

17   Shad Wilson's residence, it is relevant.  Both of those

18   individuals testified.  Both of them said that the arrangements

19   for those matters, at least Mr. Brown's, came through the

20   defendant.  Mr. Wilson testified that the amount of controlled

21   substances found in his residence came from Mr. Taylor.  It is

22   relevant.  It had been sworn to under oath.

23       In regards to paragraphs 13 and 14, that of Mr. Trigg and

24   Campbell, they state are untrue and lacking corroborating

25   evidence.  Again, Mr. Wilson testified today.  Mr. Trigg's

1    statements were sworn under oath in his plea agreement and at

2    the sentencing paragraph.

3         In regards to paragraph 23, in regards to Ms. Campbell,

4    again, Ms. Campbell testified, we submit her testimony today

5    has been accurate, it was under oath and is consistent with the

6    facts as laid forth in the PSR.

7         As far as objecting to the statements provided today, one

8    of the reasons why we called those witnesses -- of course the

9    Court could see them, examine their credibility, look at

10   whether or not statements were inconsistent, and will submit to

11   the Court that, based upon their testimony today, the facts

12   concerning the conduct of Mr. Brown, Ms. Talbert, Mr. Wilson,

13   and Ms. Campbell were accurate and reliable.  To dispute that

14   they are not, I understand their position, but I would

15   disagree, sir.

16        THE COURT:  All right.

17        MR. WEST:  Do you want me to proceed on from there, sir?

18        THE COURT:  Let's see.  I believe there are a couple of

19   additional objections, factual objections.  One to -- I'm not

20   sure it's a factual objection, but there is an objection to

21   paragraph 55, which relates to a conviction and whether that's

22   within the ten-year period of when the conspiracy in this case

23   began.

24        And I would assume you're relying upon the testimony of

25   Mr. Wilson to establish, in part, the date in 2016.  But then

1    also the plea agreement, which indicates a date as well that

2    would be within the ten-year period.

3        MR. WEST:  Yes, sir, that's exactly correct, I call it the

4    ten-year boundary.  Clearly, the testimony and the plea

5    agreement of Mr. Taylor makes that offense conduct permissible

6    to add criminal history points.  Being no evidence contrary to

7    that, I would submit that criminal history is appropriately

8    calculated, sir.

9        Additionally, the defendant's own statements, going back

10   more of a conclusory argument, some of the defendant's own

11   statements in this matter, in his plea agreement that he swore

12   to under oath to this Court, is somewhat contradictory to what

13   his objections are, in that he admitted the amount of cocaine

14   foreseeable to him is approximately ten kilograms but less than

15   15 kilograms.

16       The amount of fentanyl foreseeable is based largely upon

17   lab reports of 7.9 kilograms.  Any objections to the contrary

18   as to drug weight, I don't agree, sir.

19       In regards to the relationship enhancement under 3B1.1,

20   aggravating role, it says, "The defendant used fear, impulse,

21   friendship, affection, or some combination thereof to involve

22   another individual in the transport or storage of controlled

23   substances.  The individual received little or no compensation

24   and the individual had minimal knowledge of the scope and

25   structure of the enterprise."

1          There is sufficient evidence with Ms. Campbell's testimony

2     today for that enhancement to apply.

3          THE COURT:  Well, you're bleeding over into the legal

4     objections based upon factual information.  I've got to make

5     factual findings first before we get to --

6          MR. WEST:  Yes, sir, I apologize.

7          THE COURT:  -- the application of the enhancements.

8          MR. WEST:  Yes, sir.  Thank you.

9          THE COURT:  Thank you.

10         Mr. Boyd or Ms. Slaughter.

11         MR. BOYD:  Your Honor, obviously we've put our main

12    objections in writing with the Court.  I think that with regard

13    to paragraph 8, it was indicated that the -- Taylor's delivery

14    of fentanyl and cocaine was at irregular intervals from 2017 to

15    the residence of Wheatcroft and Lucille Drive.

16         Testimony today was that Lucille Drive, that began in

17    2019, if you believe the testimony of Ms. Campbell.  And that

18    Wheatcroft, that took place, according to the testimony of

19    Mr. Brown, in 2020, which is why we objected to the 2017.

20         THE COURT:  It's still within the period charged in the

21    indictment in the count of conviction.

22         MR. BOYD:  Judge --

23         THE COURT:  So does that matter?  The date, does it matter

24    at all?

25         MR. BOYD:  We can't disagree with you, Judge.

1          THE COURT:  All right.

2          MR. BOYD:  With regard to the residence, I think that our

3     objection was mainly that Mr. Taylor has resided in Charlotte,

4     North Carolina as his primary residence since 2011.  There was

5     reference in his PSR and also the plea agreements of

6     Ms. Talbert and Ms. Campbell that he had moved his primary

7     residence to Charlotte in 2020.  That's just, I don't think

8     it's supported by any of the facts or even the testimony here

9     today.

10          He resided in Charlotte, North Carolina, and even the

11     testimony from both individuals today indicated that he would

12     visit here, so that's our basis for the objection to that.

13          THE COURT:  That's in paragraph 7.  That's the section

14     that Mr. West says doesn't matter.  He doesn't mind if that's

15     taken out.

16          MR. BOYD:  Judge, with regard -- I think that the other

17     objections that we have would basically move into the legal

18     arguments with regard to the maintenance of the residence at

19     Lucille, and the claimed affection or use of fear, impulse,

20     friendship, affection, or combination thereof, with regard to

21     Ms. Campbell.

22          I guess I would clarify that, that at least the

23     understanding that we had with regard to that enhancement, that

24     that was coming with regard to his relationship with

25     Mrs. Talbert, I believe, that the United States just referenced

1    that to Ms. Campbell.  And we were under the impression that

2    the reason that they were seeking the enhancement for the

3    maintenance of a property was based on Lucille Drive and

4    Ms. Campbell's residence.

5        So I think before we proceed with any legal argument on a

6    potential enhancement on the affection or threat area,

7    obviously there's got to be a finding that there is a

8    leadership enhancement before we even get to that; but also

9    with clarification from the United States and the Court whether

10   or not we are defending against the enhancement for

11   Ms. Campbell or against Ms. Talbert.

12       THE COURT:  Well, it could apply to either one under the

13   guidelines section.  It doesn't depend upon whether there is a

14   four-level increase for leadership in the case.

15       Section 2D1.1(b)(16) states the defendant -- well, excuse

16   me, you are correct.  If the defendant receives an adjustment

17   under 3B1.1, it doesn't necessarily have to be a four-level

18   increase.

19       MR. BOYD:  Right.

20       THE COURT:  And the offense involved one or more of the

21   following factors, then there would be the two-level increase.

22   The defendant used fear, impulse, friendship, affection or some

23   combination to involve another individual in the illegal

24   purchase, sale, transportation or storage of controlled

25   substances.

1    Second, that the individual received little or no

2  compensation for the illegal purchase, sale, transportation or

3  storage of the controlled substance, and the individual had

4  minimal knowledge of the scope and structure of the enterprise.

5    So let's focus on Ms. Campbell for just a moment and the

6  nature of her testimony, which was very convincing to the

7  Court.

8    She testified that beginning in January, if we even

9  exclude the earlier period, but beginning in January 2021, when

10  she attempted to -- or when Mr. Taylor contacted her and asked

11  her to -- or told her he was going to use the residence again,

12  or ask her if he could, she told him no.  And then he

13  essentially made what would be in the nature of blackmail

14  threats to her that if he didn't -- that that had to take place

15  because he didn't -- she didn't know what he had stored there.

16    Based upon that fear, and then use of other individuals at

17  the residence, that would show up at the residence, she allowed

18  that to take place.  In other words, didn't feel that she could

19  say no to him, in her words.

20    And that continued on several occasions, between ten to 15

21  occasions, until the residence was searched and there was a

22  large quantity of fentanyl, 7.9 kilograms, that were found at

23  the residence at that time.

24    So if we look at those facts, do you dispute those facts,

25  first?  What is your position on the facts testified to by

1    Ms. Campbell?

2        MR. BOYD:  We definitely dispute those facts.  We believe

3    and we know, just based on my client's information, Ms. Talbert

4    was arrested in October of 2020.  I know that Ms. Campbell at

5    that point knew that, said she spoke to Mr. Taylor about that

6    and saw an opportunity.  She had a desire to continue a

7    relationship with him.

8        And we completely dispute the fact that he forced her to

9    do anything.  She offered up the opportunity for him to

10   continue to store things there.  This idea that she was under

11   some sort of terrible threat that she had no control of, we

12   have to recognize that she never allowed them to have a key.

13       So he supposedly got so much dominion over her and he's

14   telling her she has to do X, Y and Z, but she can tell them,

15   I'll open the door for you, I'll let you in when I want you in.

16   I otherwise will deny you access to this place.

17       I do also think there is some true issues with her

18   testimony with regard that she was so fearful that she didn't

19   look to see what was there.  There was nothing ever found

20   there, other than what she allowed to willingly bring in in

21   February of 2021.

22       Basically she is telling the Court that he threatened me,

23   he told me there's stuff there.  He doesn't have access.  She

24   can lock every door.  She could call any law enforcement agent

25   that she wanted.  She could do anything that she needed to when

1    he's in Charlotte, North Carolina, a thousand miles away, but

2    she doesn't do any of that because she's not doing this because

3    of fear.

4        She's doing this, because even though she's in a platonic

5    relationship with him, she desires for him to be in, I guess,

6    an affectionate relationship.

7        THE COURT:  Let's assume for a moment that that's correct,

8    that she did this voluntarily, and therefore she wouldn't have

9    a -- she wouldn't have a motion that she could make under the

10   guidelines, 5K2.12, for blackmail or coercion, and she does it

11   for attention, she just wants to get back in his good graces,

12   knowing that he's no longer involved with Ms. Taylor.  Doesn't

13   that still meet the guideline section?

14       MR. BOYD:  I don't think so.  Because it says the

15   defendant used affection.  He didn't use -- according to her,

16   she's being forced, he's this bully.  She may want affection

17   from him and he's not offering it to her.  And she desires a

18   relationship but he's not giving it to her.  So she's kind of

19   being shut out both ways.

20       And she can take the stand today and the United States can

21   tell her, we'll do a 5K motion for you.  So it motivates the

22   change in her testimony.

23       I don't believe that her testimony is consistent with what

24   she said in her plea agreement.  She talks about, you know,

25   that she allowed the three of the -- what we believe the main

1   players, Mr. Trigg, Mr. Wilson and Mr. Taylor, who we think are

2   more on all the same level, to come into that residence and do

3   what they needed to do.

4       She maintained dominion over that residence by maintaining

5   a key.  I think that -- and, you know, we'll get into the

6   leadership role that would precipitate the ability to use this

7   enhancement.

8       But one key testimony that I think differentiated between

9   what the witnesses said today, Mr. Wilson, compared to what

10  Ms. Campbell said, is Ms. Campbell said that Mr. Wilson would

11  have to use Mr. Taylor to get him out of his money problems,

12  which is just totally different than the idea that he's doing

13  whatever Mr. Taylor tells him to do, that everybody's at the

14  direction of this lord and kingpin that lives a thousand miles

15  away, that shows up in town and, you know, tells everybody what

16  to do and directs everybody to do it.

17      Mr. Wilson, he's a convicted drug trafficker.  He knew

18  Sorrow before he ever knew Sorrow.  He was involved in drug

19  trafficking with him in 2004.  It's easy for him to take the

20  stand here today with the hope that he gets some mercy from a

21  5K committee and say that this was all Mr. Taylor.

22      But the reality of this organization, the fact that even

23  what Ms. Campbell brought up today, which is that he wasn't

24  handling his money, he would have to bail him out, indicates

25  that he's doing things on his own outside the purview of

1    Mr. Taylor.

2        Because if Mr. Taylor was directing him and he was only

3    doing what Mr. Taylor told him to do, how could he ever get

4    into any money problems?

5        If he's taking his own operation and involving Mr. Taylor

6    in it, taking his own operation with Sorrow that gets shut down

7    and involve Mr. Taylor in it, then he could have money

8    problems.  And he would have to then involve Mr. Taylor to try

9    to help him keep his operation clean.  That's what we believe

10   happened here.

11       I understand that there is an allegation that Mr. Taylor

12   is the leader in this.  But if you look at the visits that we

13   have that are documented, Mr. Taylor -- kind of what I always

14   look back on when we're talking about this leadership, Judge,

15   is, if he is what they portray him as, is he is this guy that

16   sits on high in Charlotte and comes over here only to collect

17   kind of the goods of his illegal gotten gains, then why in the

18   world does a kingpin or a leader like that walk into a home,

19   that he knows is under surveillance, because Eric Trigg had

20   seen them following him and had turned back from that

21   residence, according to the discovery, and so he knew this.

22       But he comes in and takes a kilo of cocaine and walks out

23   the front door with the understanding he's probably being

24   watched.  That's not what a leader does.  That's what somebody

25   who's got to fix what these guys here are messing up, Mr. Trigg

1    and Mr. Wilson.

2        And that he's basically put in a position that if he

3    doesn't come here and take that kilo of cocaine, then he may

4    not be sitting here at this table today.  That's not what a

5    leader does, that's what somebody who's involved with two other

6    people that's a three-headed operation, does.

7        And the one that's sitting in a position where, if he

8    has -- if what I would call his credit had been used by these

9    other two players, by Mr. Trigg and Mr. Wilson, if they rang

10   credit with this cartel and they have gathered these illegal

11   drugs, then they have basically put him in the line of fire

12   with the cartel because they are not going to go without

13   getting their money.

14       Mr. Wilson is not handling his money right.  Ms. Campbell

15   allows him to store things there.  And basically Mr. Taylor

16   comes here with the hope of maybe being able to keep them off

17   of his back long enough to do something with the drugs.

18       And truthfully, Judge, in conversations with the United

19   States, a lot of the argument that we made is he had backed off

20   this operation, that Mr. Wilson and Mr. Trigg had continued

21   this operation contrary to his own desires.  And basically what

22   was stored at Ms. Campbell's house, he had been trying to get

23   them to return back to them because he did not want to be

24   responsible for it because he's not the one who asked them to

25   do that.

1    Judge, that addresses both the leadership, that addresses

2    the ability to then even move on to the affection.  Because if

3    we don't have leadership, then we don't get to whether or not

4    he used either Ms. Campbell or Ms. Talbert in this operation.

5        We have a situation where we have Ms. Talbert, one time,

6    we have one time where he has put a bag into her car.  And that

7    one time, we're talking about maybe using an enhancement that,

8    in the history of the Eastern District of Kentucky, we have

9    never enforced that enhancement.  It's a matter of first

10   impression.

11       Somehow, for some reason, that's being used potentially

12   against Mr. Taylor in a case that, compared to many of the drug

13   cases that have come through this Court in front of this -- in

14   front of Your Honor, this is not as big as they get.  This is

15   not as bad as it gets.  But we're looking at a situation where

16   the United States is asking you to impose a guideline range of

17   324 months.

18       THE COURT:  If you want to argue in allocution now, you

19   can do it.  But you can't do it twice, okay?

20       MR. BOYD:  Okay.

21       THE COURT:  We're talking about the factual summary right

22   now that's been objected to.

23       I have allowed you to go on and argue some of these legal

24   issues that deal with the enhancements.  If you want to do

25   that, you can do that too, but you can do it one time.

1      MR. BOYD:  I don't need to say it again, Judge.  I'll take

2  this as the one opportunity to do that.  And I stand by what

3  I've argued, as far as my legal argument to the Court also.  If

4  I can just finish up that, I won't --

5      THE COURT:  Sure.  Go right ahead.

6      MR. BOYD:  Okay.  So, Judge, I believe that basically the

7  Court is being asked to impose a sentence that, if we look at

8  it, is making Maurice Taylor the worst of the worst.

9      Maurice Taylor, in front of this Court, is standing, being

10  accused of having ten kilos of drugs.  Awful.  Like there's no

11  part of me that's saying this is a good man.

12      THE COURT:  You're making this same argument that you made

13  in your sentencing memo, correct?  That the Court should not

14  impose a maximum sentence because he's not the worst of the

15  worst.

16      And you mix statutory penalties with guideline

17  calculations, don't you?

18      MR. BOYD:  Judge, I am addressing the enhancements.  We're

19  at a 31.  They're asking you to impose eight --

20      THE COURT:  We're not at a 31, no, sir.  Right now we're

21  at 39, unless I sustain some of these objections to these

22  factual issues.

23      MR. BOYD:  Judge, I believe that we reserved the right to

24  object to those that -- I agree with you, Your Honor, that if

25  the eight-point enhancements are imposed, then it's at a 39.

1    And that is 324 months, minimum.  I agree with that, Judge.

2        We're asking the Court to deny those.  We don't believe

3    that you should impose a four-point leadership, which doesn't

4    open the door to the two points for affection, which has never

5    been imposed in this jurisdiction.

6        THE COURT:  Does that mean it can't be?

7        MR. BOYD:  Judge, you can do whatever you choose.

8        THE COURT:  No, I can't do whatever I choose.

9        I, number one, calculate the guidelines correctly.  And

10   number two, I consider the factors of 3553 in the context of

11   the facts of the case and the arguments that are made by the

12   parties and the statement of the defendant.

13       That's what I do.  I don't do whatever I want to,

14   Mr. Boyd, and you know that.

15       MR. BOYD:  Judge --

16       THE COURT:  And you know that.

17       MR. BOYD:  I do understand that, Judge.  I'm not trying to

18   challenge the Court and say that this is some type of, you

19   know, not within the boundaries of what you can do.

20       What I am saying to the Court is that within those

21   guideline ranges and within 3553, it says that we should

22   consider whether or not they are unwarranted sentencing

23   disparities.  We've got Eric Trigg, who has got a higher

24   criminal history than Maurice Taylor.

25       THE COURT:  All right.  Let's talk about unwarranted

1    sentencing disparities among defendants with similar records

2    who have been found guilty of similar conduct.

3         MR. BOYD:  Yes, Your Honor.

4         THE COURT:  This defendant in his presentence report right

5    now has a total offense level of 39, Criminal History

6    Category III.

7         MR. BOYD:  If the Court were to impose all the --

8         THE COURT:  That's 324 to 405.  That's the guideline

9    range, correct?

10        MR. BOYD:  Not if you don't impose the eight-point

11   enhancement.

12        THE COURT:  Let's assume I do.

13        MR. BOYD:  Okay.

14        THE COURT:  That's what we're looking at right now.  If I

15   sustain objections, you're right.  If I don't, that's what

16   we're looking at.

17        MR. BOYD:  Absolutely, Judge.

18        THE COURT:  So you want to make an argument under

19   3553(a)(6), and you can do that, but we have to talk about

20   similarly situated individuals.

21        MR. BOYD:  Correct.

22        THE COURT:  We have to look at criminal history.

23        MR. BOYD:  Right.

24        THE COURT:  And let's look at total offense levels.

25        MR. BOYD:  Right.

1     THE COURT:  How many defendants were sentenced, in the

2  statistics that you cite in your sentencing memo for 2021, how

3  many were sentenced at offense level 39 or higher for drug

4  trafficking offenses that were in Criminal History

5  Category III?

6     MR. BOYD:  Judge, I don't have that information.

7     THE COURT:  That would be a comparable group, wouldn't it?

8     MR. BOYD:  It would.

9     THE COURT:  You can look it up.  I looked it up just

10  before we started today.

11     MR. BOYD:  Okay.

12     THE COURT:  Because of the arguments that you made.

13     19 that were in 39.

14     12 that were in 40.

15     Nine that were in 41.

16     Four that were in 42.

17     And 11 defendants sentenced in 2021 in 43, Criminal

18  History Category -- base offense level or total offense level

19  43.

20     That's 55 total, out of a total of 17,608 defendants that

21  were sentenced in 2021.  Three-tenths of 1 percent.

22     And you don't know what the sentences were for those

23  defendants, do you?

24     MR. BOYD:  No, Your Honor, I don't.

25     THE COURT:  Substantially higher than the average that you

1    cite, correct?

2         MR. BOYD:  I agree with that.

3         THE COURT:  Or the mean or median.

4         MR. BOYD:  Judge, I'm not going to -- I don't know the

5    answer to that.  And I am sure the Court does because you

6    looked it up.  I don't know the answer to that.

7         In defending my client and trying to get what I hope is a

8    fair sentence for him, we weren't coming at this with the idea

9    that these enhancements that were put in the only plea

10   agreement that my client was offered were going to be

11   automatically, you know -- and I know the Court's considering

12   my objections.  I know the Court is.  I know that there are

13   good reasons to consider my objections.

14        I also don't know of those people that are similarly

15   situated, if they had eight-point enhancements for enhancements

16   that have never been imposed in the jurisdiction.

17        THE COURT:  Well, we know they had some enhancements

18   because the top offense level, base offense level, under 2D1.1

19   is 38.  If a person gets three levels off for acceptance,

20   that's 35.

21        MR. BOYD:  Right.

22        THE COURT:  We're looking at 39.

23        MR. BOYD:  Right.

24        THE COURT:  So we know that most offenders, if they don't

25   have any enhancements and they are in the top level, they are

1    going to be in a lower range that this defendant because they

2    wouldn't have those additional enhancements.

3         MR. BOYD:  Judge, we rely on the Court to impose a fair

4    sentence, and I know that the Court will.

5         I do think there that has been a piling on of some

6    enhancements.  I mean, it's hard for me to say there's not at

7    least an attempt to try to give him more time than other

8    defendants in this jurisdiction would get when we have an

9    enhancement that, based on the objections or the response to

10   our objections, the United States says this is an issue of

11   first impression in the Eastern District.  And that's what we

12   started out with, talking about the affection of two

13   individuals up here, Ms. Talbert or Ms. Campbell, either one.

14        But that means that every time anyone else before today

15   walked in this courtroom, they weren't put with the threat of a

16   possibility that they could get a two-point enhancement that

17   Mr. Taylor is.

18        And I guess the question I have is, if we look at the

19   whole history of this case from the day he was arrested and his

20   actions thereof and forward with the United States and the

21   acceptance of responsibility, that we're in a position that

22   we're being -- that they are asking the Court to impose an

23   enhancement that's never been imposed before.  Why?  Why

24   Mr. Taylor?  Why is this just happening now?

25        THE COURT:  Are you saying that you were surprised by this

1    because it was not included in the plea agreement or suggested

2    in the plea agreement --

3        MR. BOYD:  No, Your Honor, not at all.

4        THE COURT:  -- that was signed?

5        MR. BOYD:  What I'm saying to you, the United States says

6    in their objections, response to objections to PSR, if you

7    read -- objection, two-level enhancement for fear, at least two

8    or three projected witnesses will address the enhancement.

9    "This enhancement is a matter of first impression in this

10   district."  That's what I'm referring to, Judge.

11       THE COURT:  So that doesn't mean it can't be applied.

12       MR. BOYD:  Absolutely not.  But I also --

13       THE COURT:  But you're giving the impression that it's

14   being done incorrectly or wrongly for some reason, for improper

15   reasons by the United States.

16       MR. BOYD:  Judge, the issue that I'm raising to the Court

17   is, you've had I don't know how many defendants here that

18   have -- I would venture that there have been more that have had

19   more drug dealing and have a higher criminal history with four

20   points that puts them in Category III.  None of those people

21   had the United States seek this enhancement against them.  I

22   don't know the answer to why.

23       I also know that Mr. Taylor has done everything he can

24   possible to try to make up for his mistakes.  There is a motion

25   that we filed that the Court's aware of.  I'm not saying that

1    you -- that it's improper, that they can't -- obviously, we

2    made the argument, we responded to it.  And we're asking the

3    Court not to impose it.

4        The question that we have is, why is this a first

5    impression and why is Maurice Taylor the one that's been chosen

6    to be presented as this?  What's the motivation?  Why?  And

7    that's something I'm not going to get an answer to, but I am

8    raising it with the Court because it states this is a matter of

9    first impression.

10        Judge, with regard to that enhancement, we've got Talbert

11    with one transaction, Campbell stores this for two months the

12    first time, and then from January -- I guess February to

13    August.  You know, and my question is whether or not the Court

14    can use this enhancement.  I'm not --

15        THE COURT:  Let me just tell you, I completely credit

16    Ms. Campbell's testimony.  I think she provided 100 percent

17    accurate testimony to the Court today.  I don't see any reason

18    whatsoever to discount her testimony, especially her testimony

19    that she was essentially blackmailed beginning in early 2021 by

20    Mr. Taylor, that if she didn't allow him to use that premises

21    there, that he had drugs stored there and bad things would

22    happen to her.

23        There's no doubt in my mind, none whatsoever, that he made

24    those statements to her.  I believe her testimony on that.  And

25    as a result, she had to leave her house open.

1      Now, again, it's a different issue when she's sentenced

2 because we have an issue under reasonableness under 5K2.12, but

3 that's for her to argue.

4      But with regard to her testimony about why she did it, I

5 believe her 100 percent, that she did it because she was

6 essentially being threatened.

7      Now, maybe she should have gone to the police.  But

8 because she didn't go to the police, I do further find that

9 Mr. Taylor took advantage of that, used her premises, either

10 picked up or delivered or had delivered drugs to that location

11 ten to 15 times from January through the time that her premises

12 was searched in August.

13      MR. BOYD:  Judge, we've already made our argument about

14 that, and that's that if she was under such threat, then why

15 does he have to ask her permission to come?  And that's why we

16 don't think it's credible, but I understand the Court's --

17      THE COURT:  Well, I think she is credible.

18      MR. BOYD:  I understand, Judge.

19      THE COURT:  I don't think that it's credible to believe

20 what he told her about his dispute with Mr. Wilson.  It's a

21 credibility issue.  And there's not enough information in this

22 record for me to credit his testimony, especially when I look

23 at everything that he did in this particular case with all of

24 these witnesses, with Ms. Talbert, Ms. Campbell.  It's just not

25 credible to give that statement any credence, it's just not.

1        MR. BOYD:  Ms. Talbert was -- if Ms. Campbell was being

2    truthful, then her statement that he bailed him out because of

3    money would have to be credible too though, right, Judge?

4        THE COURT:  No.

5        MR. BOYD:  So she's credible on every other point but

6    that?

7        THE COURT:  No, he may have said that to her.  He may have

8    said that to her, but do I believe it was truthful when he said

9    it to her?  No.  I don't have to accept what he says.  He

10    didn't testify here.  She may have -- he may have told her

11    that, but I don't have to accept that.

12        MR. BOYD:  That's why you're the fact finder, Judge.

13        THE COURT:  Yes, sir.

14        MR. BOYD:  Yes, sir.

15        THE COURT:  Yes, sir.  I will make findings of fact in

16    this case at this time on the areas that are subject to

17    objection.

18        First, with regard to paragraph 7, the United States has

19    indicated that it does not believe it's necessary to include

20    this information in the plea agreement.  But notwithstanding

21    that fact, I believe that there is quite a bit of evidence that

22    would confirm some of the information contained in this

23    paragraph, but it doesn't affect the guideline calculations.

24    It does explain in part Mr. Taylor's connection with the

25    Sinaloa drug cartel and how that continued after these

1    particular dates.

2        With regard to the objections in paragraph 8 -- but first,

3    inasmuch as the government has not sought to include this, I'll

4    sustain the objection based on the government's position to

5    that information in paragraph 7.

6        I will overrule the objection to the information in

7    paragraph 8.  The objection really starts -- not after -- not

8    with the date, but the objection really starts with Taylor

9    engaged in an agreement with members of the organization

10   outside the Eastern District of Kentucky to receive shipments

11   of cocaine and fentanyl at irregular intervals, and that is

12   clearly established by the testimony of all the witnesses in

13   this particular case, as well as the information that is

14   contained in the plea agreement and admitted to by the

15   defendant.

16       The shipments did originate outside the Eastern District

17   that were delivered to Lexington, and the locations did include

18   the Wheatcroft Drive address where Mr. Brown lived on two

19   occasions, as well as the Lucille Drive address, which there

20   were shipments there where Mr. Taylor secretly hid drugs there

21   initially.  And then when it was discovered by Ms. Campbell,

22   finally in December they were removed.  But then in January, a

23   year later, he started using the residence again and was doing

24   so by threatening or blackmailing Ms. Campbell in order to use

25   that location.

1        And he continued to do that on several occasions for the

2  first seven to eight months of 2021 at the Lucille Drive

3  address, ten to 15 occasions during that period of time.

4  Resulting in the search that occurred in August of 2021, at

5  which time 7.9 kilograms of fentanyl was located.

6        Ms. Campbell did not know the nature of the drugs or the

7  amount of drugs that were stored there, but I credit Mr. Taylor

8  with making arrangements to have those drugs delivered to that

9  address.  And he was using the address to store the drugs, for

10  storage purposes through that entire period based upon all the

11  testimony that has been presented.

12        Turning over to paragraph 11, it doesn't affect the

13  guideline calculations, but I do find the defendant was

14  residing in North Carolina during relevant periods of time in

15  this conspiracy.  That's supported by the testimony of both

16  Ms. Talbert as well as Ms. Campbell in the case.

17        I also find there is support for the information contained

18  in paragraphs 12 and 13, and will also overrule the defendant's

19  objections to those paragraphs.

20        This includes first in paragraph 12, information about

21  Ms. Talbert picking up drugs from the defendant at Mr. Brown's

22  residence at his direction.  She was stopped by police.  There

23  were the drugs that were then located there as set forth in

24  that particular paragraph.

25        And I will also find that there is factual support for the

1    information in paragraph 13 that discusses the relationship

2    between Mr. Taylor and Ms. Campbell and his use of her

3    residence at Lucille Drive, and he used a number of other

4    individuals, including Mr. Wilson and Mr. Trigg, to pick up

5    substances from that location.

6        With regard to the individuals involved, I further find

7    that there is more than five individuals involved in this

8    conspiracy.  It's only necessary that the defendant exercise

9    control over or directions to one of those individuals, and

10   he's done that on more than one occasion with more than one

11   individual, including Ms. Campbell as well as Mr. Wilson.  But

12   there are other individuals, not only those that are charged in

13   this case, but also Mr. Warren -- Mr. West, the individual that

14   was also involved in this case?

15       MR. WEST:  Mr. Warren Miller, sir.

16       THE COURT:  Miller.

17       MR. WEST:  Yes, sir.

18       THE COURT:  So the information is supported by testimony

19   as to paragraph 14.

20       And Mr. Wilson's testimony also supports the information

21   contained in paragraphs 19 and 20 of the presentence report.

22   And that information reflects two amounts of fentanyl, amount

23   that was found on his person as well as a clear baggie that was

24   found at the location.  That fentanyl I do find came from

25   Mr. Taylor for distribution during the course of the

1    conspiracy, and Mr. Wilson was following directions of

2    Mr. Taylor at that time.

3         There is also objections to paragraphs 23, 24, and 25.

4         With regard to paragraph 23, Campbell, Ms. Campbell did

5    testify consistently with the information in the report.  The

6    objection will be overruled for the reasons previously stated.

7         And also Mr. Brown testified that he did agree and

8    permitted Taylor to maintain and use his residence, including

9    for unloading purposes on at least two occasions.  That may not

10   be sufficient to give rise to the enhancement for use of a drug

11   premises, but the parties will be able to argue subsequently

12   the issue with regard to Ms. Campbell's presence under relevant

13   authorities in the Sixth Circuit.

14        There have been no Sixth Circuit authorities cited, but I

15   will refer the parties to *Johnson, Bell*, as well as *Hernandez*

16   from the Sixth Circuit on the issue of maintaining a drug

17   premises.

18        Finally, with regard to paragraph 25, it does not affect

19   the guideline calculations in this case, but the United States

20   is correct that information in the plea agreement of Mr. Trigg

21   would be sufficient to establish the information that's

22   contained in the report with regard to Mr. Trigg's conduct, but

23   that does not affect the guideline calculations with regard to

24   Mr. Taylor.  But I do find that Mr. Trigg was also involved in

25   this drug trafficking conspiracy.

1        Finally, I also credit Mr. Wilson's testimony with regard

2   to the time at which Mr. Taylor was involved as well as the

3   information contained in the plea agreement in this particular

4   case, which does refer to 2017.  But Mr. Wilson indicated his

5   involvement, as well as Mr. Taylor's involvement, was as early

6   as 2016, so that was within the ten-year period that would be

7   relevant to the objection made to paragraph 55, and so that

8   objection will be overruled as well.

9        Those are the additional factual findings that the Court

10  will adopt in this particular case.

11       Turning to the plea agreement -- excuse me, the

12  presentence report, I'll also adopt all other findings that are

13  not inconsistent with the findings that I made here this

14  afternoon in this proceeding.

15       There are some objections, Mr. Boyd wanted to argue those

16  while we were going through the factual issues in the case.  So

17  I'll hear from the United States, but then I'll also give him a

18  chance to respond briefly to these objections if he wishes to

19  do so.

20       First, Mr. West, of course it is your burden with regard

21  to any enhancement.  The base offense level in the case, level

22  34, I believe was agreed to by the parties in the plea

23  agreement.  But the drug quantities that have been included

24  also would support that base offense level based upon fentanyl

25  and then historical quantities of cocaine that are not subject

1    to objections.

2        The first objection relates to paragraph 32 of the

3    presentence report, whether the defendant maintained a premises

4    for the purpose of manufacturing or distributing a controlled

5    substance, then the Court is to increase by two levels under

6    2D1.1(b)(12).

7        Mr. West.

8        MR. WEST:  Yes, sir.  Maintaining a residence doesn't

9    require that it operates a crack house statute.  In this case,

10   Mr. Brown's testimony was accurate.  His testimony -- I mean,

11   his testimony stated that he was hired by Mr. Taylor and paid

12   $300 on each occasion to receive drugs into his location.  They

13   were repackaged.  According to his testimony, they repackaged

14   what turned out to the fentanyl, excuse me, at his residence.

15   Two may or may not be a maintenance of a location, that will be

16   subject to interpretation by the Court.

17       But, however, in regards to Ms. Campbell's residence, it

18   is clear that that residence was maintained in whole or in part

19   by Ms. Campbell and Taylor.  Although initially removing that

20   bag that was in the pink bin, which she later quotes Mr. Taylor

21   saying that was heroin, and that was essentially removed, the

22   statements that she testified to in regards to why did you

23   allow this person to keep controlled substances?  This may not

24   be a direct quote, but she spoke about her conversation with

25   Mr. Taylor.  And his response was, "you don't know what I have

1    there.  You don't know what could be buried in the back yard."

2        Now, it's not a secret that this amount of fentanyl is one

3    of the largest seizures in the Eastern District of Kentucky.

4    It may be the largest seizure.  I don't have enough grasp of

5    all these facts recently.  And it was maintained in that

6    location.  Mr. Wilson said he had gone to her location, and

7    Mr. Trigg's plea agreement talks about going to that location

8    to pick up items as directed by Mr. Taylor.

9        This not being a storage unit, this not being the trunk of

10   a car in a parking lot, this is in a residence.  The

11   maintenance is subject to a factual interpretation or factual

12   findings by the Court, whether or not it was maintained.

13       This type of drug, as this Court is aware and is common

14   knowledge, is extremely and exceedingly dangerous.  Even the

15   mere touch of fentanyl to a person could be fatal.  That

16   characterization of what the fentanyl looks like and the

17   testimony of Ms. Campbell that she felt in fear from

18   Mr. Taylor, we believe the burden has been and there is

19   sufficient factual record to provide the assessment of

20   maintaining a place for the purpose of distribution, sir.

21       THE COURT:  Mr. West, are you familiar with really three

22   decisions from the Sixth Circuit?  Two of those are written by

23   Judge Sutton, and they are really the leading cases on this

24   particular enhancement.

25       The first one is from 2013, *United States versus Johnson*.

1          The second is also authored by Judge -- Chief Judge

2    Sutton, *United States versus Bell,* that's from 2014.

3          And then a third case is an unpublished case, but it was a

4    case that I had.  And it involved an individual, Pablo

5    Hernandez, who had -- essentially he was a marijuana dealer,

6    and Mr. Hernandez was using an abandoned warehouse in Richmond

7    to store the marijuana.  I think during the course of the

8    conspiracy, he may have stored it there three times.

9          Mr. Hernandez was -- the supplier -- Mr. Hernandez was not

10   being paid.  And in order to bring things even, he was promised

11   in the shipment of cocaine that he was going to get two kilos

12   to distribute.

13         Unfortunately, the load got lost so Mr. Hernandez took it

14   upon himself to go and find the cocaine.  And he did that, and

15   he was assessed for the conspiracy, all of the cocaine, not

16   just the two kilos but all the cocaine that he was involved in.

17   But then also the marijuana.

18         And the question was, on the marijuana, did he maintain

19   this abandoned warehouse outside of Richmond?  He didn't rent

20   it.  He didn't really have any type of legal interest in the

21   location itself, but he did control it at the time the

22   deliveries were made until the marijuana could then be

23   distributed to other locations.

24         And the Court in that case, I think it was Judge McKeague

25   that wrote the opinion, he talks about the fact that you don't

1    have to have an ownership interest in premises to maintain the

2    premises, because most of the time drug dealers don't do that,

3    they use other locations.  And they are still subject to these

4    enhancements.

5        And he talks about situations in which houses are used by

6    suppliers and they pay off the person that's living at the

7    house in drugs so they can maintain the drugs in another

8    location so they are not connected to it.

9        And in that case, Judge McKeague says the cases are clear

10   that informal dominion over a site, even if it doesn't come

11   with a formal right to exclude others or right of control, is

12   enough because maintaining a premises enhancement doesn't come

13   with a statute of frauds defense.  In other words, you can't

14   say, you can't tie me to this location through a lease, through

15   any type of ownership interest, but it's maintaining, of what I

16   did to maintain it.

17       So the question here is whether it's any different when a

18   person uses a third party, pays them off in drugs, or if a

19   person uses a third party through whatever other means it may

20   be, but maintains control over the premises.

21       Is there really any factual -- or is there any real

22   difference in those situations?

23       MR. WEST:  Not to the United States, Your Honor.

24       And if I could reflect back to the facts just briefly?

25   This is not a situation where drugs were dropped off and

1    maintained at that location forever and that's it, and there is

2    no other shipments.

3         What Ms. Campbell testified to was the Hispanic male came

4    on at least two occasions and unloaded items from the axles,

5    which she saw remnants of in her house.  And whenever the very

6    first item was removed, there are additional items that came

7    into the house, in addition to the items from the male

8    Hispanic.

9         And then on the day of the arrest of this situation, the

10   defendant goes to the residence and gets a kilo of cocaine out

11   of there, and the 17 kilos of fentanyl are found up there.

12        My review does not require that the actual titled owner or

13   titled leaseholder be compensated for using that.  That's not

14   even an issue here.

15        THE COURT:  Well, there are three elements, right, for

16   this enhancement?

17        MR. WEST:  Yes, sir.

18        THE COURT:  Knowingly -- this is by the defendant, so we

19   look at what the defendant's --

20        MR. WEST:  Correct.

21        THE COURT:  -- his relationship to this location.  We

22   don't look at the person living there.  We look at the

23   defendant, right?

24        MR. WEST:  Yes, sir.

25        THE COURT:  The elements are whether the defendant

1   knowingly opens or maintains any place, that could be within a

2   house, for the purpose of manufacturing or distribution of

3   controlled substance.  And we know from *Johnson* and *Bell* that

4   when we talk about manufacture or distribution, that could be

5   for storage purposes, because --

6        MR. WEST:  Correct.

7        THE COURT:  -- in *Johnson*, for example, there were three

8   deliveries over an eight-month period of time and the Court

9   said it's clearly sufficient.

10       MR. WEST:  Yes, sir.  In this situation, applying that

11  factual scenario, and whether or not at the time of the offense

12  that Mr. Taylor had a key, I think is immaterial, because the

13  testimony from Ms. Campbell was he would call and say "Trigg is

14  coming over" or "Shad is coming over."  And Ms. Campbell

15  testified that she would on occasion leave the back door open

16  for them to come in and get what they need or what they were

17  designated to do so.

18       The fact that a surrogate or the actual titled owner is

19  there does not mean in any way, shape or form that's a

20  requirement.

21       As this Court's aware, and anybody who does drug work, it

22  is a less than intelligent drug dealer who keeps a house in his

23  own name and puts his 17 kilos of fentanyl in there, in a place

24  under his own name.

25       By using Ms. Campbell in the manner he did, he maintained

1    that location on Lucille Drive as a place to store his drugs.

2         THE COURT:  Yes, sir.  Thank you.

3         I do want to give Mr. Boyd a chance to respond.  I have

4    referred to three cases, and so if he would like to address any

5    of these cases, he can certainly do so.  Of course, in *Johnson*,

6    the Court held that drug storage was a significant or important

7    reason for the defendant to maintain the premises involved

8    because it's not just trafficking but it's also a delivery

9    point and then storage.

10        And it was also important because there was continuing of

11    that location, of that house.  And Judge Sutton also pointed

12    out that not all the drugs were picked up immediately after

13    they were received in that house.

14        He makes an interesting point at the end.  At the

15    beginning of the case, he talks about how this two-level

16    enhancement was added after the Fair Sentencing Act of 2010 at

17    the direction of Congress.  And the enhancement essentially

18    follows very closely with the statute, Title 21, Section 856 on

19    maintaining a premises.

20        But he also indicates in that case, and then in other

21    cases, that some facts may be sufficient in one case but that

22    doesn't mean that they are necessary in every single case.

23    That may be important when citing cases from other circuits as

24    opposed to the Sixth Circuit.

25        So, Mr. Boyd, if you would like to further address this

1    issue, you can certainly do that.

2         MR. BOYD:  Judge, I think I've stated kind of the argument

3    that we had in our objections.

4         And also I understand and appreciate what the Court said

5    with regard to possessory interest.  I think that was our main

6    objection to it, was the fact -- and I think Ms. Campbell

7    testified that she -- and I understand the Court has pointed

8    out a difference in the *Hernandez* case.  But Ms. Campbell

9    stated that she rented the residence in 2016, that she paid

10   rent.  She is the one that basically took care of that.  She

11   did allow him, when she was in a relationship with him, to have

12   a key to the residence and indicated that she subsequently

13   found some drugs that were stored there.

14        She didn't indicate to the Court through testimony that

15   she knew of any type of distribution back in that original

16   storing of the drugs there.  She found that they were there,

17   she told him to come get them and to get rid of them.  She then

18   took her key back.

19        So the time period that I think that's been the main focus

20   is the January 2021 to the August 2021 period of time.  It had

21   been indicated in her plea agreement that she had seen -- that

22   basically the three individuals, Mr. Trigg, Mr. Wilson,

23   Mr. Taylor, had come there either together or on their own and

24   indicated drug pickups.

25        I'm not sure how that testimony comes about when she said

1    she never saw anything and she didn't want to know what was

2    there.  That's the only way that we really can dispute what

3    Ms. Campbell said.  Because she kind -- there's two different

4    ways to look at that.

5        If she didn't want to know and kind of took an

6    I-don't-want-to-see approach to it, and it's whatever is in the

7    closet is what's in the closet, I don't want to know, then I

8    don't know what testimony has been offered that is saying that

9    there were movement of drugs in and out, other than --

10       THE COURT:  Well, the testimony would be essentially that

11   the defendant demanded access to the house, essentially made

12   threats, or what would be in the nature of threats when he was

13   denied access.  He was then given access on ten to 15 occasions

14   for the specific purpose that he been kicked out originally a

15   year earlier, storing drugs at the premises.

16       MR. BOYD:  I understand, Judge.  That's your

17   interpretation.  Our position is that's not what happened and I

18   am going -- I have maintained that.  That's my client's

19   position.  That's not what he relates to me and that's not what

20   we believe was the situation.

21       She was seeking his affection.  There is a reference to,

22   "You don't know what I have buried in your yard."  I think

23   there's some logical conclusions from that.  If you can look in

24   your yard and there's not unturned earth, then nothing's been

25   buried in your yard.

1    If you have a child in your house and you think there is

2    dangerous drugs, then unless you are in kind of an agreement

3    with the defendant, then you're going to try to make sure that

4    your child is safe.

5    I respect what the Court's saying.  I'm not going to

6    take -- and I can't agree.  That's just not our position that

7    that's what happened.

8    The ten or 15 different times that she relates, you know,

9    she would open the door and leave, the two times with the

10   Hispanic that came there, she didn't see drugs unloaded.  I

11   think there's an inference there that can be made.  But she

12   didn't indicate that that happened.

13   We don't really know if that duffle bag -- she's not a

14   witness who can tell us what moved in and out of that house

15   because she was never, quote, watching that.

16   THE COURT:  She was scared to death to look at it.

17   MR. BOYD:  I appreciate that's the Court's position.  I

18   don't believe --

19   THE COURT:  Well, I'm basing it on the testimony.  You're

20   basing some of your argument on things that aren't evidence in

21   the case.

22   MR. BOYD:  This is the first time she ever made that

23   statement, Judge.  It's not in her plea agreement, there's not

24   one reference to that he forced her to do this.  None of that's

25   been in anything.  It's not in the discovery.

1      THE COURT:  She testified to it from the witness stand

2  because I asked her the question.

3      MR. BOYD:  She's also getting a 5K probably for that too.

4  I don't think -- we --

5      THE COURT:  You're arguing credibility.  You're arguing --

6      MR. BOYD:  Absolutely.

7      THE COURT:  -- because she may get a 5K, I should discount

8  all that testimony.  It's like when you bite somebody's ear off

9  and you say, well, gee, I didn't see him bite the ear off, but

10  you saw him spit it out.  So there's an inference that he bit

11  the ear off, right?

12      MR. BOYD:  I agree that --

13      THE COURT:  So here we have 7.9 kilograms of fentanyl in

14  Ms. Campbell's residence, and the only people that had access

15  to the residence were people that Mr. Taylor allowed to have

16  assess for an eight-month period of time.

17      MR. BOYD:  I would assume that her counsel would have

18  related that fear to the United States and that would be

19  included in what her factual summary would be so that she could

20  argue that to the Court.

21      That doesn't become relevant or even testimony that's part

22  of this case until we raise objections that will offset.  So

23  that's the credibility issue we're raising.  And, you know, I'm

24  going to have to stand by it.  I'm here to advocate for my

25  client.

1    And the bottom line is if that were the big and pervasive

2    thing, then we would be dealing with a situation where that

3    would be in her -- that would be in her plea agreement and we

4    would be talking about it.

5    But only now, when we raise an objection and say this

6    wasn't what was going on, she's got a different story to tell.

7    And, you know, that kind of takes away the idea that she

8    doesn't give a key because she's maintaining the residence.  It

9    discounts the fact that she desires a relationship with him.

10    And, Judge, you know, I can't really concede on that

11    point, that's just the position that we have.  And the points

12    that we've made, I understand the Court's position that you

13    don't have to pay the rent, you don't have to do any of those

14    things.

15    THE COURT:  Well, that's the Sixth Circuit authority.  I'm

16    not making this up, I'm citing case law.  You have not cited

17    case law.  You cited one case from the Seventh Circuit.  You

18    didn't cite any cases from the Sixth Circuit, including those

19    two seminal cases that really are the leading cases by the

20    chief judge of the Sixth Circuit.

21    And in *Johnson*, for example, there were three deliveries

22    made over an eight-month period of time, not ten to 15

23    deliveries over that same period as we have, I believe, in this

24    case.

25    MR. BOYD:  Right.  We just are getting to a place where we

```
 1   can't agree.  Because the ten or 15 times, she said that they
 2   came for reasons other -- Mr. Wilson said he went to her house
 3   and it wasn't always about drugs.  We heard that testimony
 4   today.  He said that.
 5        I don't know if we're going to discount some of his
 6   testimony because he contradicted with hers.  But he simply
 7   stated up there, yeah, I went over to her house.  He came over
 8   and did her shrubs.  Went over with Mr. Taylor, according to
 9   him, and was at the residence.  That doesn't seem like a
10   situation where somebody's under so much fear that they just
11   invite you over to have like a cordial situation.
12        So, I mean, as much as, you know, we don't agree, I think
13   that the testimony can be viewed in a different way.
14        THE COURT:  All right.
15        MR. BOYD:  So that's our position.
16        THE COURT:  I'll overrule the objection to paragraph 32.
17   I do find that the United States has met its burden of proof
18   with regard to this enhancement.  Earlier I had identified the
19   elements that have to be established for this particular
20   enhancement, there are three.  That the defendant knowingly
21   opens or maintains any place for the purpose of manufacturing
22   or distributing a controlled substance.  That's the elements
23   listed in the *Johnson* case.  That's 737 F.3d 444.  And then
24   also repeated in *United States versus Bell*, 766 F.3d 634.
25   *Johnson* is a 2013 case, *Bell* is a 2014 case.
```

1          The element that's really in dispute in this particular

2     case -- well, I suppose they are all in dispute.  I do find

3     that the defendant's actions were knowingly.  It's established,

4     when we only look at Ms. Campbell's testimony, that the

5     defendant knowingly maintained a place for the purpose of

6     storing and distributing controlled substances, her home,

7     earlier but then specifically -- not only earlier, but also in

8     2021 for approximately an eight-month period of time.

9          I find that her testimony is credible that approximately

10    ten to 15 times he would have essentially forced her to allow

11    him access, or some of his subordinates access, to the home for

12    the purpose of storing drugs at that location until they were

13    ready for distribution.  Of course some of the entries into the

14    home would have been to acquire some of the drugs for purposes

15    of distribution.

16         But for a continuous period of time, I do find that there

17    was a storage of drugs.  I do find that the fact that

18    Ms. Campbell did not look and discover the drugs does not mean

19    that they were not there but she had sufficient information,

20    and based upon the defendant's prior actions approximately a

21    year earlier.

22         And it's not just the threat that he made about, "you

23    don't know what I buried in the yard," but it's what he had

24    hidden in the home that was critical here and it motivated her

25    to allow access.

1       He didn't need a key because when he would call, she would

2   make the premises available either by opening the door or being

3   there to open the door.

4       And so I do find that under the circumstances presented,

5   that the evidence does support the enhancement for maintaining

6   a drug premises.

7       Next, Mr. West, I also will note for the record, I have

8   considered the information in Application Note 17 as well as it

9   bears on this issue in addition to authority from the Sixth

10  Circuit.

11      The next objection relates to paragraph 33, and that's the

12  aggravating role enhancement -- well, let me go to 35 first,

13  it's the adjustment for being an organizer or leader that

14  involved five or more participants or was otherwise extensive,

15  so let's address that first.

16      3B1.1, paragraph 8, I do consider all the testimony that's

17  been presented, including Mr. Wilson's testimony, who

18  identified a number of individuals, who didn't identify all of

19  the co-conspirators in the case but he identified at least four

20  plus Mr. Taylor, and he indicated that he was taking

21  instructions from Mr. Taylor during the course of the

22  conspiracy.

23      MR. WEST:  Yes, sir, that is correct.  Mr. Wilson's

24  testimony on this issue is unrefuted.  He implicated himself as

25  being a member of that organization.  Being one, he talked

1    about Mr. Trigg being there.  Mr. Wilson talked about

2    delivering controlled substances on behalf of Mr. Taylor to

3    individuals which we did not ask him to identify, picking up

4    cash and proceeds from these individuals.

5          He identified Trigg as a person who took direction from

6    Mr. Taylor.  I would include also Mr. Trigg's plea agreement,

7    which was sworn to under oath, as to he took direction from

8    Mr. Taylor also, borne out by the fact that Ms. Rae'Shawna

9    Campbell said Trigg came to her house to pick up matters after

10   Mr. Taylor said that he's going to come over, leave the back

11   door open or something of that nature.

12         Additionally, Ms. Ouisha Talbert in this matter, it does

13   not require more than one act to be a portion of an

14   organization or a group.  In this matter, perhaps her conduct

15   is the lowest role out of all of these people, but Mr. Taylor

16   did give her direction, "I'll meet you back at your apartment,

17   I'll come back and get this matter."  Ms. Rae'Shawna Campbell

18   of course testified that she did this at the direction of

19   Mr. Taylor.

20         And Mr. Brown said on at least two occasions these matters

21   were done -- the two shipments of cocaine that came through the

22   axles, through the Hispanic person, were at the direction, at

23   the request of Taylor in which he was paid $300.

24         That's Wilson, Trigg, Ouisha Talbert, Rae'Shawna Campbell,

25   and Tannare Brown, and some of these unrelated individuals.  I

1    think the proof is overwhelming, Your Honor, the facts are

2    overwhelming that he was a leader of five or more persons,

3    leader over an organization of five or more persons.

4        THE COURT:  Just one second, please.

5        Mr. Boyd, would you like to further state your position on

6    this enhancement?

7        MR. BOYD:  Judge, thank you, Your Honor.

8        I guess one of the first things we point out to the Court,

9    three of the individuals pled guilty to the conspiracy and they

10   are the three that we are -- at least our argument to the Court

11   is that they were the three individuals that were all involved

12   in equal level of this conspiracy.  That's Eric Trigg, who

13   didn't testify today and has been sentenced, and that's Shad

14   Wilson, who did testify, and Mr. Taylor.

15       When you hear from Ms. Campbell, she said that all three

16   came over there.  They came individually, they came together.

17       Mr. Wilson indicated that they used his residence to cut

18   and to distribute different levels of the drug operation.

19       When we talk about Ouisha Talbert, Your Honor, I think

20   that one thing I would like the Court to consider is that she's

21   not coming over to try to be involved in any type of drug

22   operation.  We have one incident.  In that one incident, she's

23   admittedly thinking that he is with some other individual.  He

24   pings her to come over there.

25       When he puts the bag into her car, he does say, "meet you

1    at your residence."  But I think that was already inferred that

2    they were going to meet at her residence because they were

3    involved in a relationship.  I think that could be seen outside

4    the scope of any type of drug operation.  And I don't know that

5    she should be considered someone that was party to this.

6        We've got the other individual I think that was mentioned,

7    that is the Hispanic that's not been indicted, to be

8    determined.

9        Ms. Campbell, if we're -- if she's just simply being used

10   and she's under threat of force, then I don't know that she can

11   be considered part of the organization.

12       So we submit to the Court that we don't believe that

13   there's five or more participants that would validate --

14       THE COURT:  Say that again.  Because she's being

15   threatened, you don't think she can be part of the conspiracy?

16       MR. BOYD:  Judge, we don't believe that she -- if she

17   doesn't know what's going on, she's not looking at what's going

18   on, we don't believe that she should be considered a

19   participant in terms of the calculation for the leadership

20   enhancement.  That's the argument that we would submit to the

21   Court.

22       Your Honor, I think that what we have tried to present to

23   the Court is that you've got Shad Wilson, who is -- who knows

24   Ansar, Sorrow, before he does, who is in a criminal case with

25   him.  We've got the testimony of Ms. Campbell that basically

1    states he was in money trouble.

2        Mr. Trigg has got a -- if you look at criminal history of

3    the defendant, these are not people that were recruited into

4    this lifestyle.  They were people that were already involved,

5    if you look at those three.

6        And the decision-making authority, I know there's been

7    testimony here today, at least from Mr. Wilson with regard to

8    the orders, according to him, that Mr. Taylor ordered him to do

9    certain things.

10        Mr. Taylor, obviously he doesn't agree that he was in

11    charge of these individuals.  I think that kind of the argument

12    that we would go back to, Judge, is that if he is the leader

13    and he is the one in charge, at least it's our theory that a

14    leader doesn't have to go basically grab the product and try to

15    sell a kilo of the cocaine.

16        THE COURT:  What about an organizer?  You don't have to be

17    a leader to get an enhancement, you can be an organizer.

18        MR. BOYD:  I understand, Judge.

19        THE COURT:  You have to direct people or tell people where

20    to go to pick drugs up, where to deliver the drugs.

21        MR. BOYD:  Right.

22        THE COURT:  Similar to the testimony of Mr. Wilson.

23        MR. BOYD:  Yes, Your Honor.  And if the Court's inclined

24    to increase anything on a leadership enhancement, we would much

25    rather prefer a two-point enhancement under (c) for an

1   organizer, leader for a group that's less than five.  And would

2   ask the Court that, if you were inclined to impose that

3   enhancement, that you impose it under the subsection (c), with

4   two levels.

5        We would ask the Court to not impose it at all.  We

6   believe that Mr. Wilson and Mr. Trigg and Mr. Taylor were all

7   operating on the same level.

8        THE COURT:  All right.  Thank you.

9        I do find that the four-level enhancement is properly

10  applied under Section 3B1.1, subsection (a), "If the defendant

11  was an organizer or leader of a criminal activity that involved

12  five or more participants or was otherwise extensive, increase

13  by 4 levels."

14       I do find that there were more than five individuals in

15  the conspiracy itself and that the defendant did, in fact, give

16  instructions and directions to more than one of those

17  individuals on more than one occasion, including Mr. Wilson,

18  who testified about his conduct in the case, that he was

19  directed at all stages by the defendant.  I do credit Shad

20  Wilson's testimony in that regard.

21       The individuals involved include, of course, Mr. Trigg and

22  Mr. Wilson, who were from time to time instructed to pick up

23  drugs as indicated in the factual summary of the presentence

24  report.

25       There hasn't been a lot of testimony about Mr. Trigg, but

1    certainly Mr. Wilson was following instructions.

2         And I also find that Ms. Campbell was, although perhaps

3    not willingly, she was following the defendant's instructions,

4    she knew or she should have known.  She couldn't assert a claim

5    of deliberate ignorance in this particular case based on her

6    prior activity that there were drugs being stored at her

7    residence, and that were being stored there at the direction of

8    Mr. Taylor, and she was afraid to object more strongly than she

9    did.

10        Also Mr. Brown was involved in the conspiracy per the

11   request of Mr. Taylor.  There were at least two loads of drugs

12   that were delivered to his residence, large loads that were

13   delivered, and then the drugs were taken out of axles from

14   trailers.  So Mr. Brown was involved, as well as Ms. Talbert.

15        And also while her -- while she indicated that she was not

16   completely aware at the time, there is sufficient evidence to

17   conclude, based on her plea agreement in part, that she did

18   have guilty knowledge that she was given drugs to return with

19   to the residence.

20        And then also in addition to Ms. Talbert, Warren Miller,

21   who was identified by Shad Wilson during his testimony as being

22   another member of the conspiracy during the time charged in the

23   indictment.  That would be in addition to the defendant

24   himself.  So there is more than five participants.

25        "A 'participant' is a person who is criminally responsible

1    for the commission of the offense, but need not have been

2    convicted" in the case.  And the Court does consider all of the

3    application notes, including Application Note 4, which gives

4    the Court a number of factors to consider in determining the

5    exercise of decision-making authority.

6        That it does include "the nature of participation in the

7    commission of the offense."  And in this case, the defendant

8    was involved in all levels overseeing the drug trafficking

9    organization, as well as the recruitment of accomplices, which

10   would include Mr. Wilson and as well as Miss Campbell and

11   others.

12       "The claimed right to a larger share of the fruits of the

13   crime," while there is no specific evidence presented on that

14   point, a number of individuals that have testified that were

15   co-conspirators in the case received little or no profit from

16   their participation.

17       Also look at "the degree of participation in planning or

18   organizing the offense," as well as "the nature and scope of

19   the illegal activity, and the degree of control and authority

20   exercised over others."  And these factors would call the Court

21   to conclude that the defendant was the leader of at least this

22   part of the organization located in the Eastern District of

23   Kentucky.

24       There is no basis to enhance anything less than four

25   levels.  Four-level enhancement is appropriate under the

1    guidelines section.  The objection to paragraph 35 will be

2    overruled.

3          And finally, Mr. West, with regard to the offense level

4    calculations, the objection to paragraph 33 is to the section,

5    the two-level increase under 2D1.1(b)(16)(A)(i).  And Mr. Boyd

6    has already argued, he will get a chance to address this again,

7    but I would like for you to state your position with regard to

8    that particular enhancement.  That is, the defendant using

9    relationships -- 2D1.1(b)(16)(A) states that there should be a

10   two-level increase if the defendant -- first, if he has a role

11   enhancement under 3B1.1, and the role offense involved one or

12   more of the following factors:  First is, "the defendant used

13   fear, impulse, friendship, affection, or some combination

14   thereof to involve another individual in the illegal purchase,

15   sale," transportation, "or storage of" the "controlled

16   substance."

17         Second, "the individual received little or no compensation

18   from the illegal purchase, sale," transportation "or storage of

19   controlled substances."

20         And the third is that "the individual had minimal

21   knowledge of the scope and structure of the enterprise."

22         MR. WEST:  Yes, sir.  I'll use the Court's determination

23   that found Ms. Campbell's testimony entirely credible in this

24   matter, that is accurate.

25         That section of the guidelines is broader than I thought.

1    And Mr. Boyd is correct, it is, as far as I know, a case of

2    first impression.  But as the Court stated, doesn't mean it

3    can't be applied in this matter.

4         The facts are very unique, very tailored, very narrow in

5    regards to Ms. Campbell's testimony.  And "the defendant used

6    fear, impulse, friendship, affection, or some combination

7    thereof to involve another individual."  Is that accurate?

8    Yes.

9         Was there friendship?  Initially.  Was there fear?  She

10   testified to that too.

11        Did it involve the transportation or storage of a

12   controlled substance?  Clearly.  The testimony from Mr. Wilson

13   and Ms. Campbell is items were stored there.  There was no

14   distribution taking place, there was no use taking place.

15        And there was -- the individual received little or no

16   compensation.  That's accurate also.  Ms. Campbell said she

17   didn't receive any money for this matter.

18        And the individual had minimal knowledge of the scope and

19   structure of the enterprise.  She delivered nothing.  She

20   picked up no drug proceeds.  The items were not, as I said, cut

21   down, diluted with an inert substance there.  She did not know

22   anything about the connection, Sinaloa connection that's been

23   referred to that brought the items in there.  Certainly she had

24   minimal knowledge.

25        There's sufficient evidence in the court record for the

1  Court to determine by the preponderance of the evidence that

2  this guideline is appropriate, Your Honor.

3        THE COURT:  Thank you.

4        MR. WEST:  Sir.

5        THE COURT:  Mr. Boyd, I'll let you respond, if you would

6  like.  I'll consider your previous argument with regard to this

7  particular enhancement.

8        MR. BOYD:  Your Honor, did you say that I could respond

9  again?

10       THE COURT:  If you would like to, to Mr. West's arguments.

11 I'll consider your earlier statements to the Court.

12       MR. BOYD:  Thank you.

13       THE COURT:  But I do give you the opportunity to respond

14 to Mr. West.

15       MR. BOYD:  Thank you, Your Honor, I appreciate that.  And

16 I won't belabor the point.

17       I think probably based on the Court's statement about the

18 credibility and belief of Ms. Campbell's statement, that I

19 would like to point out to the Court just one additional

20 argument with regard to this.

21       It looks as though, at least my interpretation is that

22 you've got to have all three of the elements there.  And I've

23 looked at element three, the individual had minimal knowledge

24 of the scope and structure of the enterprise.

25       The Court's previously ruled that the individuals that

1    have been listed, Mr. Trigg, Mr. Wilson, Mr. Taylor, were all

2    part of this organization.  We also know that there was

3    Mr. Brown involved.  According to the Court's finding, he

4    participated in the unloading, or at least the location where

5    they were allowed to unload the axles.

6         If we look at what Ms. Campbell was able to observe, she

7    was able to observe both Mr. Wilson, Mr. Trigg and Mr. Taylor,

8    according to her, come over ten to 15 times and participate in

9    distribution of drugs that were at her premises.

10        She also knew of two occasions where at least for some

11   reason there were axles involved.  And my belief and

12   understanding, at least to some degree, that that's how the

13   drugs were being transported.  I think that potentially offsets

14   Section 3 where the individual had minimal knowledge of the

15   scope and structure of the enterprise.  I would ask the Court

16   to overrule the enhancement based on the fact that Ms. Campbell

17   did have more than minimal knowledge.

18        In her plea agreement, it does state that she did know

19   about the sale of illegal drugs and transport of illegal drugs.

20   I would ask the Court to take that into consideration since

21   that is in her plea agreement.

22        And I would ask the Court to overrule based on the failure

23   to meet all three elements, specifically the third element with

24   regard to minimal knowledge.

25        THE COURT:  All right.  Thank you.

1          The government's position with regard to the stash house

2     is much stronger with regard to Ms. Campbell's residence than

3     it is to Mr. Brown.  But this particular enhancement would also

4     apply to Mr. Brown's residence.

5          First, this particular enhancement, subparagraph (16)(A),

6     would not require all three elements, because it states "if the

7     defendant receives an adjustment under 3B1.1," that's the

8     aggravating role adjustment, "and the offense involved one or

9     more of the following factors," it does not say it involves all

10    three of the following factors.

11         But I do find that all three are met with regard to

12    Mr. Taylor's use of Mr. Brown for unloading drugs at his home,

13    and it applies also to Ms. Campbell as well.

14         The first element, "the defendant used fear, impulse,

15    friendship, affection or some combination thereof," and in this

16    particular case with regard to Mr. Brown, Mr. Taylor did rely

17    upon his friendship, developed this friendship over some period

18    of time, and then used that friendship to have Mr. Brown agree

19    that his home could be used for the first delivery, when

20    Mr. Brown was surprised that there were drugs, that this

21    happened, but was not on the second occasion.

22         Mr. Brown received $300, which is very little compensation

23    for the amount of drugs that were delivered on those two

24    occasions.  And they were about the same amount each time, very

25    large amounts of drugs.  And it's clear that Mr. Brown had

1   minimal knowledge of the scope or the structure of the

2   enterprise that Mr. Taylor had going.

3       Ms. Campbell had a little bit more information of the

4   scope -- of the fact that drugs were being stored at her home

5   in 2021.  But there's no evidence that she had a great deal of

6   knowledge, or really more than minimal knowledge about the

7   structure of Mr. Taylor's enterprise or its scope, that would

8   include quantity of drugs as well as other relevant issues.

9   And there is no indication she received any compensation for

10  the defendant basically forcing himself to -- forcing her to

11  allow him to utilize her residence.  And he did, in part, rely

12  upon friendship and affection in doing so.

13      So I do find that with regard to both residences, both

14  Mr. Brown as well as for Ms. Campbell, that this enhancement is

15  properly applied.

16      Do I know whether this has been applied previously in the

17  district?  No.  But it is in the guidelines.  It is supported

18  by the facts of the case and it is properly applied in this

19  particular case.

20      So I do find all the elements are met, I will overrule the

21  objection to paragraph 33, which is a two-level increase.

22      And then finally, with regard to criminal history section,

23  the defendant has objected to one point being assessed under

24  paragraph 55.  He contends that the conviction reflected by

25  this paragraph occurred more than ten years prior to the start

1    of the defendant's involvement for this case.

2         That is not factually supported either by the plea

3    agreement where the defendant acknowledges participation in

4    2017, or by the facts in this hearing that were brought out

5    through Shad Wilson that establish an earlier date.

6         So I do find that the one point is properly assessed for

7    this conviction, and the defendant is properly placed in

8    Criminal History Category III.

9         I also find it's not necessary for the Court to make

10   further findings on the objection to paragraph 64, which is

11   other criminal conduct which does not result in criminal

12   history points being assessed.  The defendant's position on

13   that is noted for the record.

14        So I will adopt all the findings that I have made in the

15   course of this proceeding, as well as the findings contained in

16   the presentence report that are not inconsistent with my oral

17   findings.

18        I'll also adopt the guideline calculations contained in

19   the presentence report.  I'll go through those calculations at

20   this time.

21        The 2021 edition of the guideline manual has been used to

22   perform these calculations.  There are two counts of

23   conviction, Count 1 from the second superceding indictment,

24   conspiracy to possess with intent to distribute and to

25   distribute five kilograms or more of a mixture or a substance

1    containing a detectable amount of cocaine, and 400 grams or

2    more of a mixture containing a detectable ability of fentanyl.

3        The second count of conviction is Count 7 from the second

4    superceding indictment, possession with the intent to

5    distribute 500 grams or more of a mixture or a substance

6    containing a detectable amount of cocaine.

7        The drug quantity is properly included in the base offense

8    level of calculation as offense level 34.  It is also

9    consistent with the parties' recommendation contained in

10   paragraph 5(b) of the plea agreement.  There is the two-level

11   increase for maintaining a drug premises or a stash house in

12   paragraph 32.

13       Two-level increase for the aggravating role for using

14   friendship or affection or some combination for storage at two

15   locations.  That's, again, a two-level increase.

16       And then there is a four-level increase for leadership

17   role under 3B1.1.  That results in an adjusted offense level of

18   42.

19       There is a three-level reduction shown for acceptance of

20   responsibility, and before the Court may apply the third level

21   of acceptance credit under 3E1.1(b), it does require a motion

22   from the government.

23       MR. WEST:  We make that motion at this time, sir.

24       And may myself and defense counsel approach the bench

25   briefly, sir?

1          THE COURT:  On this issue of acceptance of responsibility?

2          MR. WEST:  No, sir.  We do move for that additional one

3     level.  Yes, sir.

4          THE COURT:  Why don't you let me finish going through the

5     guidelines?

6          MR. WEST:  Of course, sir.  Thank you.

7          THE COURT:  Thank you.

8          That results in a total offense level of 39.  And there is

9     information about the defendant's criminal history in Part B of

10    the report.  He has four criminal history points, that places

11    him in Criminal History Category III for purposes of

12    calculating the guideline range in the case.

13         The guideline range for the period of incarceration is

14    properly calculated and set forth in paragraph 79, that's a

15    range of 324 to 405 months.

16         The statutory provisions for Count 1 is a minimum term of

17    ten years, a maximum of life.  For Count 7, it's a minimum of

18    five years and maximum of 40 years.

19         The statute provides for supervised release as reflected

20    in paragraph 81 under Count 1 of at least five years.  It's not

21    less than five years nor more than life.  And for Count 7, not

22    less than four years nor more than life.  And the range for

23    supervision for Count 1 is five years and for Count 7 is four

24    to five years.

25         The fine range in the case, which is calculated according

1    to both the statutory maximum fine as well as the fine

2    contained in the fine table in 5E1.2, the minimum is $50,000,

3    with the maximum fine being $15 million in the case.

4         Those are the calculations that are adopted in this

5    matter.

6         And now, Mr. West, if you would like to come up?

7         MR. WEST:  Yes, sir, please, sir.

8         (The following portion is sealed and contained under

9    separate cover.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (The previous portion was sealed and contained under

2  separate cover.)

3    THE COURT:  Thank you.

4    We will proceed at this time with allocution in the case.

5  It's my practice to first turn to counsel for the defendant to

6  hear any additional statements, and then I'll also allow the

7  defendant an opportunity to make a statement as well.

8    After I have heard from the United States in response, if

9  counsel for the defendant would like to reply, you may do that

10  as well.

11    So, Ms. Slaughter or Mr. Boyd, if you have additional

12  comments or statements you would like to make on behalf of

13  Mr. Taylor, you may proceed.

14    MR. BOYD:  Your Honor, thank you for hearing our arguments

15  today.

16    Mr. Taylor, the first thing I can tell the Court is, from

17  the moment that he was arrested he has been remorseful for his

18  actions.  He has been willing to accept responsibility along

19  the way.  This has been a little bit of a long journey.  There

20  were two indictments that came along, and when he was

21  offered the plea agreement that's in front of the Court that's

22  the subject of this sentence, he did enter the plea at that

23  time.

24    He has made a lot of bad decisions in his life and he has

25  come from a place where he kind of learned the way of the world

1   through the streets.

2       He's remorseful for the people that he hurt.  I think that

3   he, in the course of this, has felt a lot of his own actions,

4   how they affect others, and he is seeing how they were going to

5   affect the rest of his life.

6       I would ask the Court to sentence the defendant to the low

7   end of the guideline range.  The sentence we're looking at at

8   this point would be one that's going to put him in prison for

9   at least a 27-year period of time, which is a very, very long

10  time for a 46-year-old man.

11      We appreciate that the Court's within the range that we're

12  at.  We've made our arguments otherwise.  I know that

13  Mr. Taylor would just ask the Court to consider his history and

14  character.  He's got a limited criminal history with regard to

15  at least the points that have been scored against him, a DUI,

16  and I believe it was a possession charge, Judge.

17      Mr. Taylor has done his best to kind of bankrupt himself

18  of the corrupt ways that he's had.  He's been in custody for

19  quite a long time.  He's got a loving wife behind him and two

20  children that care about him no matter what.  And I'd just ask

21  the Court to consider a sentence at the bottom end of the

22  guideline range.

23      THE COURT:  Thank you.

24      Mr. Taylor.

25      THE DEFENDANT:  First off, I would like to apologize

1    to my wife and my children, my aunt and the courts.  Not to

2    speak on what happened today, but again, they making me

3    out to be somebody that nobody's ever made me out to be, a

4    bully, threatening lives.  I've never done that.  Make people

5    do things against their own will?  That's not my character

6    and never has been.  I had never even been raised like that.

7        True enough, I made bad decisions that got me to this

8    point, and I'm highly remorseful and I truly apologize.

9        But to be labeled as I'm giving orders, threatening

10   people's lives to do something against their will, I think

11   that's far-fetched.  And I understand that they try to say this

12   too, but I shouldn't be with the knife in my back for

13   everybody's a willing participant.  They knew what they was

14   doing, we all did.

15       But did I make anybody do anything?  Did I lead or

16   organize anybody?  Your Honor, not one time.  Not one time.

17   And I just ask the Court just to have a small bit of mercy for

18   me.  27 years is a long time for me not to be able to hold my

19   wife and my children again, or my aunt.  I just ...

20       THE COURT:  Mr. West.

21       MR. WEST:  Yes, sir.  As a housekeeping matter is

22   concerned, the defendant, having pled guilty to Counts 1 and 7

23   of the second superceding indictment, we would move to dismiss

24   the underlying indictments as they pertain to Mr. Taylor, as

25   well as Counts 2, 3, and 9 of the second superceding

1    indictment.

2        I would ask that the forfeiture of the cash be listed in

3    the judgment and conviction of the defendant.

4        This is one of those cases where a thorough review of the

5    facts has been placed before this Court.  I have no additional

6    facts to place before the Court.  I would ask the Court to

7    impose a sentence within the established guidelines range and

8    respect the Court's discretion as to the final sentence.

9        Thank you, sir.

10       THE COURT:  Mr. Boyd, any additional comments?

11       MR. BOYD:  No, Your Honor.

12       THE COURT:  All right.  Thank you.

13       First, I will sustain the United States' motion to dismiss

14   the additional counts in the second superceding indictment, as

15   well as the original indictment and the first superceding

16   indictment as it relates to Mr. Taylor.  That dismissal will be

17   effective upon entry of the judgment in this case.

18       With regard to the sentence to be imposed in this matter,

19   as I indicated in my comments to counsel earlier, the Court

20   does not do just anything that it wishes to do.  The Court does

21   consider all the information that has been provided.  And

22   considers the information, first the guidelines, but then also

23   the information in the context of the factors of 3553 that are

24   to be taken into account.

25       Of course, those factors do include the nature and the

1    circumstances of the offense, as well as the history and the

2    characteristics of the defendant.  I also consider the need for

3    the sentence to reflect the seriousness of the offense or

4    offenses, the need to promote respect for the law and to

5    provide a just punishment, also to afford deterrence.  And

6    deterrence is twofold.  It's both specific deference for this

7    defendant as well as general deterrence for others that might

8    be inclined to engage in similar conduct.

9        If the Court is able to provide deterrence, then it's also

10   able to protect the public from any future crimes of the

11   defendant with regard to specific deterrence.

12       And the Court considers rehabilitative issues under

13   3553(a)(2)(D).  In this particular case, I will be recommending

14   to the Bureau of Prisons that the defendant participate in a

15   job skills or vocational training program during the period of

16   incarceration.

17       There are a number of factors in the statute.  One factor

18   that I will comment upon in a little more detail in just a

19   moment is the need to avoid unwarranted sentencing disparities

20   among defendants with similar records who have been found

21   guilty of similar conduct.

22       The Court also considers information contained in the

23   sentencing memorandum.  There's been a couple of references

24   made to the sentencing memorandum, but I do want to make a

25   couple of additional comments.  I have considered all of that

1    information.

2        But the memo does start out by describing the defendant as

3    a broken and immoral man.  It's probably a fair

4    characterization.  But in this particular case, the defendant

5    makes a number of apologies to his family, to the Court, but he

6    doesn't mention the community and the damage that's he done to

7    communities with the volume of drugs that he's peddled in this

8    district and have been handed out to others or sold to others.

9    And we don't know the total damage.

10       But we do know the approximate quantity of drugs, and it's

11   a large amount, as Mr. West indicates.  And it does include

12   fentanyl, which is, as we should all know at this point, a very

13   dangerous substance, but it didn't seem to bother Mr. Taylor at

14   the time that he was doing that.

15       It didn't seem to bother him at the time that he's

16   basically left destruction in his wake with these other

17   co-defendants in this particular case.  Now, some had criminal

18   records, and perhaps it can be said that there's probably not a

19   lot of sympathy that would go out to them.

20       But with regard to other individuals, it's a different

21   story.  He has caused individuals to acquire federal

22   convictions that will affect them for the remainder of their

23   lives, and he's responsible for that, such as his involvement

24   of Ms. Campbell in this particular case, Mr. Brown in this

25   particular case, his involvement with Ms. Talbert in this

1    particular case.

2         And so I just find that his apologies do ring hollow with

3    regard to his actions compared to his current apologies.

4         Now, when we look at the sentencing memo for just a

5    moment, going back to the sentencing memo, I do consider a

6    person's history and their characteristics, including the

7    information provided to the Court at the bench by counsel.

8         When we go back to the information in the sentencing

9    memorandum, as indicated at page 3 of the sentencing memo,

10   Mr. Taylor's actions were reprehensible and they are deserving

11   of punishment, and very serious punishment in this particular

12   case.

13        There is then a discussion about the fact that

14   Mr. Taylor's not the least culpable of offender under the

15   statute but he's not the most culpable.  And then there is this

16   conversation or this discussion about sentences near the

17   statutory maximum that should be reserved for the worst

18   possible offenders.  I referred to this earlier in my questions

19   or comments to counsel.  This case does not involve statutory

20   maximum penalties.

21        In the case of Count 1, statutory maximum is life.  In the

22   case of Count 2, it's not less than five nor more than

23   40 years.  So we're, I think, mixing apples and oranges here

24   when we immediately jump into guidelines sentences or

25   sentences that are imposed for other cases that are not similar

1  and then make the comparison between, for example, a

2  person that's sentenced for murder on average receives a

3  sentence of 258 months.  And that would be all those sentences

4  under, I believe, 2(A) of the sentencing guidelines, which

5  would include homicides, it would include a number of other

6  convictions.

7       But in this particular case, we're talking about a person

8  that's in a total offense level 39 with Criminal History

9  Category III.  It creates a guideline range of 324 to 405

10 months.

11      And there are very few people in that range, quite

12 frankly, or above that range, as I've indicated in my questions

13 to counsel based on the number of individuals that were

14 sentenced in 2021, either in total offense level 39 or above in

15 Criminal History Category III.  There are just not that many to

16 compare.

17      But we do know when we look at a number of reports from

18 the sentencing commission, that as the penalty increases, there

19 is a decline in recidivism rates.  And the study in particular,

20 2016 study, deals with persons sentenced at 60 months or more,

21 120 months or more.  But the trend line does indicate that as

22 sentences do increase, there is a greater -- excuse me, there

23 is a less risk of recidivism as a result of those higher

24 sentences.

25      So when individuals are in a Criminal History Category III

1    and in a total offense level of 39, that does merit a

2    substantial sentence.

3         Now, the sentencing memo also makes reference to the fact

4    that, quote, a sentence at the statutory maximum would nullify

5    any benefit Mr. Taylor received from an adjustment for

6    acceptance of responsibility.  Well, that's not true.  That's

7    not true at all.  Because he has been given credit for

8    acceptance of responsibility, he's not in a sentence or range

9    of life, which would be the maximum statutory sentence that is

10   allowed.

11        So I do consider the information, but there are some

12   misleading statements that are contained in the sentencing

13   memorandum that do need correction.

14        When we turn to, again, the factors of 3553, I do consider

15   the circumstances of this offense.  As indicated, I do feel

16   like it's quite serious.  The defendant involved a number of

17   other individuals.

18        The issue of deterrence is one that I do consider, both

19   specific as well as general deterrence, as well as the need to

20   protect the public.  I do not find a reason to go below the

21   guideline range in this particular case.

22        And my starting point in this matter is more toward the

23   middle of the range, but then I consider a number of negative

24   characteristics that have been brought out throughout the

25   course of this proceeding, some of which do involve others.

1   And the defendant has been given enhancements as a result of

2   his activities that do involve others or involve a stash house,

3   using other's property.  So I do consider the fact that some of

4   this information has been accounted for in the guideline range.

5        I get down to the point where I consider unwarranted

6   sentencing disparities.  I do not find it would be an

7   unwarranted sentencing disparity to impose a sentence within

8   the guideline range for this defendant when I consider other

9   individuals that have similar backgrounds that have been found

10  guilty of similar conduct.

11       This is one of the more egregious drug cases that I have

12  seen, and although I do consider the defendant's statements

13  that he's not the person he's made out to be, I disagree, I

14  think he's exactly the person he's been made out to be, which

15  is a high-level drug dealer who's distributed large quantities

16  of very dangerous drugs thought the Eastern District of

17  Kentucky for a lengthy period of time.

18       He's involved other individuals.  And I do find that he

19  has made the implicit threats that I discussed earlier with

20  regard to Ms. Campbell, for example.  I do find that he's left

21  a path of destruction and I don't find that he's really had

22  much thought or much consideration about family members that he

23  now seeks to apologize to.

24       My determination for the sentence in this case is

25  385 months for all of those reasons.  I don't find any reason

1    to go below that number or that would justify a sentence below

2    that number.

3        I'll announce the sentence.

4        It will be the sentence of the Court pursuant to the

5    Sentencing Reform Act of 1984, as modified by the decisions in

6    *Booker* and *Fanfan*, and I do find the following sentence to be

7    sufficient but it's not greater than necessary to meet all of

8    the purposes of Title 18, Section 3553(a).

9        Therefore, it will be the judgment of the Court that the

10    defendant, Maurice A. Taylor, also known as Wee Wee, will be

11    committed to the custody of the Bureau of Prisons for a term of

12    385 months on each of Counts 1 and 7 to run concurrently, to

13    produce a total term of 385 months.

14        I will recommend to the Bureau of Prisons that the

15    defendant participate in a job skills and vocational training

16    program during the period of incarceration.

17        Upon release, he will be placed on supervision for

18    five years on each of Counts 1 and 7 to run concurrently, to

19    produce a total term of five years.

20        And within 72 hours of release from the custody of the

21    Bureau of Prisons, the defendant must report in person to the

22    probation office in the district in which he is released.

23        While on supervision, he may not commit another federal,

24    state or local crime.

25        He must comply with the mandatory and the standard

184

1    conditions adopted by the Court and that will be set forth in

2    the judgment and commitment order.

3        He is also required to comply with the following special

4    conditions, there will be four.

5        First, he will be required to refrain from any use of

6    alcohol.

7        Second, he must participate in urinalysis testing or any

8    other form of substance abuse testing as directed by the

9    probation office.

10       He must refrain from obstructing or attempting to obstruct

11   or tamper in any fashion with the efficiency and accuracy of

12   any substance abuse testing which is required as a condition of

13   release.

14       He may not knowingly use or consume any substance that

15   interferes with the accuracy of substance abuse testing.

16       Third, he will be required to submit his person, as well

17   as any offices, properties, homes, residences, vehicles,

18   storage units, papers, computers or other electronic

19   communications or cloud storage locations, data storage

20   locations or media to a search conducted by the probation

21   office.

22       The failure to submit to a search will be grounds for

23   revocation of supervision, and he must warn all occupants that

24   his premises would be subject to a search according to this

25   condition.

1          The fourth special condition is that he provide the

2     probation office with access to any requested financial

3     information.

4          And while it's been my determination under 5E1.2,

5     subsection (d), that I'll not be imposing a fine in the case

6     because I do conclude that it would impose a hardship on his

7     family.

8          I do find it's necessary to include both a search

9     condition as well as the condition that he provide financial

10    information to the probation office as a means of ensuring that

11    he does not return to criminal activity of the type that's

12    resulting in this conviction.

13         So based upon his current financial situation, and my

14    finding that to impose a fine would create an undue hardship

15    for his family, I will waive the fine requirement and the

16    requirement for community restitution.  But the defendant will

17    be ordered to pay to the United States a special assessment of

18    $200, that's $100 for each count of conviction.  That will be

19    due immediately.

20         And the judgment will reflect that he's required to

21    forfeit all interest in the property listed in the forfeiture

22    allegation of the second superceding indictment, which

23    includes but is not limited to $18,166 in United States

24    currency.

25         And then following this proceeding, the defendant will be

1   remanded back to the custody of the United States Marshal

2   pending service or designation for service of his sentence by

3   the Bureau of Prisons.

4       In the plea agreement, the defendant waived the right to

5   appeal the guilty plea and conviction, but reserved the right

6   to appeal the sentence in the case, and in just a moment, I

7   will ask the clerk to advise him of that right.

8       Before I do that, I'll ask the attorneys to state any

9   objections that they may have, first to the sentence that has

10  been announced, which would include conditions of supervision.

11      Second would be any objections under *United States versus*

12  *Bostic*.   Under that decision from the Sixth Circuit, any

13  objections not previously raised should be raised at this time

14  so that they may be addressed by the Court to be properly

15  preserved for review on appeal.

16      Finally, if either party would like the Court to make

17  additional findings to support any of the matters that have

18  been announced or determined, I will be happy to make those

19  findings upon request.

20      Mr. West.

21      MR. WEST:  Yes, Your Honor.  I apologize, I missed the

22  term of supervised release.

23      THE COURT:  Five years on each of Counts 1 and 7.

24      MR. WEST:  Yes, sir.  There is no objection to the process

25  or the sentence.  There is no *Bostic* objections and no request

 1    for further findings, sir.  Thank you.

 2         THE COURT:  Thank you.

 3         Mr. Boyd or Ms. Slaughter.

 4         MR. BOYD:  All objections that we raised, we preserved,

 5    Judge.  There is no additional objections to the term of

 6    supervised release or any *Bostic* objections at this time.

 7         THE COURT:  All right.  Thank you.

 8         Madam Clerk, if you would please advise Mr. Taylor of his

 9    appellate rights.

10         THE CLERK:  Yes, Your Honor.

11         (The form entitled "Court's Advice of Right to Appeal" was

12    read aloud in open court by the clerk.)

13         THE COURT:  Thank you.

14         Mr. Boyd, if you would like to retrieve the acknowledgment

15    of rights, I'd ask that you review that with Mr. Taylor.  After

16    he has assured himself that he understands those rights, I'll

17    ask that he sign the original document.  There is a copy that

18    he can keep for his records.

19         Thank you.

20         Mr. Boyd, the practice I follow in criminal cases is that

21    if the defendant for whatever reason chooses not to file a

22    notice of appeal, I ask counsel, after the 14-day period for

23    filing a notice has passed, to file a statement in the record

24    to that effect.

25         However, if he chooses to appeal, it's not necessary to

1    file that statement.

2         Any other issues to take up in the case, Mr. West?

3         MR. WEST:  No, sir.  Thank you.

4         THE COURT:  Mr. Boyd?

5         MR. BOYD:  No, Your Honor.

6         THE COURT:  We will be in recess until 9:00 a.m. tomorrow

7    morning.

8         (Proceedings concluded at 5:29 p.m.)

9

10                    C E R T I F I C A T E

11

12         I, Linda S. Mullen, RDR, CRR, do hereby certify that

13   the foregoing is a correct transcript from the record of

14   proceedings in this above-entitled matter.

15   /s/Linda S. Mullen              March 3, 2023
     Linda S. Mullen, RDR, CRR       Date of Certification
16   Official Court Reporter

17

18

19

20

21

22

23

24

25

```
1                        I N D E X

2    GOVERNMENT WITNESS                        PAGE

3    SHAD WILSON
     Direct Examination By Mr. West              5
4    Cross-Examination By Mr. Boyd              17
     Redirect Examination By Mr. West           30
5    Recross-Examination By Mr. Boyd            33

6    TANNARE BROWN
     Direct Examination By Mr. West             39
7    Cross-Examination By Mr. Boyd              47

8    OUISHA TALBERT
     Direct Examination By Mr. West             55
9    Cross-Examination By Mr. Boyd              67

10   RAE'SHAWNA CAMPBELL
     Direct Examination By Mr. West             72
11   Cross-Examination By Ms. Slaughter         91
     Recross-Examination  By Ms. Slaughter     102
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```